IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHRISTINE CONFORTI, ARATI KREIBICH, MICO LUCIDE, KEVIN MCMILLAN, JOSEPH MARCHICA, ZINOVIA SPEZAKIS, and NEW JERSEY WORKING FAMILIES,<br><br>Plaintiffs,<br><br>v.<br><br>CHRISTINE GIORDANO HANLON, in her official capacity as Monmouth County Clerk, SCOTT M. COLABELLA, in his official capacity as Ocean County Clerk, PAULA SOLLAMI COVELLO, in her official capacity as Mercer County Clerk, JOHN S. HOGAN, in his official capacity as Bergen County Clerk, and EDWARD P. MCGETTIGAN, in his official capacity as Atlantic County Clerk, and E. JUNIOR MADONADO, in his official capacity as Hudson County Clerk,<br><br>Defendants. | Civ. A. No. 3:20-CV-08267-FLW-TJB<br><br><br>**ORAL ARGUMENT REQUESTED** |

**BRIEF IN OPPOSITION TO MOTIONS TO DISMISS FILED BY DEFENDANT COUNTY CLERKS OF MONMOUTH, OCEAN, MERCER, BERGEN, ATLANTIC, & HUDSON COUNTIES AND INTERVENOR NEW JERSEY ATTORNEY GENERAL**

Brett M. Pugach, Esq. (032572011)
Yael Bromberg, Esq. (036412011)
BROMBERG LAW LLC
43 West 43rd Street, Suite 32
New York, NY 10036-5083
Telephone: (212) 859-5083
Facsimile: (201) 586-0427
bpugach@bromberglawllc.com
ybromberg@bromberglawllc.com

Flavio Komuves, Esq. (018891997)
WEISSMAN & MINTZ
One Executive Drive, Suite 200
Somerset, NJ 08873
Phone: (732) 563-4565
Facsimile: (732) 560-9779
fkomuves@weissmanmintz.com

*Attorneys for Plaintiffs Christine Conforti, Arati Kreibich, Mico Lucide, Kevin McMillan, Joseph Marchica, Zinovia Spezakis, and New Jersey Working Families*

i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iv

PRELIMINARY STATEMENT ...............................................................................1

PROCEDURAL HISTORY.......................................................................................3

STATEMENT OF FACTS .........................................................................................4

    A.  Parties...............................................................................................................4

    B.  New Jersey's Laws Pertaining to Primary Election Ballots ...........................7

    C.  Position Bias/Primacy Effect, Weight of the Line, and Poor Ballot Design Features.....11

    D.  Forced Association..........................................................................................14

    E.  Ballot Position of Candidates.........................................................................16

        1.  Conforti....................................................................................................16

        2.  Kreibich....................................................................................................17

        3.  Lucide ......................................................................................................17

        4.  Marchica...................................................................................................19

        5.  McMillan..................................................................................................19

        6.  Spezakis ...................................................................................................19

STANDARD OF REVIEW ......................................................................................20

LEGAL ARGUMENT..............................................................................................21

POINT I – THE COURT SHOULD DENY DEFENDANTS'/INTERVENOR'S MOTIONS TO DISMISS THE AMENDED COMPLAINT BECAUSE PLAINTIFFS SUFFICIENTLY ALLEGE A JUSTICIABLE CASE OR CONTROVERSY ........................................................21

    A.  Plaintiffs Have Standing to Bring this Case .................................................21

        1. The Amended Complaint Sufficiently Alleges an Injury-in-Fact to Plaintiffs.….22

            a. 2020 Candidate Plaintiffs..........................................................................22

i

b. 2021 Candidate Plaintiff .......................................................................29

c. NJWF .............................................................................................31

2. The Amended Complaint Sufficiently Alleges that Plaintiffs' Injuries are Fairly Traceable to the Defendants ....................................................................33

3. The Amended Complaint Sufficiently Alleges that Plaintiffs' Injuries are Likely to be Redressed by a Favorable Decision.................................................36

B.  Plaintiffs' Claims are Neither Moot nor Unripe .............................................37

C.  This Case Does Not Present a Nonjusticiable Political Question...................53

POINT II – THE COURT SHOULD DENY DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT BECAUSE PLAINTIFFS ALLEGE PLAUSIBLE FACTS SUFFICIENT TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.................58

A.  Consideration of the Merits is Inappropriate on a Motion to Dismiss...........59

B.  To the Extent Consideration of the Merits is Warranted, the Alleged State Interests Proffered by Defendants are Insufficient to Outweigh the Burdens Imposed by New Jersey's Bracketing and Ballot Placement Laws ...........................................61

1. Significant and Meaningful Burden.................................................61

a. Ordering of Candidate Names...................................................61

b. Visual Cues and the Weight of the Line ...................................67

c. Associational Rights.................................................................69

2. Strict Scrutiny is Warranted.........................................................75

a. Strict Scrutiny is Warranted Under the Balancing Test ............75

b. Strict Scrutiny is Warranted for Reasons Independent of the *Anderson/Burdick* Balancing Test ...............................................85

3.  Defendants'/Intervenor's Alleged State Interests are not Legitimate and are Otherwise not Sufficiently Weighty to Justify the Burdens on Plaintiffs' Rights ..........................................................................89

a. Preserving Ballot Integrity and Avoiding Voter Confusion ......90

b. Providing the Additional Associational Benefits of Visually Aligning Names .................................................................................... 93

4. The New Jersey State Cases cited by Defendants should be Disregarded by the Court or Otherwise Assigned Little to no Value............................................ 98

C. New Jersey's Bracketing and Ballot Placement System Runs Afoul of the Elections Clause of the United States Constitution ........................................................... 103

CONCLUSION .................................................................................................... 108

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                    Page(s)

*Acosta v. Democratic City Comm.*,
   288 F. Supp. 3d 597 (E.D. Pa. 2018)................................................................39, 45

*Akins v. Sec'y of State*,
   904 A.2d 702 (N.H. 2006).....................................................................76, 83, 92

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983) ..........................................................................*passim*

*Anderson v. Martin*,
   375 U.S. 399 (1964) ..............................................................................105

*Arkansas AFL-CIO v. Federal Communications Comm'n*,
   11 F.3d 1430 (8th Cir. 1993) ...................................................................46

*Arons v. Donovan*,
   882 F. Supp. 379 (D.N.J. 1995)..............................................................39, 45

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...........................................................................20, 21

*Bado v. Gilfert*,
   13 N.J. Super. 363 (App. Div. 1951).............................................................99

*Baker v. Carr*,
   369 U.S. 186 (1962) ..............................................................................54

*Batko v. Sayreville Democratic Org.*,
   373 N.J. Super. 93 (App. Div. 2004)..........................................................97, 99

*Belitskus v. Pizzingrilli*,
   343 F.3d 632 (3d Cir. 2003) ..................................................................46, 47

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...........................................................................20, 21

*Benezet Consulting, LLC v. Boockvar*,
   433 F. Supp. 3d 670 (M.D. Pa. 2020)............................................................49

*Bldg. & Const. Trades Council of Buffalo, New York & Vicinity v. Downtown Dev., Inc.*,
   448 F.3d 138 (2d Cir. 2006) ....................................................................32

*Board of Election Comm'rs v. Libertarian Party of Illinois*,
   591 F.2d 22 (7th Cir. 1979), *cert. den.*, 442 U.S. 918 (1979) .................................48

*Bostic v. Schaefer*,
   760 F.3d 352 (4th Cir. 2014) ...................................................................52

*Bullock v. Carter*,
   405 U.S. 134 (1972) ..............................................................................25

*Burdick v. Takushi*,
   504 U.S. 428 (1992) ..........................................................................*passim*

*Bush v Gore*,
   531 U.S. 98 (2000) ...............................................................................81

*Cal. Democratic Party v. Jones*,
   530 U.S. 567 (2000) ..............................................................................69

*Clough v. Guzzi*,
   416 F. Supp. 1057 (D. Mass. 1976).............................................................48

*Colegrove v. Green*,
   328 U.S. 549 (1946) ...................................................................................... 53, 54

*Cook v. Gralike*,
   531 U.S. 510 (2001) ...................................................................................*passim*

*Crawford v. Marion Cty. Election Bd.*,
   553 U.S. 181 (2008) ........................................................ 55, 56, 60, 89, 100

*Davis v. Fed. Election Comm'n*,
   554 U.S. 724 (2008) ...................................................................................... 45

*De La Fuente v. Cort*,
   261 F. Supp. 3d 543 (M.D. Pa. 2017), *aff'd*, 751 Fed. Appx. 269 (2018) .............. 40, 41, 43, 49

*Democratic-Republican Org. of N.J. v. Guadagno*,
   900 F. Supp. 2d 447 (D.N.J. 2012), *aff'd*, 700 F.3d 130 (3d Cir. 2012) ................ 36, 42, 55, 59

*Dep't of Commerce v. New York*,
   139 S.Ct. 2551 (2019) .................................................................................... 52

*Devine v. Rhode Island*,
   827 F. Supp. 852 (D.R.I. 1993) ......................................................... 77, 78, 79

*Diamond v. Pennsylvania State Educ. Ass'n*,
   399 F. Supp. 3d 361 (W.D. Pa. 2019), *aff'd*, 972 F.3d 262 (3d Cir. 2020) ............................. 35

*Doe v. Hodgson*,
   478 F.2d 537 (2d Cir. 1973) ...................................................................... 35, 58

*Donald J. Trump for President, Inc. v. Way*,
   492 F. Supp. 3d 354 (D.N.J. 2020) .............................................................. 31

*Eu v. San Francisco County Democratic Cent. Comm.*,
   489 U.S. 214 (1989) ...................................................................... 82, 97, 101

*Ex Parte Young*,
   209 U.S. 123 (1908) ...................................................................................... 35

*Farrington v. Falcey*,
   96 N.J. Super. 409 (App. Div. 1967) ............................................................ 99

*FEC v. Wis. Right to Life, Inc.*,
   551 U.S. 449 (2007) .................................................................................. 38, 39

*Finberg v. Sullivan*,
   634 F.2d 50 (3d Cir. 1980) ............................................................................ 35

*Gaffney v. Cummings*,
   412 U.S. 735 (1973) ...................................................................................... 55

*Globe Newspaper Co. v. Superior Court*,
   457 U.S. 596 (1982) ...................................................................................... 50

*Gould v. Grubb*,
   536 P.2d 1337 (Cal. 1975) ............................................................ 63, 76, 84, 93

*Graves v. McElderry*,
   946 F. Supp. 1569 (W.D. Okla. 1996) .......................................................*passim*

*Green Party of Tenn. v. Hargett*,
   767 F.3d 533 (6th Cir. 2014) ....................................................................*passim*

*Harrison v. Jones*,
   44 N.J. Super. 456 (App. Div. 1957) ............................................................ 99

*Hawkes v. Gates*,
   129 N.J.L. 5 (N.J. 1942) ........................................................................... 90, 99

*Hicks v. Miranda*,
 422 U.S. 332 (1975) ........................................................................ 56, 58

*Holtzman v. Power*,
 62 Misc.2d 1020 (N.Y. Sup. Ct. 1970) *aff'd*, 34 A.D.2d 917 (App. Div. 1970)......... 62, 63, 92

*Honig v. Doe*,
 484 U.S. 305 (1998) .................................................................................. 46

*In re Burlington Coat Factory Sec. Litig.*,
 114 F.3d 1410 (3d Cir. 1997) ................................................................... 5

*In re Hoffman*,
 134 N.J.L. 155 (1946).............................................................................. 99

*Jacobson v. Fla. Sec'y*,
 957 F.3d 1193 (11th Cir. 2020), *vacated and opinion substituted*, 974 F.3d 1236 (11th Cir. 2020)................................................................................................*passim*

*Jacobson v. Lee*,
 411 F. Supp. 3d 1249 (N.D. Fla. 2019) ................................................... 92

*Joyner v. Mofford*,
 706 F.2d 1523 (9th Cir. 1983) ................................................................. 43

*Kautenburger v. Jackson*,
 333 P.2d 293 (Ariz. 1958) ................................................................. 63, 84

*Kost v. Kozakiewicz*,
 1 F.3d 176 (3d Cir. 1993) ........................................................................ 59

*Lautenberg v. Kelly*,
 280 N.J. Super. 76 (Law Div. 1994)...................................................... 101

*Libertarian Party v. Buckley*,
 8 F. Supp. 2d 1244 (D. Colo. 1998) .................................................. 27, 48

*Los Angeles v. Lyons*,
 461 U.S. 95 (1983) .................................................................................. 38

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992) ...................................................................... 21, 31, 33

*Mandel v. Bradley*,
 432 U.S. 173 (1976) ................................................................................ 57

*Mann v. Powell*,
 314 F. Supp. 677 (N.D. Ill. Dec. 5, 1969), 333 F. Supp. 1261 (N.D. Ill. Dec. 30, 1969), *summarily aff'd*, 398 U.S. 955 (1970) ..................................................*passim*

*Maryland Casualty Co. v. Pacific Coal & Oil Co.*,
 312 U.S. 270 (1941) ................................................................................ 51

*Mayer v. Belichick*,
 605 F.3d 223 (3d Cir. 2010), *cert. den.* 562 U.S. 1271 (2011) ................. 20

*McLain v. Meier*,
 637 F.2d 1159 (8th Cir. 1980) ...................................................... 56, 63, 83, 92

*Med. Soc'y of N.J. v. Herr*,
 191 F. Supp. 2d 574 (D.N.J. 2002)........................................................... 5

*Merle v. U.S.*,
 351 F.3d 92 (3d Cir. 2003) .................................................................*passim*

*Moore v. Ogilvie*,
 394 U.S. 814 (1969) ................................................................................ 39

*Morrill v. Weaver*,
   224 F. Supp. 2d 882 (E.D. Pa. 2002) ................................................................... 50

*Morse v. Republican Party of Virginia*,
   517 U.S. 186 (1996) ............................................................................................ 39

*Moskowitz v. Grogan*,
   101 N.J. Super. 111 (App. Div.) *cert. den.*, 51 N.J. 575 (1968) .................. 90, 99, 100

*Nelson v. Warner*,
   477 F. Supp. 3d 486 (S.D. W. Va. 2020) ................................................... *passim*

*Netsch v. Lewis*,
   344 F. Supp. 1280 (N.D. Ill. 1972) ................................................................ 63, 83

*New Alliance Party v. N.Y. State Bd. of Elections*,
   861 F. Supp. 282 (S.D.N.Y. 1994) ..................................................................... 42

*Norman v. Reed*,
   502 U.S. 279 (1992) ..................................................................................... 60, 100

*Ohio Council 8 Am. Fed'n of State v. Husted*,
   814 F.3d 329 (6th Cir. 2016) ........................................................................ 97, 98

*Pavek v. Simon*,
   967 F.3d 905 (8th Cir. 2020) ................................................................. 27, 52, 54

*PennEnvironment v. PPG Indus., Inc.*,
   23 F. Supp. 3d 553 (W.D. Pa. 2014) ................................................................. 32

*Picou v. Gillum*,
   813 F.2d 1121 (11th Cir. 1987) ......................................................................... 58

*Porter v. Jones*,
   319 F.3d 483 (9th Cir. 2003) ........................................................................ 43, 50

*Powell v. Mann*,
   398 U.S. 955 (1970) ..................................................................................... 57, 63

*Powell v. McCormack*,
   395 U.S. 486 (1969) ........................................................................................... 37

*Quaremba v. Allan*,
   67 N.J. 1 (1975) ..................................................................................... 93, 99, 100

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ........................................................................................... 87

*Reynolds v. Sims*,
   377 U.S. 533 (1964) ........................................................................................... 86

*Richardson v. Caputo*,
   46 N.J. 3 (1965) ................................................................................................ 99

*Rockefeller Ctr. Properties, Inc. Sec. Litig. v. Rockefeller*,
   311 F.3d 198 (3d Cir. 2002) ......................................................................... 59, 64

*Roe v. Wade*,
   410 U.S. 113 (1973) ........................................................................................... 49

*Rosen v. Brown*,
   970 F.2d 169 (6th Cir. 1992) ............................................................................. 78

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
   515 U.S. 819 (1995) ........................................................................................... 88

*RPR & Associates v. O'Brien/Atkins Associates, P.A.*,
   921 F. Supp. 1457 (M.D.N.C. 1995), *aff'd sub nom.*, 103 F.3d 120 (4th Cir. 1996) ............... 36

*Rucho v. Common Cause*,
  139 S. Ct. 2484 (2019)........................................................................ 53, 54, 55, 56, 58
*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
  547 U.S. 47 (2006) ................................................................................................ 52
*Sangmeister v. Woodard*,
  565 F.2d 460 (7th Cir. 1977) ........................................................................*passim*
*Sarvis v. Alcorn*,
  826 F.3d 708 (4th Cir. 2016), *cert. den.*, 137 S.Ct. 1093 (2017) ....................... 47, 50
*Schafer v. Lamone*,
  2006 U.S. Dist. LEXIS 96855, *2-3 n.3 (D. Md. 2006), *aff'd* 248 F. App'x 484 (4th Cir.
  2007), *cert. denied*, 522 U.S. 1313 (2008) ............................................................ 48
*Schundler v. Donovan*,
  377 N.J. Super. 339 (App. Div. 2005)............................................ 100, 101, 102, 103
*Simon v. E. Ky. Welfare Org.*,
  426 U.S. 26 (1976) ................................................................................................ 21
*Smiley v. Holm*,
  285 U.S. 355 (1932) ............................................................................................ 105
*Spencer v. Kemma*,
  523 U.S. 1 (1998) .................................................................................................. 38
*Step-Saver Data Systems, Inc. v. Wyse Technology*,
  912 F.2d 643 (3d Cir. 1990) ................................................................................. 51
*Storer v. Brown*,
  415 U.S. 724 (1974) .............................................................................................. 39
*Surrick v. Killion*,
  449 F.3d 520 (3d Cir. 2006) ................................................................................. 98
*Sweda v. Univ. of Pennsylvania*,
  923 F.3d 320 (3d Cir. 2019), *cert. den.* 140 S.Ct. 2565 (2020)............................... 21
*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ................................................................................................ 5
*Timmons v. Twin Cities Area New Party*,
  520 U.S. 351 (1997) .............................................................................................. 97
*U.S. Term Limits, Inc. v. Thornton*,
  514 U.S. 779 (1995) ............................................................................................ 105
*United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*,
  517 U.S. 544 (1996) .............................................................................................. 32
*United States v. Carolene Products Co.*,
  304 U.S. 144 (1938) .............................................................................................. 86
*Vieth v. Jubelirer*,
  541 U.S. 267 (2004) .............................................................................................. 53
*Vote Choice, Inc. v. DiStefano*,
  4 F.3d 26 (1st Cir. 1993) ...................................................................................... 46
*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) .............................................................................................. 97
*Wayne Land & Min. Grp. v. Del. River Basin Comm'n*,
  894 F.3d 509 (3d Cir. 2018) ................................................................................. 21

*Weisberg v. Powell*,
 417 F.2d 388 (7th Cir. 1969) ........................................................ 26, 63, 64, 80, 83
*Yick Wo v. Hopkins*,
 118 U.S. 356 (1886) ................................................................................................. 86

## Constitution & Statutes

U.S. Const., art. I, sec. 2, cl. 2 ................................................................................... 5
U.S. Const., art. I, sec. 4, cl. 1 ............................................................................... 103
N.J. Const., art. VII, sec. 2, para. 2 ......................................................................... 35
*N.J.S.A.* 19:14-1 ....................................................................................................... 41
*N.J.S.A.* 19:23-14 ..................................................................................................... 41
*N.J.S.A.* 19:23-17 ............................................................................................... 94, 98
*N.J.S.A.* 19:23-24 ................................................................................. 34, 41, 66, 90
*N.J.S.A.* 19:23-26.1 ......................................................................................... *passim*
*N.J.S.A.* 19:23-40 ..................................................................................................... 41
*N.J.S.A.* 19:31-6a ..................................................................................................... 36
*N.J.S.A.* 19:45-1 ....................................................................................................... 66
*N.J.S.A.* 19:49-2 .............................................................................................. *passim*
*N.J.S.A.* 19:63-5 ....................................................................................................... 41
*N.J.S.A.* 19:63-9 ................................................................................................. 30, 42
*N.J.S.A.* 52:16A-2 .................................................................................................... 35
*N.J.S.A.* 52:16A-11 .................................................................................................. 35
*N.J.S.A.* 52:16A-98(b) ............................................................................................. 36

## Rules

F.R.E. 201 ................................................................................................................... 5
Fed. R. Civ. P. 8 ....................................................................................................... 20
Fed. R. Civ. P. 12(b)(6) ........................................................................................... 20

## Other Authorities

5B Wright & Miller § 1357 (3d ed. 2004 and Supp. 2007) ...................................... 5
Announcement by Nicholas A. Chiaravalloti (April 19, 2021), *available at*:
   https://www.tapinto.net/towns/bayonne/sections/elections/articles/nicholas-a-chiaravalloti-
   announcement (last accessed May 15, 2021) ..................................................... 15
Atlantic County Clerk, Official Primary Election Sample Ballot for Atlantic City, *available at*:
   https://www.atlanticcountyclerk.org/wp-content/uploads/2021/05/Atlantic-City-W3-D2.pdf
   (last accessed May 15, 2021) .............................................................................. 18
Brett M. Pugach, *The County Line: The Law and Politics of Ballot Positioning in New Jersey*, 72
   Rutgers U. L. Rev. 629, 632-34 (2020) .......................................................... 86, 87
David Wildstein, *Vainieri Huttle will skip Bergen Dem convention, will run off the line in Senate
   Primary*, NJ Globe (Feb. 23, 2021), *available at*:
   https://newjerseyglobe.com/legislature/vainieri-huttle-will-skip-bergen-dem-convention-will-
   run-off-the-line-in-senate-primary/ (last accessed May 15, 2021) .................... 15

Joshua A. Douglas and Michael E. Solimine, *Precedent, Three-Judge District Courts, and the Law of Democracy*, 107 Geo. L.J. 413 (2018)……………………………………………58

Julia Sass Rubin, *Does the County Line Matter? An analysis of New Jersey's 2020 Primary Election Results*, New Jersey Policy Perspective (August 2020), https://njpppprevious.wpengine.com/wp-content/uploads/2020/08/NJPP-Report-Does-the-County-Line-Matter-Analysis-of-New-Jerseys-2020-Primary-Election-Results-Final-1.pdf …………………………………………………………..…………………13, 69, 82, 94

Laura Miller, Note, *Election by Lottery: Ballot Order, Equal Protection, and the Irrational Voter*, 13 N.Y.U. J. Legis. & Pub. Pol'y 373 (2010)............................................. 75, 76, 80, 87

Max Pizarro, *The 2021 Reemergence of the County Party Chairs*, Insider NJ (Apr. 11, 2021), *available at*: https://www.insidernj.com/2021-reemergence-county-party-county-chairs/ (last accessed May 15, 2021)………………………………………………………………..15

*Powell v. Mann*, No. 1359, Appellants' Motion to Supreme Court, 1970 WL 155703 (March 27, 1970) .......... 57

ROBERT STERN ET AL., SUPREME COURT PRACTICE 287 (6th ed. 1986) ……………..58

Samuel Issacharoff & Richard Pildes, *Politics as Markets: Partisan Lockups of the Democratic Process*, 50 Stan. L. Rev. 643 (1998) ....................................................................... 87

## PRELIMINARY STATEMENT

A ballot must be a neutral and fair forum upon which voters select the candidate(s) of their choice. Yet, New Jersey combines all the worst elements of electioneering, vote dilution, unfair/unequal treatment, forced associations/punishment for non-associations, democracy inhibition, party-insider influence, political gamesmanship, voter confusion, bad ballot design, and candidate ostracization – and features them all prominently on its primary election ballot. The New Jersey primary ballot is an outlier unlike any in the remaining 49 states and the District of Columbia. It weaponizes the ballot to favor certain candidates and associations over others by providing significant structural advantages. At the same time, it also disproportionately disadvantages the electoral prospects of opposing candidates and treats otherwise similarly-situated candidates running for the same office unequally.  By attaching a penalty as a consequence for not associating with candidates running for other offices, it punishes those who exercise their right to not associate and/or forces candidates to associate with candidates running for other offices in order to try to protect their ballot position. Moreover, it does so in a haphazard and chaotic manner where the rules are never clear from the outset and change as they go. Indeed, county clerks, who are charged with administering this rigged system, claim to do so under the cover of unbridled discretion, even though they themselves are beholden to and beneficiaries of the spoken and unspoken rules as publicly elected officials who benefit from the system.

In this manner, New Jersey's laws and practices surrounding ballot order and ballot design in primary elections, as implemented by county clerks, injure Plaintiffs' First and Fourteenth Amendment rights related to the fundamental right to vote, equal protection, and freedom of association. Neither the Defendants nor the State can articulate a legitimate state

interest, let alone a state interest sufficiently weighty to justify the significant burden these laws place on Plaintiffs' rights. The Amended Complaint sufficiently pleads plausible facts to demonstrate that Plaintiffs have been harmed by the Defendants' conduct, and that they are entitled to declaratory and injunctive relief. Moreover, with respect to the federal candidate plaintiffs, Plaintiffs have pled plausible facts that sufficiently allege that these laws and practices, as implemented by the county clerks, violate the Elections Clause of the United States Constitution as they do not represent a valid regulation of the time, place, or manner of elections.

Defendants'/Intervenor's attempts to prevent the Court from reaching the merits of this case are unavailing. Plaintiffs have standing. These laws injure all candidates, including the Plaintiffs, making this both a facial and an as-applied challenge. Their claims are neither moot nor unripe, and/or fall within the well-established exception of being "capable of repetition, yet evading review." The Court should reject Defendants'/Intervenor's disingenuous argument that Plaintiffs' claims are simultaneously too late and too early, a position which would make it essentially impossible to ever fully litigate the constitutionality of these laws and obtain final relief. Moreover, neither Eleventh Amendment immunity nor the Political Question Doctrine bar the Court from hearing this matter. Plaintiffs have set forth detailed factual allegations that allow this Court to apply the well-developed and discernable manageable standards that courts in the Third Circuit and across the country have consistently applied to similar types of claims. Plaintiffs have met all necessary showings to warrant the ability to put on their case. Therefore, Defendants'/Intervenor's seven motions to dismiss should all be denied in their entirety.

**PROCEDURAL HISTORY**

On July 6, 2020, plaintiff Christine Conforti ("Conforti") filed an Initial Complaint against Christine Giordano Hanlon, Scott M. Colabella, and Paula Sollami Covello, in their respective official capacities as the Monmouth, Ocean, and Mercer County Clerks. ECF No. 1. The Initial Complaint challenged the constitutionality of various laws and practices pertaining to ballot position and placement on New Jersey's primary election ballots ("New Jersey's bracketing and ballot placement laws"). *Id.*

Pursuant to a Consent Order signed January 5, 2021, ECF 31, a First Amended Complaint ("Amended Complaint") was filed on January 25, 2021. The Amended Complaint, ECF 33, *inter alia*, added plaintiffs Arati Kreibich ("Kreibich"), Mico Lucide ("Lucide"), Joseph Marchica ("Marchica"), Kevin McMillan ("McMillan"), Zina Spezakis ("Spezakis"), and New Jersey Working Families Alliance ("NJWF") (together with Conforti, "Plaintiffs"). *Id.* The Amended Complaint also named additional defendants, John S. Hogan, Edward P. McGettigan, and E. Junior Maldonado in their official capacities as the Bergen, Atlantic, and Hudson County Clerks (together with the Monmouth, Ocean, and Mercer County Clerks, "Defendants"). *Id.* On March 29, 2021 and/or March 30, 2021, Defendants each filed separate Motions to Dismiss the Amended Complaint. ECF 55, 57, 58, 59, 60, 63.

After a Rule 24.1(b) Letter and an ensuing Order to notify the Attorney General's Office of the case, ECF 36, 39, on March 29, 2021, the Attorney General's Office filed a Motion to Intervene, and a separate Motion to Dismiss the Amended Complaint, ECF 52, 53. The same day, the Court granted the Attorney General's motion to intervene on behalf of the State ("Intervenor"). ECF 54. Shortly after filing the Amended Complaint, Plaintiffs also notified all non-Defendant county clerks in the state of the existence of this lawsuit to enable them to take

any action they deemed appropriate. ECF 33, ¶ 64. On March 30, 2020, James Hogan, in his official as the Gloucester County Clerk, filed a Motion to Intervene which was granted the same day. ECF 61, 62.

In accordance with the Scheduling Order entered April 27, 2021, ECF 66, Plaintiffs now submit this Opposition to Defendants'/Intervenor's Motions to Dismiss. Contrary to Defendant Ocean County Clerk's brief, ECF 55-1, p. 25, and Intervenor Attorney General's brief, ECF 53-1, p. 20 n.3, Plaintiffs are contesting the New Jersey ballot design laws and practices on both a facial and as-applied basis.  Irrespective of the statewide application of these laws, the Complaint makes detailed allegations on how these laws and practices specifically harmed the electoral chances of the named plaintiffs actually before the Court, along with the NJWF.

<strong><u>STATEMENT OF FACTS</u></strong>

Plaintiffs hereby adopt and incorporate by reference, in its entirety, the First Amended Complaint, ECF 33. Plaintiffs also highlight the following.

**A. Parties**

Conforti, Kreibich, Marchica, McMillan, and Spezakis (collectively the "2020 Candidate Plaintiffs") were all candidates in connection with the 2020 Democratic Primary Election held on July 7, 2020. ECF 33, ¶¶ 19, 24, 33, 37, 44. Conforti ran for the U.S. House of Representatives in New Jersey's Fourth Congressional District, Kreibich ran for the U.S. House of Representatives in New Jersey's Fifth Congressional District, Marchica ran for Democratic County Committee in Mercer County from Hamilton Township's 27th Election District, McMillan ran for Township Committeeperson in Neptune Township, and Spezakis ran for the U.S. House of Representatives in New Jersey's Ninth Congressional District. *Id.* The 2020 Candidate Plaintiffs all were and continue to be registered to vote as Democrats within the appropriate district in which they were

running. *Id.* at ¶¶ 21, 26, 35, 43, 46. Conforti, Marchica, and Spezakis have explicitly indicated an intent to run for office again in a Democratic primary election. *See id.* at ¶¶ 23, 36, 47.[1]

      Lucide is a candidate currently running for Atlantic County Clerk in connection with the June 8, 2021 Democratic Primary Election. *Id.* at ¶ 28-32. He is registered to vote in Atlantic County. *See id.* at ¶ 30. At the time the Amended Complaint was filed, Lucide stated he did not want to bracket with any other candidates running for any other offices, but due to the substantial advantages given to bracketed candidates, he was forced to consider seeking the county party endorsement and bracketing with the endorsed candidates solely to protect his ballot position. *Id.* at ¶ 131. A sample ballot reveals that ultimately, Lucide did not bracket with any other candidates, and is listed in a column by himself for the 2021 Primary Election – juxta positioned against a full opposition line of 16 candidates headed by the Gubernatorial race, *see infra* at 17.[2]

---

[1]    Congressional candidates are only required to be residents of the State, not the district they hope to represent. U.S. CONST., art. I, sec. 2, cl. 2. As all Plaintiffs are New Jersey residents, any redistricting of congressional districts for the 2022 election or thereafter would not (as the State claims, *see* ECF 53-1, p. 14) have any effect on their claims. For consistency, Plaintiffs' references to Defendants'/Intervenor's briefs herein and throughout will cite to the *brief* page number, and not to the *ECF* page number.

[2]    On a motion to dismiss, the Court may consider matters of public record or subject to judicial notice under F.R.E. 201. Matters integral to the claim, subject to judicial notice as an adjudicative fact, and in the public record may be considered as part of the complaint. *See* 5B Wright & Miller § 1357 (3d ed. 2004 and Supp. 2007). *See also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (an exception to the general rule that a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings is where a "document [is] integral to or explicitly relied upon in the complaint" or "an undisputedly authentic document." (internal citation omitted)). The material discussed *infra* nn. 4, 5, 10, 11 and *infra* p. 17 are publicly available on websites, including in one instance, a governmental website. Separately, with respect to a factual attack on underlying subject matter jurisdiction pursuant to a Rule 12(b)(1) motion to dismiss, courts may consider materials that are outside of pleadings. *Med. Soc'y of N.J. v. Herr*, 191 F. Supp. 2d 574, 578 (D.N.J. 2002).

Whether he wins or loses in this election cycle, Lucide intends to run for Atlantic County Clerk the next time the office is on the ballot. ECF 33, ¶ 32.

NJWF is a non-profit 501(c)(4) organization that advances progressive policies and works to elect candidates who share its values and policy priorities. *Id.* at ¶ 48. NJWF has various members[3] and has endorsed numerous candidates in primary and other elections, including with respect to the 2020 and 2021 Primary Elections, and plans to do so in future elections. *See id.* at ¶¶ 49, 51-53.[4] NJWF advocates for various issues and causes, *id.* at ¶ 50, and devotes significant resources toward various voter education efforts and other political endeavors, *id.* at ¶ 54. Due to the impact of New Jersey's bracketing and ballot placement system on NJWF's mission and policy goals, NJWF has diverted and continues to divert resources away from its other campaigns and advocacy efforts to educate voters about the county line to advocate against the burdens that New Jersey's bracketing and ballot placement system impose. *Id.* at ¶ 55.[5]

Defendants are county clerks in their respective counties which overlap with counties where Plaintiffs were, are, or will be running for office. *See id.* at ¶¶ 57-62. Their statutory duties

---

[3]     As described *infra* at p. 31, disclosure of organizations member names is not necessary at the motion to dismiss stage; however, the evidence at trial will show Plaintiff Mico Lucide who is running off the line, and Amy Kennedy, a 2020 congressional candidate burdened by having to run off the line, are among NJWF's members.

[4]     *See also* https://workingfamilies.org/2020/12/nj-working-families-2020-endorsements/ (last visited May 21, 2021) (endorsements for 2020 candidates, many of which were in the primary and not bracketed on county line); https://workingfamilies.org/state/new-jersey/ (last visited May 21, 2021) (listing 2021 endorsements, many of which are not bracketed on county line). ELEC filings will also corroborate donations by Plaintiff NJWF to off-the-line candidates.

[5]     *See, e.g.*, https://twitter.com/NJWFA/status/1395517097661419520 (detailing 2021 Democracy Symposium); https://twitter.com/DavidPringle11/status/1388166607608983554 (education through opinion articles); https://www.facebook.com/watch/live/?v=466390060913659&ref=watch_permalink (2020 Democracy Symposium).

make them each responsible for conducting a ballot draw and designing and otherwise preparing ballots in their respective counties. *Id.*

**B. New Jersey's Laws Pertaining to Primary Election Ballots**

Outside of New Jersey, all other states and the District of Columbia organize their primary ballots around the office being sought, followed immediately by the names of the candidates running for that office. *Id.* at ¶ 3. Specifically for primary elections, the overwhelming majority of states use a ballot format which lists the office sought, and then immediately displays all of the candidates for that office directly underneath or to the side (hereinafter referred to as "bubble ballot" or "office block ballot"). *See id.* at ¶ 4 (with accompanying ballot image examples from Nevada and Delaware). Unlike these office block ballots in other states, New Jersey primary election ballots generally contain a grid of columns and rows, with one axis listing candidates and the other axis listing the office sought.[6] *Id.* at ¶¶ 4 (Camden ballot), 66. Unlike all other states and the District of Columbia, which organize their ballots around the office being sought, followed immediately by the names of all the candidates running for that office, New Jersey's primary election ballots are organized by bracketing together groupings of candidates in a specific column. *Id.* at ¶ 3. This is based on a feature of New Jersey law which provides a mechanism for certain candidates running for completely different offices to appear together in the same column ("bracketing"), with the same slogan associated with their names. *Id.* at ¶ 5.

---

[6] For ease of reference, the word "column" will be used to identify the column *or row* where candidates are listed, regardless of whether the county clerk designs the ballots with candidates listed vertically or horizontally.

Bracketing Process

        To bracket with candidates running for other offices, a candidate, after successfully filing a petition, must request to bracket with candidates who filed a joint petition with the County Clerk ("joint petition county candidates")[7]. *Id.* at ¶ 73 (citing *N.J.S.A.* 19:49-2). In order to effectuate bracketing, candidates running for higher or lower level offices have 48 hours from the petition filing deadline to request permission from the campaign manager of the joint petition county candidates, who in turn has 48 hours to grant permission to such candidates to bracket with the joint petition county candidates. *Id.* at ¶ 74 (citing *N.J.S.A.* 19:49-2). Candidates who successfully bracket together will be featured in the same column with the same slogan. *Id.* at ¶ 75.

Preferential Ballot Draw

        In order to determine the ballot position of various candidates, county clerks will draw for a particular office first, which includes all candidates running for that particular office. *Id.* at ¶ 78. The office chosen by the county clerk to draw first is referred to as the "pivot point," and the initial ballot drawing for the pivot point office is referred to as the "preferential ballot draw." *Id.* at ¶ 69. Once a candidate in the preferential draw gets placed on the ballot, all other candidates bracketed with such candidate will also be automatically placed in the same column. *Id.* at ¶¶ 69, 75. Any candidate running for the pivot point office and all of the candidates with whom they are bracketed are hereinafter referred to as "bracketed candidates." *Id.* at ¶ 70. Candidates who are not running for a pivot point office and/or who are not bracketed with candidates running for a pivot point office are not included in the preferential draw and are

---

[7]    In practical terms, joint petition county candidates usually refers to a group of at least two candidates running for county freeholder/commissioner. The office formerly known as county freeholder is now referred to as county commissioner. This Brief will use both names to avoid confusion based on past and future candidacies.

hereinafter referred to as "unbracketed candidates" or as being "not bracketed." *Id.* at ¶ 71. Because candidates bracketed with a pivot point candidate are automatically placed in the same column, all bracketed candidates are eligible to receive the first ballot position, and will be featured further to the left (or further to the top) of the ballot than other unbracketed candidates running for the same office. *Id.* at ¶ 78.

Non-Preferential Ballot Draw and Placement of Unbracketed Candidates

After the preferential draw, a series of non-preferential draws take place between remaining unbracketed candidates for other offices. *Id.* at ¶ 79. These unbracketed candidates are *identical* to bracketed ones in every other way, including having satisfied the same qualifications of office on citizenship, age, and residency, and have properly filed petitions with the requisite number of minimum signatures, associated disclosures and oaths. *Id.* at ¶ 184. Yet, such unbracketed candidates are not eligible to receive the first ballot position, and will be placed further to the right (or further to the bottom) of the ballot than the bracketed candidates running for the same office. *Id.* at ¶ 79. Such unbracketed candidates are not even guaranteed the next available column after the bracketed candidates. *Id.* at ¶ 80. They are often (1) placed at the discretion of the county clerk multiple columns away from the bracketed candidates with only blank spaces in between; (2) stacked in the same column as another candidate for the exact same office; and/or (3) placed in the same column as candidates with whom they did not request to bracket and who requested a different ballot slogan. *Id.* These candidates are harder to find in such obscure portions of the ballot, separated by one or more blank columns from the bracketed candidates, often in random and/or remote ballot positions,[8] and otherwise appearing to be less

---

[8]     The New Jersey election community refers to unbracketed candidates placed in particularly remote ballot positions as being relegated to "Ballot Siberia." In any event, whether separated by just one blank column or several from their county line opponents, the unbracketed

important or serious. *Id.* This further confuses voters and deprives candidates of a fair chance to compete for the same office. *Id.*

<u>Selection of Pivot Points</u>

County clerks typically use joint petition county candidates, such as county freeholders/commissioners as the pivot point, based on the bracketing requirements of *N.J.S.A.* 19:49-2 and interpreting case law. *Id.* at ¶ 77. In years when United States Senator and/or Governor have been up for election, many county clerks have used such offices as the pivot point, based on the requirements of *N.J.S.A.* 19:23-26.1 that candidates for such offices be placed on the first column of the ballot and interpreting case law. *Id.* at ¶¶ 82-83. Sometimes, county clerks have used President as the pivot point. *Id.* at ¶ 85. Which office is used as the pivot point by a particular county clerk is often not announced to the public until after petitions are already filed and the deadline for bracketing requests has already passed. *Id.* at ¶ 86. Nor do county clerks publish practices or standards for ballot design in advance. *Id.* at ¶ 177. The county clerks have also applied varying and internally inconsistent interpretations and standards as to which office the pivot point should be. *Id.* at ¶ 88. These variations have occurred in past elections including the 2020 Primary Election, and have varied from county to county, within the same county in different election cycles, and within the same county and same election cycle but differently by party. *Id.* at ¶¶ 67-68, 72, 89, 177. Some counties have not used bracketing at all. *Id.* at ¶ 68. Some used bracketing for machine ballots but not for vote by mail ballots. *Id.* Some ballots make it impossible to tell what if any office was used as a pivot point. *Id.* at ¶ 89.

---

candidates remain injured by the existence of this empty space. Those placed into especially remote ballot locations – "Ballot Siberia" – suffer an injury that is greater in degree, but not in kind.

**C.  Position Bias/Primacy Effect, Weight of the Line, and Poor Ballot Design Features**

Due to a well-known phenomenon – the primacy effect – a candidate who receives the first ballot position obtains an electoral advantage whereby they receive additional votes simply because they are listed first. *Id.* at ¶¶ 2, 90-91. With respect to New Jersey, (1) overwhelming evidence demonstrates that the primacy effect affords a systematic advantage by giving such candidates more votes solely due to their first position on the ballot, (2) the primacy effect is as large or even greater in primary elections as compared to general elections, and (3) other poor ballot design features specific to New Jersey exacerbate the primacy effect. *See id.* at ¶ 96 (citing ECF 33-2, Joanne M. Miller, *The Electoral Effects of Ballot Design* (June 21, 2020) (finding that primacy effects are extremely likely to have occurred and to continue to occur in New Jersey primary elections)); *id.* at ¶¶ 98-99. Bracketed candidates are always eligible for first ballot position, whereas unbracketed candidates are always excluded from the preferential draw, and thus have no chance to obtain the first ballot position. *Id.* at ¶¶ 78-79, 97. The primacy effect, coupled with other poor ballot design features that exacerbate it, has injured the electoral chances of unbracketed candidates like Plaintiffs, providing a meaningful, yet arbitrary advantage to their bracketed opponents, and is virtually certain to do so with respect to unbracketed candidates in future primary elections. *Id.* at ¶¶ 173, 192.

Other ballot design features influence voters to vote for bracketed candidates and lead to systemic biases and voter confusion resulting in over and under votes, proximity mistake votes, and ballot-flaw-induced votes, disenfranchising substantial numbers of voters and treating similarly-situated candidates unequally. *Id.* at ¶ 99. These features include (1) ballot gaps placing candidates multiple columns away from other candidates running for the same office with only blank spaces in between; (2) the visual cue of a full ballot column with candidates for all offices

11

as compared to columns with fewer candidates; (3) arbitrarily grouping candidates for different offices in the same column; and (4) featuring candidates in a column all by themselves. *Id.* These features further advantage bracketed candidates and disadvantage unbracketed candidates like Plaintiffs, and are virtually certain to injure unbracketed candidates in future primaries. *Id.* at ¶¶ 173, 178, 191-92. Conforti was further impacted by being listed in the same column as her opponent, which led to over votes and disenfranchised approximately one-third of Mercer County voters in her congressional district who attempted to cast a vote in that race. *Id.* at ¶ 179.[9]

Among the bracketed candidates receiving these significant ballot advantages are candidates endorsed by the leadership of the county political party. *Id.* at ¶ 7. The endorsement by party leadership leads to a governmentally-conferred advantage to the endorsees, who are all bracketed together and almost always appear on a full or almost-full slate of candidates for all available offices with the same slogan. *Id.* This column of the ballot, in which the state puts its thumb on the scale to boost the endorsement preferences of party leaders, is referred to as the "county line." *See id.* The county line disproportionately contains the names of incumbents, other highly-recognizable names at the top of the ticket, and other party elites. *Id.* at ¶¶ 6-7. In addition to the advantages they receive through bracketing, such as inclusion in the preferential draw for first position, the candidates on the county line also receive an additional ballot advantage because they invariably appear on a full or almost-full column of candidates, and the top of their slate contains candidates for higher level office with recognizable names. *Id.* at ¶ 7. This provides a visual cue hereinafter referred to as the "weight of the line," which influences voters to vote for all the county line candidates and not candidates like Plaintiffs. *Id*, *see supra* p. 9.

---

[9]    Thus, the Ocean County Clerk's assertion, see ECF 55-1, p. 12, that Plaintiffs are not alleging that any votes are going uncounted or are being improperly counted, is incorrect. Conforti's experience of being placed in the same column as her opponent, resulting in overvotes, is but one example.

Plaintiffs were injured by these advantages afforded to their opponents and disadvantages to their own candidacies as a result of these ballot placement practices, and it is virtually certain that off-line candidates in the future will be injured in the same way. *See id.* at ¶¶ 173, 191-92.[10]

An analysis of the 2020 Primary Election in congressional races across both parties found that a candidate's "share of the vote varied by as much as 50 percentage points, based on whether or not they were on the county line." *See id.* at ¶ 8 (citing Julia Sass Rubin, *Does the County Line Matter? An analysis of New Jersey's 2020 Primary Election Results*, New Jersey Policy Perspective (August 2020), https://njpppprevious.wpengine.com/wp-content/uploads/2020/08/NJPP-Report-Does-the-County-Line-Matter-Analysis-of-New-Jerseys-2020-Primary-Election-Results-Final-1.pdf (hereinafter "2020 Primary Analysis")). The 2020 Primary Analysis further found for congressional races in the 2020 Primary Election where "different candidates were on the county line in different counties in the same congressional district," then "the average vote margin between appearing on the county line and having one's opponent on the county line was 35 percentage points." *See id.* Moreover, the 2020 Primary Analysis examined congressional primary elections in prior years, concluding that "only two congressional incumbents have lost a primary in New Jersey in the last fifty years," and in both instances, "they lost to incumbents, following redistricting that eliminated one of their districts," and in both of those instances, "the incumbent who won the primary had also received the party endorsement and the county line in the county that decided the election." *See id.*

---

[10]    Aside from the adverse impact of ballot design practices on off-the-line candidates, one prominent local advocate has suggested that supporters of off-the-line candidates will be subjected to extortion from "county line" candidates. *See* https://www.insidernj.com/khan-advises-voters-back-joshi-risk-wrath-establishment-dems/ (last visited May 21, 2021) (threatening supporters of off-the-line candidate that backers of on-the-line candidates "are going to come against you.")

### D. Forced Association

Due to the advantages of bracketing and further disadvantages of not bracketing, candidates are thrust into a system where they have to engage in gamesmanship whereby they are presented with a Hobson's choice: to protect their ballot position, they can associate with candidates, through bracketing, with whom they would not want to associate; or they can decide to not associate with such candidates and thereby subject themselves to a barrage of ballot disadvantages and unequal treatment. *See id.* at ¶¶ 196-97. Those who, by virtue of the realities of having to compete in a rigged system, force themselves to associate with candidates running for other offices that include a pivot point candidate will be rewarded with preferential treatment, and those who exercise their right not to associate will be punished in the variety of ways in which unbracketed candidates are disadvantaged, as set forth above. *See id.*

Unlike bracketed candidates, who are all featured with candidates with whom they requested to bracket, unbracketed candidates are often featured in a column with other candidates with whom they do not wish to associate and with whom they do not share a common slogan. *See id.* at ¶ 199. Due to bracketing, candidates can also be stacked in the same column as their opponents running for the very same office. *See id.* at ¶ 201. Even candidates who choose to bracket with candidates running for certain other offices can be excluded from preferential ballot treatment if the county clerk decides to use a different office as the pivot point, thereby favoring some candidate associations over others. *See id.* at ¶¶ 198, 204-05. Plaintiffs have been injured by governmental punishment of the exercise of their right to not associate with a diminution in their chance to succeed in their election and by otherwise requiring them to associate with candidates for the same and other offices in order to protect their ballot position, and it is

virtually certain that they and primary election candidates in future elections will be injured in the same way. *See id.* at ¶ 206.

Plaintiffs, and the voters who support them, are further injured by being forced to engage in an arbitrary system of gamesmanship. *Id.* at ¶ 197. Indeed, candidates' ballot fate is subject to the discretion of county clerks who themselves run for office and often are beneficiaries of the county line. *Id.* at ¶ 177. The rules of the game are never revealed and changed as they go: it is unclear what seat the county clerk will select as the pivot point(s) from the outset, and the pivot point(s) change each election and even among the party ballots in the same year. *Id.* Candidates must seek and associate with candidates up and down the ballot to increase their likelihood of success. *Id.* at ¶ 197. If they do not engage in this game, then their association may be forced anyway with candidates they have nothing in common with and whom they may even oppose. *Id.* at ¶ 199. They will also have to contend with the weight, the primacy of the line, Ballot Siberia, and other poor ballot design features. *Id.* at ¶¶ 196, 198. Regardless of the precise formulation – as seen by the candidate-Plaintiffs here who sought and are seeking a range of positions across the state – candidates are forced to participate in a rigged system that is manipulated and designed to favor certain candidates and party insiders over others.[11]

---

[11]    One need look no further than the contemporary news cycle covering the June 2021 primary election in New Jersey. *See e.g.*, Announcement by Nicholas A. Chiaravalloti (April 19, 2021), *available at*: https://www.tapinto.net/towns/bayonne/sections/elections/articles/nicholas-a-chiaravalloti-announcement (last accessed May 15, 2021) (three-term Assembly Majority Whip Nicholas Chiaravalloti withdraws nomination for fourth bid, explaining: "In reviewing my options, I considered running off the line. The task of winning off the line is daunting in a normal year; however, running against the HCDO [Hudson County Democratic Organization] this year would mean running against Governor Phil Murphy. I believe the power of the line and the popularity of Governor Murphy would make it impossible to compete successfully."); *see also* Max Pizarro, *The 2021 Reemergence of the County Party Chairs*, Insider NJ (Apr. 11, 2021), *available at*: https://www.insidernj.com/2021-reemergence-county-party-county-chairs/ (last accessed May 15, 2021); David Wildstein, *Vainieri Huttle will skip Bergen Dem convention, will run off the line in Senate Primary*, NJ Globe (Feb. 23, 2021), *available at*:

### E. Ballot Position of Candidates

Each of the Plaintiffs has a commonality in that they were forced to engage in a state-sanctioned rigged system of gamesmanship which treated them unequally in comparison to otherwise similarly-situated candidates. *Id.* at ¶ 197. With the exception of Spezakis, each of the 2020 Candidate Plaintiffs have a commonality in that each was excluded from the preferential ballot draw, and thus was not among the candidates eligible to participate in the random draw for first position on the ballot. *Id.* at ¶¶ 104, 110, 121, 135, 145. In contrast, at least one of their respective opponents were featured on the county line in the first column with a virtually full slate of candidates. *Id.* at ¶¶ 105, 107, 111-12, 122-23, 136, 138, 146, 150. Additional detail relevant to each Plaintiff is further provided below.

1. <u>Conforti</u>

Sample and official ballots from Monmouth, Ocean and Mercer County demonstrate Conforti's ballot position. *See id.* at ¶¶ 103, 109, 114. In Monmouth and Ocean Counties, Conforti was placed in the fourth column, all by herself, three columns away from her bracketed opponent with two and one blank spaces, respectively, in between the bracketed and unbracketed candidates. *See id* at ¶¶ 103, 109. A different ballot in Monmouth County, from Neptune Township where Conforti was also running for county committee, shows that Conforti was forced to bracket with her opponent in the congressional race, instead of bracketing with herself, in order to protect her ballot position vis-à-vis her county committee candidacy. *See id.* at ¶ 144.

In Mercer County, Conforti bracketed with candidates in order to protect her ballot position, but was nevertheless placed in the same column as one of her opponents, and also listed

---

https://newjerseyglobe.com/legislature/vainieri-huttle-will-skip-bergen-dem-convention-will-run-off-the-line-in-senate-primary/ (last accessed May 15, 2021) (eight-term assemblywoman objects to process that did not give her a chance to compete for the county line).

horizontally as compared to her other opponent. *Id.* at ¶ 115. Approximately one-third of Mercer County voters who cast a vote in her race were disenfranchised because they voted for more than one congressional candidate, as their over votes were disqualified. *Id.* at ¶ 117.

### 2. Kreibich

A sample ballot from Bergen County demonstrates Kreibich's ballot position. *See id.* at ¶ 120. Kreibich's exclusion from the preferential draw occurred even though she bracketed with two county freeholders, because the Bergen County Clerk used United States Senator as the pivot point. *Id.* at ¶¶ 121, 124. Kreibich was placed in the third column, with only two other candidates, two columns away from her bracketed opponent with a blank space in between them. *Id.* at ¶ 123.

### 3. Lucide

A 2020 sample ballot from Atlantic County demonstrates the ballot position of various candidates in that election. *See id.* at ¶ 127. The Atlantic County Clerk chose to use President as the pivot point and the county line was featured in the first column with a virtually full slate of candidates for every office. *Id.* at ¶ 128. Candidates running for other offices who were not bracketed with a presidential candidate, including Cory Booker who was running for United States Senator, had no ability to obtain the first ballot position, even though some like Cory Booker were bracketed with other candidates running for other offices. *See id.* Other candidates who did not bracket with anyone were placed multiple columns away from their bracketed opponents with blank spaces between them, and some were placed in a column alone or in a column with uncommitted delegates to the Democratic National Convention, with whom the candidates did not request to bracket. *Id.* at ¶ 130.

Lucide is a current candidate for the June 8, 2021 Primary Election, and a sample ballot from Atlantic County indicates his ballot position.



[*available           at*:           https://www.atlanticcountyclerk.org/wp-content/uploads/2021/05/Atlantic-City-W3-D2.pdf (last accessed May 15, 2021)]

This ballot is properly considered on a motion to dismiss for substantially the reasons stated in n.2, *supra.* The above ballot image demonstrates that Lucide did not bracket with other candidates and is listed in a column by himself. Evidently, Defendant Atlantic County Clerk chose to select the county clerk seat as the pivot point for the Democratic Party primary ballot this year, despite the existence of four higher-listed offices on the ballot, as well as a seat for County Commissioner. Notably, the Clerk chose a different pivot point, Governor, for the Republican primary ballot. As a result of the county line, Lucide sits in a column by himself against a full slate of 16 candidates.

18

4.  Marchica

A sample ballot from Mercer County demonstrates Marchica's ballot position. *See id.* at ¶ 134. Marchica was placed in a column with two other candidates running for other offices, none of whom requested to bracket with one another. *Id.* at ¶ 137. One of these candidates featured in the same column as Marchica was the opponent of a candidate that Marchica vocally supported and even volunteered his time to campaign for. *Id.* at ¶ 139. Marchica is also featured horizontally as compared to his opponents who were both listed vertically on the county line, where voters were instructed to vote for two candidates. *Id.* at ¶ 140.

5.  McMillan

An official ballot from Monmouth County demonstrates McMillan's ballot position. *See id.* at ¶ 144. There, McMillan was excluded from the preferential ballot draw even though he bracketed with candidates for other offices, because the Monmouth County Clerk used United States Senator as the pivot point. *Id.* at ¶¶ 145, 149. McMillan was placed in the sixth column, with only two other candidates, five columns away from his bracketed opponent with four blank spaces in between them. *Id.* at ¶¶ 149-50.

6.  Spezakis

Sample ballots from Bergen and Hudson County demonstrate Spezakis' ballot position. *See id.* at ¶¶ 154, 161. In order to protect her ballot position, Spezakis bracketed with a candidate for United States Senator and two freeholders in Bergen County, *id.* at ¶ 154, and with a candidate for United States Senator in Hudson County, *id.* at ¶ 161. Had she not bracketed to protect her ballot position, she would have suffered the same fate as her unbracketed opponent, who was not included in the preferential draw and thus had no ability to obtain first ballot position, was placed in a column all by himself, and placed one or more multiple spaces away

from his bracketed opponents with only blank spaces between. *See id.* at ¶¶ 155, 158, 162, 164. In Bergen County, Spezakis was featured in a column with only three other candidates and with a blank space at the top of the ticket for President. *See id.* at ¶ 154. In Hudson County, Spezakis was featured in a column with only one other candidate and with a blank space at the top of the ticket for President. *See id.* at ¶ 161. In both counties, her bracketed opponent was featured on the county line in the first column with a full slate of candidates for every office. *Id.* at ¶¶ 155, 165. Spezakis intends to run for this same office in connection with the June 7, 2022 Democratic Primary Election, where she does not intend to bracket with any other candidates for any other offices. *Id.* at ¶¶ 160, 166.

## **STANDARD OF REVIEW**

To defeat a motion to dismiss, Plaintiffs, under Fed. R. Civ. P. 8 and 12(b), must simply "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The pleading standard does not require "detailed factual allegations." *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). In reviewing a complaint on a Rule 12(b)(6) motion to dismiss, courts must "take all of the factual allegations in the complaint as true." *Id.* at 678 (citing *Twombly*, 550 U.S at 555). The court should consider the allegations of the complaint, documents referenced therein and attached thereto, and other matters of public record or otherwise cognizable on a motion to dismiss, *see supra* n.2; *see also Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010), *cert. denied*, 562 U.S. 1271 (2011), and "view them and reasonable inferences drawn from them in the light most favorable to [Plaintiff] to decide whether they

plausibly give rise to an entitlement to relief." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 326 (3d Cir. 2019), *cert. denied*, 140 S.Ct. 2565 (2020) (internal quotation marks and citation omitted).

## LEGAL ARGUMENT

### POINT I

**THE COURT SHOULD DENY DEFENDANTS'/ INTERVENOR'S MOTIONS TO DISMISS THE AMENDED COMPLAINT BECAUSE PLAINTIFFS SUFFICIENTLY ALLEGE A JUSTICIABLE CASE OR CONTROVERSY.**

In spite of a barrage of baseless procedural challenges from Defendants, this case is justiciable. Plaintiffs have standing, the matter is neither moot nor unripe, and it does not present a nonjusticiable political question.

**A. Plaintiffs have Standing to Bring this Case.**

To establish standing, plaintiffs must demonstrate (1) that they suffered an injury-in-fact, (2) that there is a causal connection where the injury is "fairly traceable to the defendants," and (3) that the injury will likely be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (quoting *Simon v. E. Ky. Welfare Org.*, 426 U.S. 26, 38, 41-43 (1976)). Under first element, plaintiffs must suffer a "concrete and particularized" injury, which is "actual or imminent, not conjectural or hypothetical." *Id.* at 560-61 (internal citations and quotation marks omitted). Under the second element, there must be a causal connection linking the injury to the defendants' offending conduct. *Id.* Finally, under the third element, "it must be likely as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561. The use of these factors to test the justiciability of a complaint seeking a declaratory judgment survives *Iqbal* and *Twombly*. *Wayne Land & Min. Grp. v. Del. River Basin*

*Comm'n*, 894 F.3d 509, 524-25 (3d Cir. 2018). Plaintiffs meet these elements and have standing to sue.

### 1. The Amended Complaint Sufficiently Alleges an Injury-In-Fact to Plaintiffs

a. <u>2020 Candidate Plaintiffs</u>

Plaintiffs Conforti, Kreibich, Marchica, McMillan, and Spezakis all suffered an injury-in-fact. As alleged throughout the Amended Complaint, the 2020 Candidate Plaintiffs each suffered a "concrete and particularized" injury in connection with the 2020 Democratic Primary Election and their ballot placement.[12] The injuries include the following:

1. **Harm to electoral chances, inability to compete on an equal footing, and diminution in chances of winning.** This injury was carried out by various combinations of (a) excluding Plaintiffs from having any chance to obtain the first ballot position, and thus from obtaining any of the advantages of the primacy effect, while their opponents (all similarly situated to them) were eligible to and did in fact obtain the first ballot position and its accompanying advantages; (b) featuring Plaintiffs on the ballot in incomplete and random locations, whereas their opponents for the same office were displayed on the county line as a full column of candidates for each office, with highly recognizable names at the top of the line, and obtained the advantages of the full weight of the line which provides visual cues and otherwise influences voters to vote for such candidates; (c) being featured on the ballot multiple spaces away from their opponents who were running for the same office, with at least one blank space between them, and frequently with a *plurality of spaces* between them, i.e., a "Ballot Siberia" situation, *see supra* n.8; (d) being treated differently with respect to ballot placement and position from their opponents running for the same office, despite being otherwise similarly situated; (e) being placed in the same column as their opponent; and (f) being punished with respect to ballot placement and positioning when, presented with a Hobson's choice of forced association or a better ballot position, they exercise their right to not associate with a pivot point candidate and/or with any other candidates running for other offices.

2. **Compelled association** carried out by: (a) when the same Hobson's choice is presented to them, they associate with candidates running for other offices and/or have to recruit candidates to run for other offices, when Plaintiffs have no desire to do so, to maintain a fair chance at obtaining the first ballot position; (b) being placed in the same column as other candidates running for different offices who have a

---

[12]    At least three of these candidates have overtly declared their intention to run in a future primary election. ECF 33, ¶¶ 23, 36, 47.

different slogan and with whom they did not wish to bracket; and (c) being placed in the same column as their opponent.

Specifically, Plaintiffs have alleged that because they did not bracket with a pivot point candidate, Conforti, Kreibich, Marchica, and McMillan were all excluded from the preferential ballot draw, and thus prohibited from having a chance to obtain the first ballot position. *See* ECF 33, ¶¶ 104, 110, 121, 135, 145. They further allege that they were thus not treated equally compared to similarly situated candidates running for the same office, who were eligible to, and who did receive, the first ballot position and the accompanying advantage of the primacy effect. *Id.* at ¶¶ 171, 184, 188. Similarly, the Amended Complaint sets forth that Spezakis intends to run for the House of Representatives in the next election cycle, in the 2022 Democratic Primary Election, and that she does not intend to bracket with any other candidates. *See id.* at ¶¶ 160, 166. Therefore, Spezakis will similarly be excluded from the preferential ballot draw, and have no ability to compete for the first ballot position, thus harming her electoral prospects as well as her ability to compete on equal footing with candidates running for the same exact office.

The Amended Complaint also alleges that Plaintiffs have been harmed by other poor ballot design features which influence voters toward voting for bracketed candidates and otherwise confuse and disenfranchise voters. *Id.* at ¶¶ 178-79. These features include placing candidates multiple columns away from their opponents running for the same office with only blank spaces between them, the visual cue provided by a ballot column which contains candidates running for all offices, arbitrarily grouping together in the same column candidates that are running for different offices, and featuring candidates in a column by themselves. *Id.* at ¶ 178.

Specifically, the ballot images for Conforti in Monmouth and Ocean, and for Kreibich, Marchica, McMillan, and Spezakis demonstrate that their opponents were all featured in a

column on the county line with candidates for all or virtually all offices up for election, as compared to their own columns which contain significantly fewer candidates. *See id.* at ¶¶ 103, 109, 120, 134, 144, 154, 161. For example, in Monmouth and Ocean, Conforti is isolated in a column by herself compared to the county line bearing 7 and 5 candidates, respectively. *See id.* at ¶¶ 103, 109. In Bergen, Kreibich is listed in a column with only two other candidates. *See id.* at ¶ 120. In Mercer, Marchica is listed in a column with only two other candidates, both of which contain a different slogan, the closest of which is seven ballot spaces away, and none of which he requested to bracket with. *See id.* at ¶ 134. Therein, he faces a county line containing 12 full rows. *Id.* In Monmouth, McMillan is listed in a column with only two other candidates tucked into the very bottom right corner of the ballot. *See id.* at ¶ 144. Therein, he faces a full county line of 9 seats. *Id.* In Bergen, Spezakis is listed in a column with only three other candidates, with no candidate at the top of the ballot, and in Hudson she is listed in a column with only one other candidate, with no candidate at the top of the ballot. *See id.* at ¶¶ 154, 161. In both instances, she faces a full county line. *Id.*

Additionally, Conforti, Kreibich, and McMillan were placed multiple columns away from their bracketed opponents, with blank gaps in between, and Conforti and McMillan in particular experienced multiple blank spaces between the bracketed and unbracketed candidates, landing them in Ballot Siberia. *See id.* at ¶¶ 103, 109, 120, 144 (McMillan listed five spaces from bracketed opponent with four blank spaces between them). Furthermore, in Mercer, Conforti was listed in the same column as her opponent vertically, as well as against her other opponent horizontally. *See id.* at ¶ 114. As set forth in the Amended Complaint, approximately 1/3 of the Democratic primary voters within that congressional district in Mercer County who cast a vote for that office were disenfranchised for over-voting due to the confusion. *Id.* at ¶ 117.

24

These numerous injuries stemming from the ballot placement and positioning by the Defendants harm the electoral prospects of these candidates, impairing their ability to compete on equal footing with other candidates running for the exact same office, and violating their rights under the First and Fourteenth Amendments, as well as the rights of the voters who support them.[13]

Many federal courts have found candidates and organizational plaintiffs to have standing in the context of similar ballot order cases. In fact, in the only ballot order case considered by the United States Supreme Court, it upheld a *per curiam* 3-Judge District Court ruling enjoining an election official's method of breaking ties to determine and provide favorable primary ballot placement to candidates he personally preferred, such as incumbents and party entrenched candidates. The court found this practice to be violative of the plaintiff-candidates' "Fourteenth Amendment right to fair and evenhanded treatment." *Mann v. Powell*, 314 F. Supp. 677, 679 (N.D. Ill. Dec. 5, 1969) (opinion and interlocutory order), 333 F. Supp. 1261 (N.D. Ill. Dec. 30, 1969) (opinion and final order), *summarily aff'd*, 398 U.S. 955 (1970).[14] Accordingly, the court enjoined this discriminatory manner of breaking ties to determine the order of candidates' names for primary ballot placement, mandating that the defendants use "nondiscriminatory means by which each of such candidates shall have an equal opportunity to be placed first on the ballot." *Id*.

Notably, *Mann* considered a challenge to the plaintiff-candidates' standing. 333 F. Supp. at 1265. Specifically, the defendants argued that although the candidates had filed their nomination petitions, they lacked standing because the election administrator had yet to certify

---

[13]     "[T]he rights of voters and the rights of candidates do not lend themselves to neat separation . . . ." *Bullock v. Carter*, 405 U.S. 134, 143 (1972).

[14]     *See infra* n.24.

ballots and allocate ballot positions. *Id.* Essentially, the challengers argued that the harm to the

plaintiff-candidates was speculative because they had not yet been placed in an inferior ballot

position. *Id.* The court squarely rejected this argument. *Id.* In so doing, the court acknowledged,

"the injury to candidates as a result of such action may be severe." *Id.* The court further

explained that even though some plaintiffs may ultimately get the preferred ballot placement,

their standing does not depend on whether they were actually treated unfairly:

> The earlier *Weisberg* case found, and we agree, that the order of
> listing candidates' names on the ballot can affect the outcome of an
> election, and that candidates have a right to equal protection in the
> allocation of ballot positions. The defendants argue [ ] that some of
> the remaining plaintiffs will be given priority positions under the
> system which [the election administrator] intends to employ. We
> do not think the standing of a candidate to challenge the
> constitutionality of [a statute] depends upon whether he is actually
> treated unfairly. *If the statute permits discriminatory treatment,*
> *then all candidates are threatened, and these plaintiffs have a*
> *sufficient personal stake to maintain this suit.* We proceed to the
> merits of plaintiffs' complaint.

> *Id.* (emphasis added).

Like the Plaintiffs in *Mann* subjected to a statute that threatened them with discriminatory

treatment, the Plaintiffs here plead, with great detail, the injury arising from the "forced

gamesmanship" they are forced to participate in, and various violations of First and Fourteenth

Amendment rights. *See supra* at pp. 13-14. And as long as these statutes that threaten candidates

with discriminatory treatment remain on the books, they will continue to injure candidates. *See*

ECF 33, ¶¶ 11, 173, 180, 192, 206.

More recently, various federal courts have concluded that Plaintiffs suffer an injury-in-

fact sufficient to establish standing when they are treated unequally in their inability to obtain

first ballot position compared to their opponents who can avail themselves of the advantages of

the primacy effect. *See, e.g., Nelson v. Warner*, 477 F. Supp. 3d 486, 495-96 (S.D. W. Va. 2020)

(collecting cases) ("The inability to compete on equal footing due to the application of allegedly biased criteria has been recognized in many contexts as an injury in fact sufficient to support constitutional standing . . . Several circuits have extended this competitive standing theory to elections, holding that a candidate and his or her party can show an injury-in-fact if the defendant's actions harm the candidate's chances of winning."); *see also Pavek v. Simon*, 967 F.3d 905, 907 (8th Cir. 2020) (sufficient injury in fact where complaint alleged that ballot order statute violated the Fourteenth Amendment because "it unequally favors supporters of *other* political parties") (emphasis in original); *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 544-45 (6th Cir. 2014) (minor party plaintiffs had standing where they backed candidates listed as independents who were affected by the ballot order statute in prior general election cycle); *cf. Libertarian Party v. Buckley*, 8 F. Supp. 2d 1244, 1248 (D. Colo. 1998) (plaintiffs had standing in ballot order case because the candidates qualified to appear on the ballot and were statutorily excluded from being placed in the top tier). The standing inquiry is entirely discrete from the constitutional merits of the case. *Buckley*, 8 F. Supp. 2d at 1247-48.

While the above cases make clear that Plaintiffs have alleged an injury-in-fact sufficient to support standing, here all of the 2020 Candidate Plaintiffs' injuries go above and beyond those set forth above, and include injuries beyond the primacy effect, including the weight of the line and other wrongful ballot design practices that are unique to New Jersey as a national outlier in primary ballot design. *See* ECF 33, ¶¶ 176, 178-79, 185, 191. Plaintiffs allege that these features have impacted their electoral chances by confusing and disenfranchising voters and by influencing voter behavior to vote for opposition candidates. *Id.* at ¶¶ 178-80. The Amended Complaint goes further and highlights research conducted on the 2020 Primary Election in congressional races where "different candidates were on the county line in different counties in

the same congressional district," finding that "the average vote margin between appearing on the county line and having one's opponent on the county line was *35 percentage points*." *See id.*, ¶¶ 8, 176 (citing 2020 Primary Analysis) (emphasis added).

Going further still, the Amended Complaint also alleges injuries to their freedom of association, and more particularly, the right to not associate. *See generally id.* at Count III. Plaintiffs were each faced with a Hobson's choice whereby they could forfeit their First Amendment right to not associate and bracket with other candidates to ensure equal treatment, or they could forfeit their First and Fourteenth Amendment equal protection rights by exercising their right to not associate. *Id.* at ¶ 196.

Forced by New Jersey's bracketing and ballot placement system to choose which constitutional rights they were going to forfeit, Conforti (in Mercer) and Spezakis (in Bergen and Hudson) bracketed with other candidates, which they were required to do in order to protect their ballot position and avoid being relegated multiple columns away from other bracketed opponents. *Id.* at ¶¶ 200-01. For Conforti, this meant literally having to bracket and thereby associate with her congressional opponent to protect her ballot position for her county committee race. *Id.* at ¶ 202.

Those choosing the other side of the Hobson's choice were punished for exercising their First Amendment right to not associate, including Conforti (in Monmouth and Ocean), Kreibich (in Bergen), Marchica (in Mercer), and McMillan (in Monmouth). *Id.* at ¶ 198. In fact, not only were they excluded from the preferential draw, but their opponents received the first ballot position with the accompanying advantages of the primacy effect, and Conforti, Kreibich, and McMillan were placed multiple columns away from their bracketed opponents with only blank spaces in between them. *Id.* It is virtually certain that Spezakis will suffer the same fate in the

28

2022 Primary Election and be punished with respect to her ballot position, as she does not intend to bracket with any candidates in connection with that race. *Id.* at ¶¶ 160, 166.

Furthermore, Plaintiffs suffered additional injuries in connection with their First Amendment associational rights. Conforti and Marchica were both placed in the same column as other candidates running for different offices, giving the false appearance that they were associated together. *Id.* at ¶¶ 199, 201-02. Conforti was even forced to appear in the same column with her opponent, giving the appearance that they were running together/bracketed together, even though voters could only select one. *Id.* at ¶ 201. Moreover, Kreibich and McMillan did choose to bracket with candidates running for other offices, but their seats were not selected as the pivot point in this election cycle by their respective county clerks. *Id.* at ¶ 205. Thus, they were not permitted to draw for the first ballot position, even though their opponents were. *Id.* In other words, the specific associations engaged in by their opponents were rewarded, while Kreibich's and McMillan's associations were not equally valued.

Any one of the multiple harms set forth above is sufficient to demonstrate an injury-in-fact to afford standing to the Plaintiffs.

### b. 2021 Candidate Plaintiff

For similar reasons, the Court should find that Lucide has sufficiently alleged an injury-in-fact. Lucide is currently campaigning in connection with his bid for county clerk of Atlantic County in the June 8, 2021 primary.[15] He did not want to bracket with any other candidates but was forced to consider the substantial advantages of doing so should he obtain the party endorsement and secure the county line. ECF 33, ¶¶ 28-32, 131. The Atlantic County primary ballot designed since the filing of the Amended Complaint, *see supra* at p. 17, reveals that the

---

[15]    Lucide has also overtly declared his intention to run in a future primary election. ECF 33, ¶ 32.

Atlantic County Clerk inexplicably used county clerk as the pivot point on the Democratic ballot (despite the presence of four elections for higher-listed office including Governor and an election for county commissioner); yet, he used Governor as the pivot point for the contemporaneous Republican ballot.[16] Moreover, Lucide stands in a column alone, facing a county line of 16 seats. *Id.*

These allegations show clear injuries-in-fact like those faced by his fellow 2020 Candidate Plaintiffs and incorporated herein by reference, *see supra* at p. 21. From the outset, Lucide suffered the harm of having to engage in gamesmanship and confront the state-imposed dilemma of whether to bracket with candidates with whom he did not want to associate or whether to risk the disadvantages faced by unbracketed candidates.  He is also treated unequally compared to his otherwise similarly-situated opponent who benefits from the weight of the line comprised of 16 candidates – wherein Governor Phil Murphy sits at the top of the ticket, and the bracketed slate includes candidates running for all offices on the ballot. *See id.* In other words, the ballot presents not as a 1:1 race, but as a 1:16 race. The visual cues from this poor ballot design clearly represent discriminatory treatment. And as the court held in *Mann*, "If the statute permits discriminatory treatment, then all candidates are threatened, and these plaintiffs have a sufficient personal stake to maintain this suit." 333 F. Supp. at 1265 (opinion and final order), *summarily aff'd*, 398 U.S. 955 (1970).

Moreover, especially in light of the fact that the Atlantic County Clerk was required to begin mailing mail-in ballots to voters on April 24, 2021, *see N.J.S.A.* 19:63-9 (45 days before the election), Lucide has already suffered "actual" harm in a concrete and particularized fashion, and additionally is likely to continue to suffer "imminent" harm through Election Day, which is

---

[16]     Plaintiffs anticipate probing the uniqueness of and motivations behind such decision in discovery.

"not conjectural or hypothetical." *See Lujan*, 504 U.S. at 560-61 (internal citations and quotation marks omitted). He therefore meets the requirements to demonstrate an injury in fact. *Id.*

### c. NJWF

NJWF has standing based on both of the recognized theories for granting an organization standing to sue: (1) for injuries to itself, including for "diver[sion] [of] its resources to counteract unlawful conduct"; and (2) for injuries to members of the organization, on behalf of such members. *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 364 (D.N.J. 2020).

### i.      *Injuries to Itself / Diversion of Resources*

The Amended Complaint adequately alleges that NJWF has been forced to expend effort and resources on counteracting unlawful conduct. Specifically, it stated that NJWF has previously, and will continue to, "divert resources it could use for other activities, issues, and campaigns, as well as to expend additional resources, to educate voters about the county line and other ballot design and ballot placement issues to help them overcome the burdens that New Jersey's bracketing and ballot placement system place on the right to vote, equal protection, and the freedom of association." ECF 33, ¶ 55. Although not required at the motion to dismiss stage, illustrative examples of these injuries, including two Democracy Symposia led by NJWF, are among the details provided, *supra* at n.5, to demonstrate the injury. Plaintiffs should be afforded the opportunity to present this and additional evidence to the Court in this regard. Further, among NJWF's goals is to achieve the election of candidates it supports. *Id.* at ¶ 53. Such an organization, that is suing "to invalidate a state law that frustrates this goal by diminishing their candidates' competitiveness" *ipso facto* has organizational standing based on direct injury to itself. *Nelson*, 477 F. Supp. 3d at 500; *accord Hargett*, 767 F.3d at 544 (group that participated in

electoral politics, including by backing candidates affected by the ballot-ordering statute had standing to challenge ballot-ordering statute in its own right).

<em>ii.      Injuries to Members</em>

Separate from its rights to sue over injuries to itself, "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996) (quotation omitted). In the election context, an association whose members have experienced or are about to experience "harm to [their] electoral prospects" has standing to sue under the injury-to-members prong of organizational standing. *Nelson*, 477 F. Supp. 3d at 500. Here, the Amended Complaint can be fairly read as alleging that NJWF has members who have sought or will seek public office in a contested primary, and who are running in a ballot position other than the "county line." ECF 33, ¶¶ 48-56. At the motion to dismiss stage, the organization does "not need to identify specific members who have been injured when the complaints were filed." *PennEnvironment v. PPG Indus., Inc.*, 23 F. Supp. 3d 553, 581 (W.D. Pa. 2014) (citing *Bldg. & Const. Trades Council of Buffalo, New York & Vicinity v. Downtown Dev., Inc.,* 448 F.3d 138, 145 (2d Cir. 2006)). Nevertheless, NJWF has done precisely that. *See supra* n.3. NJWF's members, including Plaintiff Lucide, would have standing to sue in their own right; the members' goals of competing in and winning elections match those of NJWF; and the participation of its members in this challenge to the State's ballot design laws is permitted, but not required.

Accordingly, NJWF has standing to sue under both theories applicable to organizations.

32

2.  **The Amended Complaint Sufficiently Alleges that Plaintiffs' Injuries are Fairly Traceable to the Defendants.**

Plaintiffs' injuries are "fairly traceable to the challenged action of the defendant[s], and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (citation omitted). In ballot order cases, federal courts considering this issue have found that the types of injuries at issue here, related to ballot position and design of the ballot, are fairly traceable to the election officials in the state who are statutorily responsible for ballot design and ordering candidates on the ballot. For example, in *Nelson*, the court found that the injury to the plaintiffs resulting from ballot position was fairly traceable to ballot commissioners because their statutory duties included ballot preparation for general, primary, and special elections held in counties and magisterial districts. *Nelson*, 477 F. Supp. 3d at 499. Likewise, *Nelson* found a causal connection to the Secretary of State because her statutory duties included preparing ballots for statewide special elections. *Id.* (citation omitted). Additionally, the court noted that in West Virginia, the Secretary of State had "direct control over ballot commissioners' compliance with state election law," and thus the ballot commissioners were bound to follow any orders or legislative rules promulgated by her. *Id.* (citation omitted).

The *Nelson* court thoughtfully distinguished an Eleventh Circuit opinion, *Jacobson v. Fla. Sec'y*, 957 F.3d 1193 (11th Cir. 2020), *vacated and opinion substituted*, 974 F.3d 1236 (11th Cir. 2020). *Nelson* noted that in *Jacobson*, the injury was not traceable to the Florida Secretary of State because she "had no role in ordering candidates' names on ballots," and "had no control over county supervisors except through coercive judicial process." *Nelson*, 477 F. Supp. 3d at 499. While the *Jacobson* opinion referenced in *Nelson* was subsequently vacated with a substituted opinion, the court's opinion remained the same with respect to traceability, holding that any injury could not be fairly traceable to the Secretary and could not be redressable by

33

issuing a judgment against her because she was not responsible for enforcing the law that was challenged. *Jacobson*, 974 F.3d at 1241. The Eleventh Circuit noted that, instead of the Secretary of State, it was in fact the county supervisors of elections, who were county officials that were independent of the Secretary of State, to whom the injuries were traceable, as they were "responsible for placing candidates on the ballot in the order the law prescribes." *Id.* at 1241, 1253. The court further noted that the supervisors of election were constitutional officers elected by county voters and were not appointed by the Secretary of State. *Id.* at 1253. Moreover, the appeals court found it irrelevant that the Secretary of State was the chief election officer charged with "general supervision and administration of election laws," because she did not directly control ballot order. *Id.* at 1254.

All of Plaintiffs' various injuries set forth above and throughout the Amended Complaint, are inextricably intertwined through the common thread of the ballot design and ballot positioning. Similar to the West Virginia ballot commissioners and Secretary of State in *Nelson*, and similar to the Florida county supervisors of election in *Jacobson*, New Jersey law vests responsibility over ballot design and ballot ordering with the county clerks. *See N.J.S.A.* 19:49-2; *N.J.S.A.* 19:23-24. *N.J.S.A.* 19:49-2 explicitly states that "where voting machines are used," (which is everywhere in New Jersey), "[t]he providing of the official ballots, [and] the order of the precedence and arrangement of parties and of candidates," are fully in the hands of "the county clerk [who] shall have the authority to determine the specifications for, and the final arrangement of, the official ballots." *Id.* Likewise, *N.J.S.A.* 19:23-24 provides that "[t]he position which the candidates and bracketed groups of names of candidates for the primary election for the general election shall have upon the ballots used for the primary election . . . shall be determined by the county clerks in their respective counties . . . ." *Id.* The county clerks are also

34

further charged with conducting the ballot draw to determine ballot order. *Id.* Thus, the alleged injuries are fairly traceable to the county clerks because these statutory duties vest them with direct control over ballot design and ballot ordering of candidates. [17] *See Jacobson*, 974 F.3d at 1253; *Nelson*, 477 F. Supp. 3d at 499.

Moreover, similar to the Florida county supervisors of elections in *Jacobson*, here in New Jersey, county clerks are constitutional officers "elected by the people of their respective counties," N.J. CONST., art. VII, sec. II, para. 2, and thus are independent from the Secretary of State who does not exercise control over the county clerks or their statutory functions. Instead, the Secretary of State is a State officer who only supervises employees who fall under the direct control of the Department of State. *See N.J.S.A.* 52:16A-2; *N.J.S.A.* 52:16A-11. As in *Jacobson*, the fact that the Secretary of State is the chief election official in New Jersey, *see N.J.S.A.*

---

[17]    For similar reasons, the Ocean County Clerk's Eleventh Amendment immunity argument fails. The Ocean County Clerk claims that he was "acting in good-faith under color of state law," and that his actions "emanate[d]" from state law. *See* ECF 55-1, p. 7. He asserts that he should therefore "be conferred the same Eleventh Amendment immunity protections from suit in federal court as any other state official such as the Secretary of State," had they been named as defendants. *See id.* However, public officials are appropriate defendants if their "office has some connection with the enforcement of the [challenged law]." *Finberg v. Sullivan*, 634 F.2d 50, 54 (3d Cir. 1980) (en banc) (quoting *Ex Parte Young*, 209 U.S. 123, 157 (1908)). Even if a public official was performing ministerial functions and merely acting pursuant to existing law, they are nevertheless properly named as defendants. *See id.* at 54. The inquiry focuses on the effect of the official's performance of duties on the plaintiff's rights, and lawsuits that seek to enjoin such performance of their official duties, even with respect to ministerial functions, have been permitted by the court. *See id.* (collecting cases). Indeed, the Third Circuit has held that once a public official has "relied on the authority conferred by [state law] to work an injury to the plaintiff, they may not disclaim interest in the constitutionality of these procedures." *Id.*

It is also hard to take the Ocean County Clerk's position seriously, in light of the fact that Defendants generally maintain that county clerks may exercise discretion as to ballot design and position. There is no justification for treating county clerks like state officials. Moreover, even if they were state officials otherwise protected by the Eleventh Amendment, "suits against individual state officers for prospective injunctive and declaratory relief to end an ongoing violation of federal law," are not barred by the Eleventh Amendment. *Diamond v. Pennsylvania State Educ. Ass'n*, 399 F. Supp. 3d 361, 378 (W.D. Pa. 2019), *aff'd*, 972 F.3d 262 (3d Cir. 2020) (citing *Ex parte Young*, 209 U.S. 123 (1908)); *Graves v. McElderry*, 946 F. Supp. 1569, 1577 (W.D. Okla. 1996) (applying same principle in ballot order case).

52:16A-98(b); *N.J.S.A.* 19:31-6a, is irrelevant because she does not exercise direct control over

the ballot design and ordering of candidates. *See Jacobson*, 974 F.3d at 1254.[18]

### 3. The Amended Complaint Sufficiently Alleges that Plaintiffs' Injuries are Likely to be Redressed by a Favorable Decision Against Them.

For the same reasons that Plaintiffs' injuries are fairly traceable to the Defendants, they

are also likely to be redressed by a favorable decision against them. As set forth above, county

clerks are statutorily responsible for designing the ballot and ordering candidates' names on the

ballots. Therefore, declaratory and injunctive relief to prevent them from carrying out

unconstitutional provisions of the bracketing and ballot placement laws will redress Plaintiffs'

injuries. *Compare Nelson*, 477 F. Supp. 3d at 499 ("As explained regarding traceability, the

Secretary of State and ballot commissioners are responsible under state law for enforcing the

Statute, so declaratory and injunctive relief against them would effectively stop implementation

of the Statute . . . ."), *with Jacobson*, 974 F.3d at 1254 (injunctive and declaratory relief against

---

[18]     Thus, to the extent the Defendants such as the Hudson or Ocean County Clerks contend that the Secretary of State or the State should have been named as a defendant in this case, there is no merit to such contention. First and foremost, the state has effectively intervened here and is a party to this action. Moreover, the county clerks were properly named because the injuries alleged in the Amended Complaint are fairly traceable to them based on their statutory duties. And of course, even if these defendants are correct, the remedy for failing to join an indispensable party subject to personal jurisdiction and whose joinder will not deprive the court of subject matter jurisdiction is to order that party joined, rather than to dismiss the case. *See e.g., RPR & Associates v. O'Brien/Atkins Associates, P.A.*, 921 F. Supp. 1457, 1463 (M.D.N.C. 1995), *aff'd sub nom.*, 103 F.3d 120 (4th Cir. 1996) ("In general, federal courts are extremely reluctant to grant motions to dismiss based on nonjoinder, and dismissal will be ordered only when the defect cannot be cured and serious prejudice or inefficiency will result"). Equally unavailing is the Monmouth County Clerk's assertion that Plaintiffs failed to name every potential political candidate who might potentially by impacted by a decision in this case. *See* ECF 59-2, pp. 27-28. Surely, Plaintiffs cannot be expected to name such an infinite and amorphous group as defendants, nor are they indispensable parties. Indeed, the Monmouth County Clerk cites to zero ballot order cases where any opposing candidates, let alone all potential candidates, were deemed to be indispensable parties. Indeed, candidates were not named nor otherwise found to be indispensable in numerous ballot order cases, including in the Third Circuit. *See, e.g., Democratic-Republican Org. of N.J. v. Guadagno*, 900 F. Supp. 2d 447 (D.N.J. 2012), *aff'd*, 700 F.3d 130 (3d Cir. 2012).

Secretary of State would not redress plaintiffs' injuries because "neither she nor her agents control the order in which candidates appear on the ballot," and such relief would not bind the supervisors of elections who are in fact responsible for printing the candidates' names on the ballot in the appropriate order pursuant to Florida law).

If this Court were to enjoin Defendants from carrying out the unconstitutional provisions of the bracketing and ballot placement laws, Plaintiffs would no longer be subjected to the current ballot design and ballot ordering system which violates their constitutional rights and otherwise harms their electoral prospects in the variety of ways set forth elsewhere in this brief. Therefore, granting the requested relief would redress Plaintiffs' injuries. *See Nelson*, 477 F. Supp. 3d at 499-500 (finding redressability prong met where enjoining enforcement of statute would mean that "the primacy effect will no longer disproportionately harm candidates' electoral prospects based on their party affiliation").

**B.** **Plaintiffs' Claims are Neither Moot Nor Unripe.**

Defendants spend considerable but misplaced time and attention on the fact that the 2020 Primary Election already occurred, and the 2021/2022 Primary Elections have not yet occurred. They claim that there is no longer an ongoing "case or controversy" because the ability to obtain relief for harms in connection with the 2020 Primary Election is moot, and that the prospect of potential harm in connection with future election cycles is speculative and therefore unripe. Both of these arguments fail, are made against the weight of virtually all ballot order cases addressing these issues, and would severely impair the judiciary's ability to ever order final relief in connection with a challenge to unconstitutional voting and election law legislation.

A case is considered "moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496

(1969) (citation omitted). However, courts apply a well-recognized exception to mootness when a dispute is "capable of repetition, yet evading review." *See, e.g.*, *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007) (hereinafter "*WRTL*") (collecting cases). This exception to mootness applies when "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Id.* (quoting *Spencer v. Kemma*, 523 U.S. 1 (1998) (internal quotation marks and brackets omitted)).

In *WRTL*, the plaintiff challenged provisions of the Bipartisan Campaign Reform Act of 2002 ("BCRA") which made it a federal crime for corporations to make certain broadcasts naming federal candidates for office shortly before an election. *Id.* at 455-56. The Supreme Court held that the plaintiff met the first prong of the exception, acknowledging that it would have been "entirely unreasonable" for the plaintiffs to have obtained "complete judicial relief" with respect to airing its advertisements during the blackout periods before the election under BCRA. *Id.* at 462. Even though there was a 2-year period between elections, the Court found the plaintiff could not know in advance the exact topic of what ads it would want to run. *Id.* Moreover, the Court recognized that during the pendency of the litigation, two blackout periods under BCRA had already passed, demonstrating the difficulty of fully litigating the matter within a shortened window of time. *Id.* at 462-63. Regarding the second prong of the exception, the Court noted that "the same controversy [is] likely to recur when a party has a reasonable expectation that it 'will again be subjected to the alleged illegality.'" *Id.* at 463 (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)). The Court rejected the FEC's contention that the plaintiff had to demonstrate that it would run future ads that shared all of the same characteristics that were deemed legally relevant. *Id.* Instead, the Court found it sufficient that the plaintiff claimed that it planned on

running ads that were "materially similar" and which would mention the name of a candidate during the BCRA blackout period. *Id.* (internal quotation and citation marks omitted). Thus, the Court found there was "a reasonable expectation that the same controversy involving the same party will recur." *Id.* at 464.

Courts within the Third Circuit have recognized and applied this well-known exception, particularly in the election context. *See Merle v. U.S.*, 351 F.3d 92, 94-95 (3d Cir. 2003) (relying on *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996); *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Storer v. Brown*, 415 U.S. 724 (1974); *Moore v. Ogilvie*, 394 U.S. 814 (1969)); *see also Acosta v. Democratic City Comm.*, 288 F. Supp. 3d 597, 623-24 (E.D. Pa. 2018) (collecting cases); *Arons v. Donovan*, 882 F. Supp. 379, 383 (D.N.J. 1995). In *Merle*, a candidate challenged application of the Hatch Act's prohibition on federal employees running for political office to his employment with the Postal Service. *Id.* at 94. Even though the election already passed, the Third Circuit found the plaintiff's claim was not moot because it fell within the exception of being capable of repetition, yet evading review. *Id.* at 94-95. The court found the two-year period between election cycles for congressional candidates to be too short to fully litigate, and acknowledged that practically, the duration is in fact much shorter. *Id.* at 95. The court found a reasonable expectation the plaintiff would be subject again to the same harm, rejecting the Government's contention that he could not satisfy this prong of the exception without specifically alleging his intent to run for the same office in the next election. *Id.* By contrast, the court held that there was a reasonable expectation that the plaintiff would wish to run for the same office in the next election "or at some future date." *Id.* Moreover, while not necessary to its holding, the court went on to say that it could nevertheless find sufficient expression of intent from the mere fact that the brief submitted on the plaintiff's behalf

maintained that he and other federal employees will continue to be subject to the Hatch Act in future elections. *Id.*

In *De La Fuente v. Cortés*, 261 F. Supp. 3d 543 (M.D. Pa. 2017), *aff'd*, 751 Fed. Appx. 269 (2018), the plaintiff was a candidate who first sought the Democratic nomination for President in the 2016 primary election, and who then sought the same office as an independent candidate in the 2016 general election but was unable to do so pursuant to Pennsylvania's "sore loser" laws. *Id.* at 547. The plaintiff intended to run again for President in 2020 as a Democrat or an independent. *Id.* The defendants argued that the claim was moot because the 2016 election was over and unripe because the 2020 election claims were hypothetical. *Id.* at 549. However, the court found that state law prevented the plaintiff's ability to continue his 2016 run, and would have a similar impact on his 2020 campaign. *Id.* Thus, the court found that the claims were "not purely hypothetical but are grounded in factual occurrences that are susceptible to repetition." *Id.*

The court recognized that "[t]his exception [to mootness] readily applies to most election cases." *Id.* (citing *Merle*, 351 F.3d at 94). The court explained that the plaintiff's harm would likely not arise until merely months before an election, which is too short to fully litigate his claim, and thus absent the exception to mootness, would "always bump against a jurisdictional bar." *Id.* Furthermore, the court emphasized that the plaintiff "expressed his intent to run in the 2020 election, where he is likely to face the same obstacles and raise the same claims again." *Id.* The court rejected defendants' skepticism as to whether the plaintiff would actually run in 2020, holding that the court "do[es] not require substantial evidence of Plaintiff's intent to determine that he is likely to run in 2020." *Id.* at 449-50. Moreover, the court noted even in instances where a "plaintiff failed to allege an intent to run for office again," the Third Circuit nevertheless found that it was "'reasonable to expect that [the plaintiff] will wish to run for election' at the next

40

opportunity, or even at some future date." *Id.* at 450 (quoting *Merle*, 351 F.3d at 95). Therefore, the dispute fell "within the 'capable of repetition, yet evading review' exception to the mootness doctrine and [was] ripe for adjudication." *Id.*

Here, the 2020 Candidate Plaintiffs also fall within the well-established exception to mootness.[19] Notably, Defendants/Intervenor simultaneously urge this Court to find that Plaintiffs lack standing because the controversy is both moot and unripe. In other words, Defendants make the dubious argument that Plaintiffs claims are simultaneously too early and too late. However, as the case law set forth above makes clear, there is no magic date when plaintiffs must file suit to address constitutional injuries to fundamental voting rights that impact candidates in each and every primary election cycle, which in this State, occur each and every year.

Regarding the first prong of the exception, as with other election cases, there is too short of a duration to fully litigate their claims. Primary elections in New Jersey are typically held on the first Tuesday after the first Monday in June. *N.J.S.A.* 19:23-40. Candidates must file their petitions 64 days prior to the primary. *N.J.S.A.* 19:23-14. The ballot draw to determine the position of candidates occurs 53 days prior to the primary. *N.J.S.A.* 19:23-24. The draft ballot or "printer's proof" showing the positioning of candidates is due 50 days prior to the primary. *N.J.S.A.* 19:14-1. This is far too short of a period in which to fully litigate a constitutional challenge to ballot laws and practices which Defendants claim to have been in existence for 80 years. From a practical perspective, it would require Plaintiffs to bring their constitutional challenge via an order to show cause, within an expedited proceeding. In addition, to actually obtain relief, Plaintiffs would have to contend with additional statutory deadlines. The County Clerks must begin mailing ballots by 45 days prior to the primary, *N.J.S.A.* 19:63-5; *N.J.S.A.*

---

[19]     Defendants/Intervenor do not assert that Lucide's claim is moot.

19:63-9. Thus, if candidates learn their ballot position 50 days before the election, and if mail-in ballots begin to be sent out 45 days before the election, *that leaves a whopping 5 days for plaintiffs to mount and resolve their constitutional challenge* without the court adjusting sensitive statutorily prescribed deadlines.

Furthermore, many federal courts deciding ballot order cases have required a close examination of the evidence in the record regarding the burden to the plaintiffs' rights and the defendants' state interests. *See, e.g.*, *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 551 (6th Cir. 2014) (remanding case for further development of factual issues); *Sangmeister v. Woodard*, 565 F.2d 460, 465-66 (7th Cir. 1977) (relying on expert testimony to strike down ballot order law); *Nelson v. Warner*, 477 F. Supp. 3d 486, 496-97 (S.D. W. Va. 2020) (striking down ballot order law after consideration of expert testimony, reports, and studies); *Graves v. McElderry*, 946 F. Supp. 1569, 1574-76 (W.D. Okla. 1996) (striking down ballot order law after considering expert testimony from both sides). Even ballot order cases that have failed have often been due to lack of a sufficiently developed record. *See, e.g.*, *Democratic-Republican Org. of N.J. v. Guadagno*, 900 F. Supp. 2d 447, 458-59, 465 (D.N.J. 2012), *aff'd*, 700 F.3d 130 (3d Cir. 2012) (plaintiffs did not present any empirical evidence or affidavits/certifications of benefits or harms regarding ballot position, contrary to case law requiring plaintiffs to show same); *New Alliance Party v. N.Y. State Bd. of Elections*, 861 F. Supp. 282, 287-88 (S.D.N.Y. 1994) (plaintiffs offered no empirical evidence, studies, or expert testimony). It would be virtually impossible to put forth a fully-developed factual record in such a short period of time.

If Defendants'/Intervenor's position were taken to its logical conclusion, then election law cases would almost always be shielded from judicial review. They would essentially become ripe for a very short period of time, and then immediately become moot without the issuance of

final, permanent injunctive relief and/or consideration of any appeals. This would essentially strip the federal courts of their Article III jurisdiction to review the constitutionality of fundamental voting rights. Perhaps for this reason, the Third Circuit and other federal courts have consistently held that "most election cases[] fit[] squarely within the 'capable of repetition yet evading review' exception." *See Merle*, 351 F.3d at 94; *De La Fuente*, 261 F. Supp. 3d at 549; *see also Porter v. Jones*, 319 F.3d 483, 490 (9th Cir. 2003) ("Election cases often fall within [the mootness] exception, because the inherently brief duration of an election is almost invariably too short to enable full litigation on the merits."); *Joyner v. Mofford*, 706 F.2d 1523, 1527 (9th Cir. 1983) ("If such cases were rendered moot by the occurrence of an election, many constitutionally suspect election laws—including the one under consideration here—could never reach appellate review."). Surely, the role of the federal courts to protect fundamental rights, including the right to vote which is preservative of all rights, cannot be reduced to fly-by-night emergency order to show cause litigation within some magical window of time fabricated by Defendants, without sufficient time and due process to develop a record or the ability to obtain permanent relief.

The 2020 Candidate Plaintiffs also meet the second prong of the exception because there is a reasonable expectation that they will be subject to the same action. Defendants themselves contend that the laws and practices surrounding bracketing of candidates on the ballot and preferential draws to determine ballot position have existed in each and every primary election for decades. *See, e.g.*, Ocean County Clerk Br., ECF 55-1, p. 23 (describing same as "seventy-eight years of precedent"). If the ballot laws are as static as Defendants claim, it is a plausible and natural inference that, as alleged in the Complaint, "[t]he same principles impacted various elections up and down the ballot and across various counties in the 2020 primary election and

43

beyond, and is virtually certain to allow the State to put its thumb on the scales in favor of certain bracketed candidates in all subsequent primary elections, as it has in past primary elections." ECF 33, ¶ 173.

Conforti, Marchica, and Spezakis specifically and overtly allege that they will run in Democratic primary elections in the future. *See id.* at ¶¶ 23, 36, 47. For example, Spezakis intends to run in the 2022 Democratic Primary Election for Member of the House of Representatives. *Id.* at ¶¶ 160, 166. This office is not a traditional pivot point office (e.g., President, United States Senator, Governor, joint petition county candidates). On this basis alone, it is reasonably likely that she will be required to engage in arbitrary and unjustified gamesmanship surrounding her ballot position and display. *Id.* It is reasonably certain that she will have to face the Hobson's choice of (1) being forced to associate with candidates running for other offices to protect her ballot position, or (2) exercising her right to not associate with candidates running for other offices and thereby forfeiting her ability to obtain preferential ballot position. *Id.*

Furthermore, Spezakis has already declared that she does not intend to bracket with any other candidates running for any other offices, making it reasonably likely, if not virtually certain, that she will not be included in the preferential ballot draw, and will have no ability to receive the first ballot position. *Id.* It is also reasonably likely that she will be placed in a column by herself or that she will be placed in a column with candidates running for other offices with whom she did not request to bracket and who have different slogans and are otherwise not associated with her. *Id.* One of these fates is inevitable for any unbracketed candidate. Moreover, given the universality of the county line and past experience in virtually every single primary election outside of Sussex and Salem Counties, it is reasonably likely that Spezakis will have to

compete against an opponent featured on the county line, with a full or almost-full slate of candidates running for every office. *See id.* at ¶¶ 67-68. As explained in the injury-in-fact section above, it is reasonably likely that Spezakis' electoral prospects will be diminished in the multiple ways set forth throughout this brief. Indeed, Spezakis' unbracketed 2020 opponent was placed in Ballot Siberia with blank spaces between himself and the bracketed candidates for the same office in Bergen and Hudson County. *See id.* at ¶¶ 154, 161. In fact, a combination of some or all of these harms were suffered by each unbracketed 2020 Candidate Plaintiff in the 2020 primary. *See id* at ¶¶ 103, 109, 120, 144.

The same principles regarding reasonable expectation of suffering similar harm hold true for Kreibich and McMillan. As discussed in *De La Fuente*, courts within the Third Circuit "do not require substantial evidence of [a plaintiff's] intent to determine that [they] are likely to run in" a future election. 261 F. Supp. 3d at 449-50; *see also Davis v. Fed. Election Comm'n*, 554 U.S. 724, 736 (2008) (Supreme Court relied on an unbriefed, after-the-fact public statement of the plaintiff candidate that he would self-finance his campaign for another attempt to win a congressional seat – a statement made shortly before the plaintiff filed his reply brief to the Supreme Court and well after the whole case had already been litigated – as the sole basis for finding that the plaintiff's intention to run did not render the case moot). Rather, even in instances where plaintiffs do not clearly allege any intent to run for office again, the Third Circuit still found it reasonably likely to expect that the plaintiff would want to run for office at the next available opportunity and/or in a future election. *See Merle*, 351 F.3d at 95; *see also Acosta*, 288 F. Supp. 3d at 624 ("[I]t is reasonable to assume that Plaintiffs would attempt to run for office in future elections."); *Arons*, 882 F. Supp. At 383 (claims not moot just because

45

election was over as the issue was "likely to re-emerge in future electoral seasons" and therefore "reflects a continuing controversy").

In the election context, the Third Circuit also refused to dismiss the claims of candidate plaintiffs who challenged a Pennsylvania ballot access law concerning filing fees based on indigency despite the fact that the plaintiffs did not set forth any intention of running in future elections. *See Belitskus v. Pizzingrilli*, 343 F.3d 632, 648 n.11 (3d Cir. 2003). Even though it was a "close" question as to whether the candidates would actually run again and whether they would also qualify as indigent again, the court found that in such circumstances "the only question . . . [is] whether there is a 'demonstrated probability' that the same parties will again be involved in the same dispute." *Id.* (citing *Honig v. Doe*, 484 U.S. 305, 318 n.6 (1998)). The Third Circuit concluded it was "reasonable to expect political candidates to seek office again in the future." *See id.* (adopting the holding of *Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 37 n.12 (1st Cir. 1993) (stating the case was not moot where plaintiff "ha[d] not renounced possible future candidacies" and recognizing candidates' general inclinations to not be easily discouraged and run again)). The Third Circuit further found that in the absence of contrary evidence, it could reasonably assume that the plaintiffs would "again seek a waiver of the mandatory filing fees based on indigency." *Id.* The court thus concluded that there was "every reason" to expect a similar controversy in the future from the same parties. *Id.* (citation omitted). Importantly, the Third Circuit further acknowledged that if the case was found to be outside the capable-of-repetition exception to mootness, it would "doom all challenges to the [state's] ballot access law," given that future indigent candidates would similarly be unable to have their claims completely adjudicated during the course of a single election cycle. *See id.* (citing *Arkansas AFL-CIO v. Federal Communications Comm'n*, 11 F.3d 1430, 1436 (8th Cir. 1993)).

46

*Belitskus* is instructive as to all Plaintiffs, and particularly as to Kreibich and McMillan, insofar as it demonstrates that in the election context, the default position is that absent renunciations of an intent to run in the future, it is reasonably likely that a candidate *will* run for office again, even in the absence of specific statements affirming so. *See id.* Furthermore, neither Kreibich nor McMillan bracketed with candidates running for the office drawn as the pivot point in the 2020 Primary Election, *see* ECF 33, ¶¶ 121, 145, and there is no reason to believe that they will in future elections. *See Belitskus,* 343 F.3d at 648 n.11 (finding that without evidence to the contrary it was reasonable for the court to assume that the same plaintiffs would run again and also meet the indigency requirements thereby confronting the same limitations to ballot access such that the case is not rendered moot). Therefore, it is reasonably likely that they will not be included in the preferential draw and therefore cannot obtain first ballot position. It is also reasonably likely that they will have to compete against the full weight of the county line, just like they did in the 2020 primary, as did all of the Plaintiffs seeking the Court's relief today. *See* ECF 33, ¶¶ 103, 109, 120, 134, 144, 160, 166. At the very least, it is reasonably likely they will again be forced to make a Hobson's choice pitting ballot position advantages against the right to not associate, forfeiting either their electoral prospects and Equal Protection rights or their First Amendment rights.

Moreover, in interpreting the appropriateness of the capable of repetition, yet evading review exception to mootness in *this* ballot order case, the vast overwhelming weight of federal case law consistently demonstrates that ballot order cases do not become moot simply because the election already took place. *See Sarvis v. Alcorn*, 826 F.3d 708, 713 (4th Cir. 2016), *cert. denied*, 137 S.Ct. 1093 (2017) (parties determined that litigation would not be resolved in time but also agreed that plaintiff intended to seek office in future so case would remain ripe under

capable of repetition, yet evading review exception); *Hargett*, 767 F.3d at 544-45 n.1 (claim would not be moot because capable of repetition, yet evading review); *Board of Election Comm'rs v. Libertarian Party of Illinois*, 591 F.2d 22, 24 (7th Cir.), *cert. denied*, 442 U.S. 918 (1979) (not moot even though election already occurred as it was capable of repetition, yet evading review); *Schafer v. Lamone*, 2006 U.S. Dist. LEXIS 96855, *2-3 n.3 (D. Md. 2006), *aff'd* 248 F. App'x 484 (4th Cir. 2007), *cert. denied*, 522 U.S. 1313 (2008) (claim not moot simply because plaintiff lost the primary election because it was capable of repetition, yet evading review); *Buckley*, 8 F. Supp. 2d at 1248 n.4 (fact that candidate plaintiffs did not qualify for next general election ballot or announce intention to run does not render their case moot); *Graves v. McElderry*, 946 F. Supp. 1569, 1576-77 (W.D. Okla. 1996) (applying exception to mootness where some plaintiffs expressed through affidavits intent to run again in a future election); *Clough v. Guzzi*, 416 F. Supp. 1057, 1060 n.3 (D. Mass. 1976) (not moot even though plaintiff was not a candidate in the next primary election because it was capable of repetition, yet evading review as cases challenging election practices will rarely be settled while a particular election is still live).

In fact, these cases include instances where federal courts have held that ballot order cases are not moot, even where the plaintiff had *not declared* an intention to run in any future election. *See, e.g.*, *Buckley*, 8 F. Supp. 2d at 1248 n.4 (fact that candidate plaintiffs did not qualify for next general election ballot or announce intention to run does not render their case moot); *Clough*, 416 F. Supp. At 1060 n.3 (not moot even though plaintiff was not a candidate in the next primary election); *see also Hargett*, 767 F.3d at 544-45 (plaintiffs had standing to sue even though they "have not qualified for ballot access in an upcoming election" because they did

appear on the ballot in a prior election cycle "and were therefore subject to the ballot-order rules at that time").[20]

Against this considerable body of case law, and despite having filed approximately 200 combined pages of briefing, Defendants/Intervenor collectively fail to cite to a single ballot order case dismissed for mootness on the grounds that the election already occurred, or that the doctrine of capable of repetition, yet evading review was insufficient to overcome such arguments.

Because the 2020 Candidate Plaintiffs' claims fall into the exception of being capable of repetition, yet evading review, they are also not unripe. Especially in the election context, courts have held that matters which met the exception to mootness were also not unripe. *See, e.g.*, *Benezet Consulting, LLC v. Boockvar*, 433 F. Supp. 3d 670, 684 (M.D. Pa. 2020) ("'It is reasonable to expect' that Plaintiffs intend to participate in the 2020 primary process in such a way as to invoke application of the challenged provisions, which is sufficient to negate any finding of mootness *and establish that Plaintiffs' claims are ripe for review*.") (emphasis added) (citation omitted); *De La Fuente*, 261 F. Supp. 3d at 549-50 (finding the continuing effect of laws that burdened Plaintiff in the prior election cycle sufficient to conclude that the plaintiff's claim was not hypothetical but "grounded in factual occurrences that are susceptible to repetition," and holding that "therefore . . . Plaintiff's claims fall within the 'capable of repetition yet evading review' exception to the mootness doctrine *and are ripe for adjudication*.")

---

[20]   The evolution of this election law jurisprudence is consistent with the most frequently cited example of the capable of repetition, yet evading review doctrine, regarding women's rights to bodily autonomy. *See Roe v. Wade*, 410 U.S. 113 (1973). One dare not fathom a circumstance where, in order to obtain relief, a woman would be forced to explicitly admit an intent for future harm despite past harm. Such is the very definition of evading review.

(emphasis added).[21] Regarding the election context, courts within the Third Circuit have recognized that "[o]ur abiding interest in the constitutionality of the elections process cannot be negated by adjudging every case unripe before the election or moot after the election." *Morrill v. Weaver*, 224 F. Supp. 2d 882, 891 (E.D. Pa. 2002). Indeed, Defendants/Intervenor have not pointed to a ballot order case (let alone another election case) where courts have found that the plaintiff's claims fell within the mootness exception of being capable of repetition, yet evading review, and were nevertheless found to be unripe. The 2020 Candidate Plaintiffs' claims are neither moot, nor unripe.

Furthermore, any of Defendants' contentions that Lucide's claims are not ripe are premised on the alleged existence of contingencies. However, as set forth above, *see supra* at pp. 4-5, 16-18, there are no longer any contingencies needed to demonstrate harm to Lucide. We already know that he is running for office, we already know he is on the ballot, we already know his ballot position, we already know that he is featured in a column by himself, and we already know that his opponent is featured on the county line which consists of a full column of 16 candidates, with Governor Murphy at the top of the ticket. These issues thus arise in a concrete

---

[21]     Courts in other circuits have done the same. *See, e.g.*, *Saris*, 826 F.3d at 713 (acknowledging that the parties and district court agreed that the case would not be resolved before the election and that if the plaintiffs "intend to seek elected office in the future, their case would *remain ripe* beyond the [election] under the capable of repetition yet evading review doctrine") (emphasis added); *Hargett*, 767 F.3d at 545 n.1 (injury in ballot order case that was capable of repetition yet evading review was "[s]imilarly . . . *not unripe*, as it 'arises in a concrete factual context and concerns a dispute that is likely to come to pass.'" (emphasis added) (citation omitted); *Porter v. Jones*, 319 F.3d 483, 490-91 (9th Cir. 2003) (finding that the presentation of a fully developed factual scenario in the prior election cycle and intent to engage in similar conduct in a future election cycle was "relevant to Plaintiff's claim that this controversy is capable of repetition, yet evading review, *and cannot be read to constitute a separate, unripe claim*.") (emphasis added); *see also Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 623 n.3 (1982) (Stevens, J. dissenting) ("[A]n order that is capable of repetition yet evading review generally is no less ripe for review the first time it is presented than it would be on subsequent occasions.").

factual context giving rise to a real threat of harm that is not hypothetical nor speculative; as such, they demonstrate "a substantial controversy, between parties having adverse legal interest, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *See Step-Saver Data Systems, Inc. v. Wyse Technology*, 912 F.2d 643, 647 (3d Cir. 1990) (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). Moreover, Lucide's claims cannot be unripe because, as explained above, *see supra* at p. 29, Lucide has already been harmed in light of the fact that mail-in ballots featuring Lucide in a column by himself going up against the full weight of the line were mailed out to voters weeks ago, and continued harm is imminent as voters continue to vote their mail-ballots and/or on machines or paper ballots through early voting and/or on Election Day.

In sum, the Amended Complaint presents Plaintiffs in varying circumstances: candidates whose equal protection, freedom of association, and other First and Fourteenth Amendment rights related to the right to vote and engage in the political process have been injured in connection with the 2020 and 2021 primary elections and those whose rights are reasonably likely to be injured in connection with the 2021, 2022, and/or other future primary elections. Plaintiffs include candidates whose rights were injured in connection with the 2020 or 2021 primary election and who have also indicated their intent to run in the 2022 and future primary elections. They include candidates who ran and are running for federal office, county office, local office, and party office. They include candidates who did not and/or will not bracket with candidates for office in future elections. They include those who were and/or will be excluded from obtaining the first ballot position; placed one or more columns apart from candidates running for the same exact office; forced to bracket with candidates with whom they did not wish to associate in order to protect their ballot position including being featured in the same column

as their opponent; placed in columns by themselves with no other candidates running for any other offices below or above them and/or otherwise contending against the weight of the line; and placed in a column with candidates with a different slogan and with whom they did not wish to associate. Defendants' assertion that none of these various candidates in all of these various situations have standing to sue does damage to well-recognized standing principles and would render the Court unable to redress significant First and Fourteenth Amendment and other violations for all practical purposes. Surely, the role of the judiciary is not so limited.[22]

To the extent that the Court finds that any *one* of the Plaintiffs have standing, the Court need not decide whether any of the other Plaintiffs have standing. In *Nelson*, the court declined to address whether two individual plaintiffs had standing in a ballot order case because it already found that one other individual and two organizational plaintiffs had standing. *See id.* at 501 (citing *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.") (quoting *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006))); *see also Pavek v. Simon*, 967 F.3d 905, 907 n.2 (8th Cir. 2020) ("[W]e need not determine whether the individual-voter plaintiffs have standing because the political committees do.") (citing *Dep't of Commerce v. New York*, 139 S.Ct. 2551, 2565 (2019) ("For a legal dispute to qualify as a genuine case or controversy, as least one plaintiff must have standing to sue.")).

---

[22] Because Plaintiffs have alleged that NJWF's members include candidates who were harmed in the same way in the 2020 primary election and who have been or will be harmed in the same way in the 2021 primary election and/or future elections, its claims are also not moot and/or fall within the exception for being capable of repetition, yet evading review, and are not unripe. Moreover, NJWF's direct harm, including diversion of resources, already occurred in 2020 and is likely to recur in the future. This further supports its position that its claims are neither moot, nor unripe.

**C. This Case Does Not Present a Nonjusticiable Political Question.**

One Defendant argues that Plaintiffs' claims present a non-justiciable political question on the basis that allegedly no judicially discernable and manageable standard exists to determine fairness in allocation of the first ballot position, and that even if there were such a standard, there would be no way to identify when it was violated. *See* ECF 55-1, p. 10-11 (citing *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019)). Notably, the Ocean County Clerk is the only defendant to raise this argument, and the Intervenor Attorney General does not assert it on behalf of the State. Further, the Ocean County Clerk asserts this argument only with respect to ballot order for the first ballot position, and thus does not address any of the other compounding issues presented here – including the weight of the line, ballot gaps, Ballot Siberia, stacking, bad ballot design features that cause over-votes, etc. Nevertheless, the Ocean Clerk convolutes the applicability of *Rucho*.

*Rucho* is a landmark redistricting case presented to the Supreme Court following nearly 50 years of the Court's grappling with partisan gerrymandering claims generally, and two decades of legal contests concerning various reiterations of the North Carolina maps specifically. *See generally id.* Ultimately, the Court held that partisan gerrymandering claims – unlike other redistricting challenges such as one-person-one-vote/vote-dilution or racial gerrymandering challenges, *see id.* at 2495-96 – present nonjusticiable political questions for want of identifying a "clear, manageable, and politically neutral" standard. 139 S. Ct. at 2498 (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 306-08 (2004)). *Rucho* reasoned that partisan gerrymandering challenges are grounded in the Guarantee Clause of Article IV, § 4 (guaranteeing a republican form of government), *id.* at 2506, which are non-justiciable because they force the Court into an untenable evaluation of fairness, *see id.* at 2506-08. *See also Colegrove v. Green*, 328 U.S. 549

(1946) (invalidating a congressional redistricting challenge premised on the failure of Illinois to redistrict in 45 years, reasoning that "Courts ought not enter this political thicket. . . . Violation of the great guaranty of a republican form of government in States cannot be challenged in the courts"). *But see Baker v. Carr*, 369 U.S. 186 (1962) (reversing *Colegrove* and explaining the political question doctrine, holding that redistricting challenges are justiciable pursuant to Fourteenth Amendment).

The Court explained that the struggle in the partisan gerrymandering context is that determining political fairness necessarily required the Court to engage in political determinations of concepts of fairness that inevitably conflicted with one another. *Id.* at 2500. For example, on one hand, under one conception of political fairness, district lines could be drawn to create the greatest amount of competitive districts; yet, this quest for achieving competitive districts could lead to one party having very few seats after losing many close elections. *Id.* On the other hand, under a different conception of political fairness, district lines could be drawn to create the greatest number of safe seats to obviate representation for both political parties; yet, doing so could lead to a lack of competitive districts and wading into the distribution of political power. *Id.* Thus, these competing visions of fairness are a zero-sum game, whereby trying to achieve one aspect of political fairness directly compromised a different aspect of political fairness. *Id.* Moreover, they are the types of considerations that "pose[] basic questions that are political, not legal." *Id.*

Rucho is inapposite here and should not be read expansively to limit applicability of the *Anderson/Burdick* balancing test, nor to end judicial review of ballot order cases which have relied on this standard to determine First and Fourteenth Amendment and Equal Protection challenges. *See Pavek v. Simon*, 967 F.3d 905, 907 (8th Cir. 2020) (acknowledging *Rucho* and

nevertheless concluding, "We have adjudicated the merits of such [ballot order] claims before and have comfortably employed judicially manageable standards in doing so.") (citation omitted). Specifically, courts have applied this test to determine whether the state's interests are sufficiently weighty to justify the burden it places on plaintiffs' rights. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (lead opinion). This familiar test has been applied by federal courts for decades, and specifically in the context of ballot order cases, including from the Third Circuit. *See, e.g.*, *Guadagno*, 900 F. Supp. 2d at 447.

Unlike the zero-sum game of considerations and competing visions of fairness in the partisan gerrymandering context, ballot order cases do not implicate the same concerns. Indeed, in describing the history of the struggle with partisan gerrymandering, the Court cited its earlier decisions acknowledging that "[p]olitics and political considerations are inseparable from districting and apportionment." *See id.* at 2497 (quoting *Gaffney v. Cummings*, 412 U.S. 735, 753 (1973)). The Court further emphasized this point, stating that "[t]o hold that legislators cannot take partisan interests into account when drawing district lines would essentially countermand the Framers' decision to entrust districting to political entities." *Id.* Regardless of whether political considerations are appropriate in the redistricting process, the same cannot be said for ballot order cases, as a ballot is meant to be a neutral forum upon which voters can select candidates, not a forum upon which to assert political power or inject political considerations. Whereas redistricting and reapportionment may be inherently political, a ballot certainly does not have to be. By contrast, ballots are inherently grounded in principles of equal treatment and evenhandedness; and while there may be legitimate reasons (state interests) with respect to a ballot, that could infringe on notions of equal treatment and associational rights (burdens on First and Fourteenth Amendment rights), courts can apply the familiar *Anderson/Burdick* balancing

test to determine whether the asserted state interests are sufficiently weighty to justify the restrictions on First and Fourteenth Amendment rights. *See Crawford*, 553 U.S. at 191.[23]

Finally, federal courts cannot ignore a Supreme Court summary affirmance necessarily concluding that judicially manageable standards do exist to consider challenges to ballot order schemes. *See Hicks v. Miranda*, 422 U.S. 332, 344 (1975) ("[L]ower courts are bound by summary decisions by this Court until such time as the Court informs [them] that [they] are not.") (internal quotation marks and citation omitted). In *Mann v. Powell*, 314 F. Supp. 677 (N.D. Ill. 1969), a three-judge district court held that a practice employed by the Illinois

---

[23]    While Plaintiffs maintain that the ballot order context is distinguishable from the partisan gerrymandering context in *Rucho* generally, the distinctions become even clearer in the specific context of primary election ballots, which are at issue here. In fact, there can be no concern that federal judges would be "reallocat[ing] political power between the two major political parties," *Rucho*, 139 S. Ct. at 2507, as all candidates on a primary election ballot, at least in New Jersey, must belong to the same political party. As such, there is no risk that a federal court will encounter any of the concerns raised in *Rucho* by using the *Anderson/Burdick* standard to determine if some primary election candidates are being favored and/or disfavored in their ballot position vis-à-vis their opponents from the same political party running for the same office. Especially in the primary election context, such determinations are clearly legal, and not political, do not implicate clear separation of powers issues, do not thrust the court into making decisions based on competing political considerations of fairness, and are not inseparable from politics and political considerations.

Moreover, unlike the partisan gerrymandering conundrum where *thousands of maps* may be scrutinized along with their data inputs and algorithms due to the sophistication of election data science, here other states' primary election ballots provide examples of nondiscriminatory ballot designs and ballot ordering systems. *See* ECF 33, ¶¶ 3-4.

While courts do not have to select between which ballot order system is the most fair, they are well-equipped to determine which ballot order schemes unconstitutionally burden plaintiffs' constitutional rights, and to enjoin same. *See, e.g.*, *McLain*, 637 F.2d at 1169-70 (finding ballot order system favoring incumbents unconstitutional and leaving it to the Legislature to fix within constitutional bounds for future elections); *Sangmeister*, 565 F.2d at 468-69 (finding constitutional violation and remanding to order defendants to adopt any constitutional system that is neutral and takes account of all parties); *Graves*, 946 F. Supp. at 1582 (finding constitutional violation and leaving it to defendants to find a system that does not discriminate); *Nelson*, 477 F. Supp. 3d at 515 (permanently enjoining defendants from issuing ballot prepared under the state's ballot order statute and ordering defendants to implement a ballot order system that comports with the Constitution until such time as the state "legislature adopts a permanent alternative").

Secretary of State to determine ballot order was unconstitutional and issued injunctive relief prohibiting the practice. The court later granted permanent injunctive relief. *Mann v. Powell*, 333 F. Supp. 1261 (N.D. Ill. 1969). The Illinois Secretary of State appealed directly to the Supreme Court, which summarily affirmed the decision of the district court, thereby leaving in place the permanent injunction. *See Powell v. Mann*, 398 U.S. 955 (1970).

While a summary affirmance should not be construed to mean that the Supreme Court adopted the reasoning of the lower court, such courts are prohibited from reaching contrary conclusions with respect to the precise issues presented as well as those "necessarily decided by" the Court. *See Mandel v. Bradley*, 432 U.S. 173, 176 (1976). In *Mann*, the Illinois Secretary of State presented the question for review as: "Does the 'political question doctrine' permit federal judicial cognizance of political cases, involving inter- or intra-party election disputes?" *Powell v. Mann,* No. 1359, Appellants' Motion to Supreme Court, 1970 WL 155703, *6 (March 27, 1970). Specifically, the chief election official for the State of Illinois argued that the "lack of predeterminable federal standards" of how to review a challenge on ballot order turned on "subjective . . . notions of political fairness" that would lead to "an unprecedented over-extension of the federal judicial power into the internal political affairs of a State." *Id.* at *18-21.

The Supreme Court was unfettered and summarily affirmed the *per curiam* 3-Judge District Court's decision, thereby leaving in place the injunction that candidates' names be drawn and listed on the primary ballot "by lot or other nondiscriminatory means . . . such [that] candidates shall have an equal opportunity to be placed first on the ballot." 314. F. Supp. at 677. By summarily affirming the grant of injunctive relief, the Supreme Court necessarily had to have rejected all jurisdictional arguments raised, and particularly nonjusticiability because of political question; otherwise, if the Supreme Court agreed with the Secretary of State on this issue, the

Court would have had to vacate the injunction.  It did not do this in *Mann* but did in *Rucho*, *see*

139 S.Ct. at 2508.  Accordingly, in *Mann*, the Supreme Court "necessarily decided" on the

"precise issue" of the inapplicability of the political question doctrine to a ballot order challenge,

and such conclusion is binding.[24]

**POINT II**

**THE COURT SHOULD DENY DEFENDANTS' MOTIONS
TO DISMISS THE AMENDED COMPLAINT BECAUSE
PLAINTIFFS ALLEGE PLAUSIBLE FACTS SUFFICIENT
TO STATE A CLAIM UPON WHICH RELIEF CAN BE
GRANTED.**

Defendants seemingly attempt to turn their motions to dismiss into an argument more

suited for a summary judgment brief after the close of discovery, after the parties have had a

chance to bring forth evidence and test the claims about the level of burden on candidates

brought about by unconstitutional ballot design laws, consideration of the state interests, and the

alleged importance of those interests in light of the burden – key factors to a decision on the

merits. This is inappropriate at this stage of the case. Plaintiffs clearly plead factual allegations to

withstand a motion to dismiss.

---

[24]    *See Hicks v. Miranda*, 422 U.S. 332, 344 (1975) ("[L]ower courts are bound by summary decisions by this Court 'until such time as the Court informs (them) that (they) are not.'" (*quoting Doe v. Hodgson*, 478 F.2d 537, 539 (2d Cir. 1973)); *Picou v. Gillum*, 813 F.2d 1121, 1122 (11th Cir. 1987) ("A summary affirmance by the Supreme Court has binding precedential effect."); cf. ROBERT STERN ET AL., SUPREME COURT PRACTICE 287 (6th ed. 1986) (explaining that such affirmances still have precedential value). The precedential value of summary affirmances is not limitless, however. *See Anderson v. Celebrezze*, 460 U.S. 780, 784-85 n.5 (1983) ("We have often recognized that the precedential value of a summary affirmance extends no further than the precise issues presented and necessarily decided by those actions." (internal quotation marks omitted)). *See also* Joshua A. Douglas and Michael E. Solimine, *Precedent, Three-Judge District Courts, and the Law of Democracy*, 107 Geo. L.J. 413 (2018) (explaining precedential value of Supreme Court summary affirmance of a decision by a three-judge district court).

A. **Consideration of the Merits is Inappropriate on a Motion to Dismiss**

Defendants cannot meet their burden of demonstrating that the Amended Complaint fails to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *See Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In applying the test described in the Standard of Review, *supra*, "[t]he inquiry is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims." *Rockefeller Ctr. Properties, Inc. Sec. Litig. v. Rockefeller*, 311 F.3d 198, 215 (3d Cir. 2002) (citation omitted). Dismissal at this stage is only appropriate if the Defendants prove "beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.*

While consideration of the merits is inappropriate on a motion to dismiss in any case, here it is especially inappropriate given that the First and Fourteenth Amendment claims are governed by the familiar *Anderson/Burdick* balancing test applied in voting rights cases challenging the constitutionality of state laws. *See, e.g.*, *Democratic-Republican Org. of N.J. v. Guadagno*, 900 F. Supp. 2d 447, 453 (D.N.J. 2021), *aff'd*, 700 F.3d 130 (3d Cir. 2012) (applying *Anderson/Burdick* balancing test to ballot order case); *Nelson v. Warner*, 477 F. Supp. 3d 486, 502 (S.D. W. Va. 2020) (same). This balancing test calls for a careful analysis of "the character and magnitude of the asserted injury," and the "precise interests put forward by the State as justifications for the burden imposed by its rule." *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). Courts must then judicially determine whether the interests are valid at all, then weigh the burdens against the state interests, and take into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* When voting rights under the

59

First and Fourteenth Amendment are subject to "'severe' restrictions," then the state law must be narrowly tailored to support a compelling state interests; however, if the law "imposes only 'reasonable, nondiscriminatory restrictions' . . . [then] 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). There is no threshold amount of severity of a burden that a law must impose. *See Crawford,* 553 U.S. at 191. Instead, a court must weigh and perform the balancing test even for slight burdens, which nevertheless "must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 288-89 (1992)). Under this sliding scale approach, the state's interest must be strong enough to outweigh the burden, so the stronger the burden imposed, the stronger the state interest must be. *See id.* at 202-03.

Because the *Anderson/Burdick* balancing test calls for determining and then balancing the character and magnitude of the burden and of the strength of the precise interest of the state, and considering the extent to which burdening the Plaintiffs' rights is necessary, it is impossible for the Court to make a determination as to the merits without either side being able to introduce any evidence. Indeed, courts have looked very closely at the evidence presented in ballot order cases. *See, e.g.*, cases collected *supra* at pp. 42-43. Therefore, it is wholly inappropriate for Defendants to ask this Court to dismiss this case for failure to statute a claim without affording the Court any opportunity to consider any evidence required to render an analysis of the appropriate consideration under the *Anderson/Burdick* balancing test. For this reason alone, Defendants'/Intervenor's motions to dismiss must be denied.

**B. To the Extent Consideration of the Merits is Warranted, the Alleged State Interests Proffered by Defendants are Insufficient to Outweigh the Burdens Imposed by New Jersey's Bracketing and Ballot Placement Laws.**

The Amended Complaint adequately pleads facts which demonstrate that New Jersey's bracketing and ballot placement laws place a significant and meaningful burden on Plaintiffs' rights, and will continue to place a similar burden on candidates' and voters' rights in future elections. Specific features of New Jersey law and practice warrant the application of strict scrutiny, based on the severity of the burden as well as other independent factors. Furthermore, Defendants have not even articulated a legitimate state interest, and therefore New Jersey's bracketing and ballot placement laws should not even survive a rational basis analysis. To the extent Defendants articulate some form of a legitimate state interest, the Court must await evidence on the exact interest asserted, its weight, if any, and the specific burdens placed on Plaintiffs' rights – none of which are appropriately considered at this stage – before making a determination of whether such state interests are sufficiently weighty to justify the burden imposed.

**1. Significant and Meaningful Burden**

Based on the allegations in the Complaint, New Jersey's bracketing and ballot placement laws place a significant and meaningful burden on Plaintiffs' rights.

a. <u>Ordering of Candidate Names</u>

The Amended Complaint alleges that due to the primacy effect, candidates listed first on the ballot receive additional votes solely because they are listed first. ECF 33, ¶ 96. New Jersey's bracketing and ballot placement laws, as interpreted and as carried out by the county clerks, put a governmental thumb on the scale in favor of certain similarly-situated candidates over others, based on wholly arbitrary criteria. *Id.* at ¶ 173. In particular, county clerks conduct ballot draws

that do not include every candidate running for the same office, in the same draw as against each other, where each would have an equal chance to obtain the first ballot position. *Id.* at ¶ 184. Nor do they rotate candidate names to more evenly distribute the number of times each candidate is listed first. *See id.* at ¶¶ 86, 92. Instead, the county clerks draw for ballot position based on their own uncabined preference about which pivot point office to use for the preferential draw. *Id.* at ¶ 69. Once the candidates for that particular office are drawn, all candidates running for other offices who are bracketed with candidates for the pivot point office are automatically placed on the ballot in the appropriate column, with all such bracketed candidates featured together in the same column with the same slogan. *Id.* at ¶¶ 69, 75. Thus, candidates bracketed with a candidate running for a pivot point office (but not others) are eligible to be included in a drawing where they have a chance to receive the first ballot position and its resulting benefits. *Id.* at ¶ 78.

By contrast, any candidate running for a different office that is not bracketed with a candidate for the pivot point office used by the county clerk in a particular election is automatically excluded from the preferential ballot draw, and thus has no ability to obtain the first ballot position. *Id.* at ¶ 79. These excluded candidates include both those who are bracketed with candidates for other offices but not the pivot point office, and those who are not bracketed with any other candidates for any other offices. *Id.* at ¶ 71. Such unbracketed candidates are harmed because the state-sponsored advantages on the ballot given to their opponents harms their electoral prospects. *Id.* at ¶ 173. Having no ability to even be included in a drawing with their opponents or to ever receive the first ballot position means that they are not competing on equal footing with other candidates running for the exact same office.

Numerous courts have invalidated state laws and practices that prevented certain types of candidates from ever receiving the first ballot position and/or that otherwise provide a ballot

position advantage to certain types of candidates over others. *See, e.g.*, *Mann v. Powell*, 314 F. Supp. 677, 679 (N.D. Ill. 1969), *aff'd*, *Powell v. Mann*, 398 U.S. 955 (1970) (mandating "fair and evenhanded treatment" and enjoining ballot placement of candidates "by any means other than a drawing of candidates' names by lot or other nondiscriminatory means by which each of such candidates shall have an equal opportunity to be placed first on the ballots."); *McLain v. Meier*, 637 F.2d 1159 (8th Cir. 1980) (ballot order system listing winner of last election first and thereby benefitting incumbents was unconstitutional); *Sangmeister v. Woodward*, 565 F.2d 460 (7th Cir. 1977) (ballot order system based on preference and discretion of county clerk was unconstitutional); *Weisberg v. Powell*, 417 F.2d 388 (7th Cir. 1969) (practice of elections officials to use their own preference and discretion to break ties in ballot order system based on order in which petitions were filed was unconstitutional); *Nelson v. Warner*, 477 F. Supp. 3d 486 (S.D. W. Va. 2020) (ballot order system that ordered candidates based on parties' votes for President in prior election was unconstitutional); *Graves v. McElderry*, 946. F. Supp. 1569 (W.D. Okla. 1996) (ballot order system giving Democrats top position on all general election ballots was unconstitutional); *Netsch v. Lewis*, 344 F. Supp. 1280 (N.D. Ill. 1972) (ballot order system that granted priority to candidates based on incumbency and seniority was unconstitutional); *see also Gould v. Grubb*, 536 P.2d 1337 (Cal. 1975) (ballot order system that listed incumbent first and which listed other candidates by alphabetical order was unconstitutional under state and federal constitution); *Kautenburger v. Jackson*, 333 P.2d 293 (Ariz. 1958) (ballot order system based on alphabetical order was unconstitutional under state and federal constitution); *Matter of Holtzman v. Power*, 62 Misc.2d 1020 (N.Y. Sup. Ct. 1970), *aff'd*, 34 A.D.2d 917 (N.Y. App. Div. 1970) (ballot order system listing incumbents first was unconstitutional). In light of this significant body of case law, and the fact that Plaintiffs have not even been given a chance to put

on *any* evidence, Defendants simply cannot meet their burden of demonstrating that there is "no set of facts in support of [their] claim which would entitle [them] to relief." *See Rockefeller*, 311 F.3d at 215.

Making matters worse as to the burdens here, unbracketed candidates are not only prohibited from ever receiving the first ballot position, but they are not even guaranteed a next available column after their bracketed opponents. ECF 33, ¶ 80. The clerks, applying some undefined discretion used in selecting the pivot point, can then impose additional disadvantage on the unbracketed candidates when they place them multiple columns away from their bracketed opponents running for the same office, with one or more blank spaces in between. *Id.* In essence, there is a ballot separation between the bracketed and unbracketed candidates, who are relegated to obscure portions of the bottom or right side of the ballot, where it is harder to find them, harder to know what office they are running for, harder to know who they are running against, and where they otherwise appear as less legitimate candidates. *Id.* at ¶¶ 7, 80, 99. This confuses voters, and costs unbracketed candidates votes, further injuring their electoral prospects and impairing their ability to compete on equal footing with bracketed opponents who are not subjected to these disadvantages. *Id.* at ¶¶ 10, 80, 96, 99-100. These advantages and disadvantages have harmed the electoral prospects of unbracketed like Plaintiffs, and will continue to harm the electoral prospects of all future unbracketed candidates. *Id.* at ¶ 173.

These laws and practices also fail to treat similarly situated candidates the same. *Id.* at ¶¶ 9, 171, 184. As set forth above, whether a candidate is eligible to obtain the ballot advantages or will be subject to ballot disadvantages stem from two factors: (1) whether a candidate is bracketed with a candidate running for a completely different office; and (2) which office the county clerk decides to use as the pivot point. *Id.* at ¶ 186. Each of these criteria is arbitrary and

wholly unrelated to what order candidates' names should appear. *Id.* A candidate's ballot position vis-à-vis their opponents running for the same office should not be determined by something so irrelevant as the discretion of a county clerk in determining a pivot point office or unbridled ballot-design decisions. In fact, courts throughout the country have been particularly critical of ballot order schemes that permit discretion of election officials and non-uniform or arbitrary standards in determining ballot position. *See, e.g.*, *Sangmeister*, 565 F.2d at 467 (striking down ballot order practice that gave discretion to clerks for ballot placement); *Weisberg*, 417 F.2d at 391-94 (discretion exercised by election official to break ties in ballot order system was unconstitutional and in practice tipped scales in favor of some candidates, who were endorsed by party organizations, over others); *Mann*, 333 F. Supp. at 1267 (holding it is unconstitutional for election officials to use discretion to break ties for ballot position and enjoining election officials from breaking ties by any means other than by lot or other nondiscriminatory means where each candidate has an equal opportunity to be placed first).

New Jersey law and practice on pivot points and ballot placement have been secretive, inconsistent, and in total disarray. ECF 33, ¶¶ 67-68, 72, 88-89, 177. The statute that most closely discusses the process for bracketing is *N.J.S.A.* 19:49-2, which provides that candidates for federal, state, and local offices can request and obtain permission to bracket from the campaign manager of joint petition county candidates. *See id.* Presumably relying on this statute, in a given election cycle, some county clerks will use joint petition county candidates (e.g. county freeholder/commissioner) as the pivot point. ECF 33, ¶ 77. A separate statute calls for candidates for United States Senator and/or Governor, when such positions are on the ballot, to be listed in the first column or row of the ballot. *See N.J.S.A.* 19:23-26.1. Presumably relying on this statute, in a given election cycle, some county clerks will use United States Senator or

Governor as the pivot point. ECF33, ¶ 83. While not listed specifically in *N.J.S.A.* 19:23-26.1, some clerks have used President as the pivot point. *Id.* at ¶ 85.

Regardless of what authority or discretion county clerks appear to rely on in a given election, it is completely uncodified and lacks any uniform standard for determining which office to use as the pivot point. *Id.* at ¶¶ 72, 88-89, 177. *See supra* at p. 10 (citing ECF 33, ¶¶ 68, 72, 88-89, 177). These types of arbitrary considerations related to what candidates are running for what other positions and who is bracketed with who have no business dictating ballot advantages and disadvantages to certain candidates at a state-sponsored primary paid at public expense. *See N.J.S.A.* 19:45-1 (primary elections paid "at the expense of the state or its political subdivisions").

Simply put, existing law and practice allows some candidates to draw for first ballot position or to be automatically placed there, while other candidates for the same office are subjected to subsequent rounds of drawing as among each other only for non-preferential ballot position and/or to random, standardless decisions about which column to assign to the other, similarly situated, primary election candidates. It is noteworthy that *N.J.S.A.* 19:23-24, which governs ballot draws, goes into great substantive and procedural detail to ensure fairness between the candidates being drawn for the same office. *See id.* (dictating equal sizes and thickness of cards with candidate names, thorough shaking and mixing of cards, and drawing of cards without knowledge of names); yet, not all candidate are included in the same drawing. Fair procedures are rendered meaningless if they only apply to some candidates, but not to others. While candidates may not have a right to a particular place on the ballot, their exclusion from a chance at obtaining the first ballot position and from equal treatment among candidates running for the same office, violates their constitutional rights.

Defendants/Intervenor make the disingenuous argument that candidates for the same office are treated equally because they all appear on the same horizontal row. *See, e.g.*, Atty. Gen. Br. (hereinafter "AG Brief"), ECF 53-1, at pp. 9-10. In addition to the fact that this is not always the case for unbracketed candidates, *see, e.g.*, ECF 33, ¶¶ 114-15 (Conforti placed in same column vertically with opponent Schmid and in same row horizontally with other opponent Applefield), it nevertheless falls well short of providing equal treatment to candidates. As set forth above, bracketed candidates are included in an initial ballot draw where they have a chance to receive the all-important first ballot position, while unbracketed candidates are excluded from same and will never receive the first ballot position. *Id.* at ¶¶ 78-79. Furthermore, unbracketed candidates, though in the same line, can be featured multiple columns away from their bracketed opponents for the same office. *Id.* at ¶ 80; *see also id.* at ¶ 4 (Camden County ballot, 7 columns away). Defendants'/Intervenor's argument is akin to saying that a race was fair, where one runner had to run two miles and the other runner only had to run one mile, because both runners simultaneously began the race at the same starting line. As with the runners, here the existence of some factor in common does not suffice for equal protection principles under the First and Fourteenth Amendments when one group of candidates is systematically provided with a ballot advantage over others.

b. <u>Visual Cues and the Weight of the Line</u>

The Amended Complaint alleges that, separate and apart from the primacy effect, bad ballot design practices employed by county clerks influence voters to vote for certain candidates over others. *Id.* at ¶¶ 96, 99. Year in and year out, in virtually every election cycle, New Jersey's primary election ballot will inevitably feature a county line displayed as a single column consisting of various party-endorsed candidates running for all or virtually all offices. *Id.* at ¶¶ 7-

8, 173, 175-76. These candidates are featured together on the ballot with the same slogan, usually in the left-most column or close thereto, headed by highly-recognizable top-of-the-ticket candidates that lend weight and legitimacy to down-ballot candidates through the weight of the line. *Id.* at ¶ 7.

Their opponents have to compete against the weight of the line and must also contend with other bad ballot design features such as placing candidates multiple columns away from their opponents running for the same office with only blank spaces between them; the visual cue provided by a ballot column which contains candidates running for all offices, arbitrarily grouping together in the same column candidates that are running for different offices; and featuring candidates in a column by themselves. *Id.* at ¶¶ 96-99; *see also* ¶¶ 103, 114, 120 (visual examples). Thus, in contrast to the candidates on the county line, their opponents are often spewn about haphazardly around the ballot. *Id.* The visual display signals to voters that the candidates on the county line are more legitimate and influences voters to vote straight "down the line" for all of these candidates presented in a visually-organized fashion. *Id.* As compared to the candidates on the county line, the ballot position of their opponents makes it harder to find them, harder to know what office they are running for, harder to know who they are running against, and makes them otherwise appear less legitimate. *Id.* at ¶ 7.

These ballot design features influence voters toward voting for the bracketed candidates on the county line, confuse and disenfranchise voters, adversely impact the electoral chances of unbracketed and other opposing candidates, and impact their ability to compete on equal footing. *Id.* at ¶¶ 7, 10, 96, 99. Recall the 2020 Primary Analysis, cited above, which found that in congressional races for the same position, "the average vote margin between appearing on the county line and having one's opponent on the county line was 35 percentage points," *id.* at ¶¶ 8,

176, and sometimes up to 50 percentage points. It also found that "[o]nly two congressional incumbents have lost a primary in New Jersey in the last fifty years." *Id.* In both of those instances, "they lost to other incumbents, following redistricting that eliminated one of their districts . . . . [a]nd, in both cases, the incumbent who won the primary had also received the party endorsement and the county line in the county that decided the election." *Id.*

These burdens exist and the harm is done irrespective of whether or not a candidate was ultimately successful in their primary race; the very fact that the impact of the primacy effect, the weight of the line, and the other bad ballot features could swing the results of the election in favor of a different candidate further evidences the magnitude of the burden, but is not a prerequisite to demonstrating a burden. *See e.g.*, *Nelson*, 477 F. Supp. 3d at 509 (systematically awarding benefits of first ballot position based on party in general election burdens First and Fourteenth Amendment rights, even if it is a numerically small advantage); *id.* at 511-12 (primacy effect's ability to impact election outcomes served as basis for more rigorous scrutiny which state interests could not outweigh).

    c.  <u>Associational Rights</u>

In addition to the above harms, New Jersey's bracketing and ballot placement laws also burden fundamental associational rights. The Supreme Court has recognized that a critical component of the freedom to associate is the corresponding right to not associate. *See, e.g.*, *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000). Plaintiffs allege that New Jersey's bracketing and ballot placement laws, as implemented and carried out by the county clerks in designing primary ballots, significantly burden the freedom to not associate in a variety of ways, including by forcing candidates to associate and/or by attaching a punishment to certain candidates who do not associate with candidates running for other offices. ECF 33, ¶ 196.

Indeed, every candidate running in a primary is faced with a constitutional Hobson's choice. *Id.* They can choose to bracket with candidates running for other offices with whom they do not want to associate, and hopefully protect their chances at a better ballot position. Or they can exercise their right to not associate with candidates running for other offices and be punished with a barrage of ballot disadvantages and unequal treatment. *Id.* This Scylla-or-Charybdis choice pits the right of association against equal protection rights, needlessly forcing candidates to sacrifice one or the other. *Id.* If a candidate chooses the former, they will be forced to bracket with candidates running for other offices with whom they may not want to associate, violating their First Amendment right to not associate. If they choose the latter, they will not be treated equally as compared to other candidates running for the same office, will have no chance at obtaining the first ballot position, and risk being placed multiple spaces away from bracketed candidates running for the exact same office, or in Ballot Siberia, in violation of their Equal Protection and other fundamental rights under the First and Fourteenth Amendments. *Id.* at ¶¶ 196-202.

To be clear, the State is correct that candidates always face consequences related to their free speech and association. *See* ECF 53-1, p. 23 (claiming that "every association or non-association can carry with it perceived harms and benefits."). However, what makes this different than a run-of-the-mill decision made by a candidate to associate with someone else, which might generally impact public opinion of that candidate, is that here state law and practices surrounding the ballot, as implemented by county clerks, attach a punishment and/or a penalty to a candidate's decision not to associate *on the ballot itself*. This penalty harms candidates' electoral prospects and fails to treat them the same as similarly situated candidates running for the same office. ECF 33, ¶ 206. Regardless of whether it is viewed as an advantage for forfeiting their

right to not associate or as a disadvantage for exercising their right to not associate, candidates' rights have been and will continue to be violated – by the government – in every primary election. *Id.*

It is hard to ignore the practical realities of what candidates need to do to protect their ballot position and avoid unequal treatment. For example, a candidate will need to either (1) find existing candidates who are running for different offices and convince them to bracket together; or (2) recruit candidates to run for those offices just so that they can bracket with them. *Id.* at ¶ 197. In any given election cycle, it may also be unclear what office will be considered to be the pivot point by the county clerk, so to be on the safe side, candidates will likely have to find and convince existing candidates and/or recruit new ones to run for all these potential pivot point offices. *Id.*

The absurdity of the situation becomes even more readily apparent through the example of a candidate running for town council in a presidential election year, like Plaintiff McMillan. Such a candidate may be running to make the town a better, safer place for residents. But to avoid exclusion from the preferential ballot draw and to avoid Ballot Siberia, that town council candidate now needs to find or recruit two candidates for county freeholder/commissioner, and to cover bases to account for county clerk discretion in determining the pivot point, candidates for United States Senator and President of the United States of America. This is a tall ask for someone who wants to make a difference on town council. Even assuming the local candidate could find individuals for these other offices willing to bracket together, and even assuming they shared the same views, the town council candidate may not want to have the fate of his or her race in any way intertwined with the fate of other candidates, who are likely to be running against incumbent, household names for higher level office. More fundamentally, the town

council candidate inevitably has a different set of priorities than a candidate for county freeholder/commissioner, let alone a candidate for United States Senator or President. Candidates should not have to engage in this burdensome level of activity to compete on equal footing, and the very fact that they are confronted with this state-created conundrum is itself a burden on their constitutional rights.

The absurdity is compounded by the fact that associations among candidates are not treated equally. For example, if our town council candidate ultimately brackets with a slate consisting of a congressional candidate, a state senate or assembly candidate, a single candidate for county surrogate, a mayoral candidate, and a county committee candidate, *none* of these associations would entitle him or her to be included in the preferential ballot draw. By contrast, an opposing candidate for town council may bracket with two freeholders/commissioners, and therefore be included in a preferential ballot draw if the county clerk used that office as the pivot point. Furthermore, because counties do not use the same pivot point, *compare, e.g.*, *id.* at ¶¶ 103-04 (U.S. Senator as pivot point), *with id.* at ¶¶ 127-28 (President as pivot point), candidates may be given preferential ballot position for bracketing with a candidate for United States Senator in one county, as compared to another candidate not being included in the preferential ballot draw because they bracketed with candidates for freeholder/commissioner instead. This is exactly what happened to Plaintiff Kreibich in the 2020 Democratic Primary Election, because the Defendant Bergen County Clerk valued an association with a candidate for U.S. Senator more. *Id.* at ¶¶ 120-21, 124. Yet, in other counties, candidates bracketed with a candidate for United States Senator may not be included in the preferential ballot draw. This is exactly what happened to down-ballot candidates who bracketed with Senator Cory Booker in the 2020

Democratic Primary Election in Atlantic County, where Defendant Atlantic County Clerk chose to use President as the pivot point instead of United States Senator. *Id.* at ¶¶ 127-28.

The rights of unbracketed candidates to not associate are further trampled when the county clerks assign them to the same column as other candidates with whom they do not wish to associate, and did not request to bracket. When the ballot features bracketed slates of candidates, the impression that is left is that candidates featured on the same column are associated with one another. However, in many instances, county clerks have placed candidates who are not bracketed in the same column, giving the appearance that they are associated with one another. For example, in the 2020 Democratic Primary Election in Mercer County, Plaintiff Marchica was, without his consent, featured on the same column as Lawrence Hamm, who was running for United States Senate, and David Applefield, who was running for Member of the House of Representatives from New Jersey's Fourth Congressional District. *Id.* at ¶¶ 134, 137. None of these candidates wanted to be bracketed or associated with one another. *Id.* at ¶¶ 137, 139. In fact, Marchica was a vocal supporter and volunteer of Applefield's opponent, Christine Conforti. *Id.* at ¶ 139.

In an unsuccessful attempt to mitigate how problematic this is for associational rights, the Attorney General, who intervened in this matter to defend the constitutionality of the statute, makes a startling admission: "Voters could see what positions Plaintiffs were running for, and who Plaintiffs chose to associate or not associate with by virtue of the shared slogan." *See* ECF No. 53-1, p. 21.[25] This revelation is truly astonishing, as it concedes that a slogan is sufficient for

---

[25]   In fact, the Attorney General doubled down on this argument with respect to defending this practice of featuring candidates who are not bracketed on the same column with respect to other Plaintiffs. *See, e.g., id.* at p. 22 n.5 (suggesting that the Mercer County Clerk did not follow state law with respect to placing Conforti and Schmid, opponents for the same office, in the same

voters to identify which candidates are associated and which are not, *regardless of the visual alignment of their names*. Of course, this position is completely and totally at odds with the Defendants'/Intervenor's primary alleged justification/state interest for upholding the law, which asserts that the visual alignment of names of bracketed candidates is necessary for voters to identify their alleged common ideology. *See, e.g.*, *id.* at p. 25 (claiming state has interest in "preserving candidates' rights to associate or not to associate [and] *making those associative characteristics of candidates known to voters*) (emphasis added). At once, Defendants/Intervenor disingenuously try to convince this Court that a slogan is sufficient to show non-association of unbracketed candidates, but insufficient to show association of bracketed candidates. Defendants/Intervenor cannot have their cake and eat it too. What is revealed is a hypocritical double standard that is designed to favor and provide a state-sponsored ballot advantage to certain candidates over others through application and implementation of state law carried out by the county clerks.

The situation was even worse for Plaintiff Conforti with respect to her ballot placement in connection with the 2020 Democratic Primary Election in Mercer County. Defendant Mercer County Clerk placed Conforti in the exact same column as her opponent, Schmid, featuring both on the same column with the county line candidates, even though voters could only vote for one. ECF 33, ¶¶ 114-15. Their third opponent, Applefield, was listed horizontally to Conforti. *Id.* at ¶ 114. Featuring Schmid and Conforti on the same column gave the appearance that they were running together and associated with one another, even though they were running against each other. Moreover, perhaps unsurprisingly, this confused and disenfranchised approximately one-

---

column but nevertheless noting that "[Schmid] did not have the same slogan as Plaintiff Conforti and other candidates in the 'county line.'").

third of the Mercer County voters who voted in this race, as their votes were cast aside and not counted because they over-voted for too many candidates. *Id.* at ¶ 117.[26]

### 2. Strict Scrutiny is Warranted

The allegations in the Amended Complaint demonstrate that strict scrutiny is warranted under both the *Anderson/Burdick* balancing test and separate considerations.

### a. Strict Scrutiny is Warranted Under the Balancing Test.

Under the balancing test, when laws imposes "severe restrictions" to First and Fourteenth Amendment voting rights, then they should be subject to strict scrutiny, and must be narrowly tailored to support a compelling state interest. *See Burdick*, 504 U.S. at 434. There are numerous specific features of New Jersey's bracketing and ballot placement laws that warrant strict scrutiny.

First, the impact of the primacy effect has been found to be heightened in primary elections, as compared to general elections. *See* ECF No, 33, ¶¶ 96, 98 & Exh. B; *see also* Laura Miller, Note, *Election by Lottery: Ballot Order, Equal Protection, and the Irrational Voter*, 13 N.Y.U. J. LEGIS. & PUB. POL'Y 373, 388 (2010) ("In primary and non-partisan elections, the effect [of ballot order] is larger both in magnitude and statistical significance for all types of

---

[26]     The various burdens alleged in the Amended Complaint and set forth above represent numerous deprivations of rights that are secured by the Federal Constitution, including but not limited to rights protected by the First and Fourteenth Amendments. Plaintiffs allege specific conduct by each of the Defendants in their official capacities as the County Clerk of their respective counties, whereby they were acting under color of law when implementing state law and exercising discretion thereunder. Without repeating each at length, Plaintiffs allege, *inter alia*, that each Defendant was acting under color of law when they conducted the ballot draw and designed primary ballots in such a manner that results in various constitutional harms, as summarized *supra* at p. 22-23. That the Amended Complaint contains a separate "Count" with a heading that says "Violation of Civil Rights Act," when § 1983 does not itself provide a source of substantive rights, does not negate the fact that Plaintiffs allege sufficient facts to adequately plead a § 1983 claim. *See* ECF 33, ¶¶ 222 (realleging and incorporating by references all previous paragraphs of the Amended Complaint), 225 (alleging specific conduct of Defendants acting under color of law).

candidates."). In fact, other cases have recognized that the burden imposed due to the primacy effect is stronger in primary elections than general elections, and nevertheless applied strict scrutiny even to general election ballot order schemes. *See, e.g.*, *Sangmeister*, 565 F.2d at 466-67 (finding intentional discrimination even in the absence of express statements based on exclusionary and systematic practices in existence for over 100 years and in numerous counties for county clerks who exercised statutory discretion in ordering candidates on the ballot by placing candidates from their own party at the top); *see also Akins v. Sec'y of State*, 904 A.2d 702, 707 (N.H. 2006) (adopting *Anderson/Burdick* test for state constitutional analysis and applying strict scrutiny to general election ballot order scheme based on prior electoral success of party and by alphabetization based on the primacy effect which while small could potentially impact a close election); *Gould*, 536 P.2d at 1344 (applying strict scrutiny to incumbent-first ballot order scheme based on dilution of votes of supporters of nonincumbent candidates). The additional impact of the primacy effect in primary elections warrants additional scrutiny. *See* Miller, 13 N.Y.U. J. LEGIS. & PUB. POL'Y at 375-76 (suggesting that position bias in "'down-ballot,' non-partisan, and primary elections leads to severe infringements on the right to vote so as to warrant strict scrutiny and suggesting that the severity of position bias in such elections is such that "courts should demand rotation of ballot order on equal protection grounds").

Second, unlike other ballot order cases, the weight of the line and other ballot design features in New Jersey create additional burdens, which add to both the character and magnitude of the burdens imposed by New Jersey's bracketing and ballot placement laws, as summarized *supra* at pp. 22-23. *See, e.g.*, ECF 33 ¶ 176 (2020 Primary Analysis finding a 50-percentage-point difference in some races and an average of a 35-percentage-point difference depending on whether the congressional candidate was featured on the county line versus their opponent being

featured on the county line). While on its own, burdens of this magnitude provide ample grounds for applying strict scrutiny, what is worse here is that these separate burdens are often combined to the extent that the county line candidates, in addition to being on the county line itself, are always eligible for first ballot position, whereas unbracketed candidates are excluded from the preferential ballot drawing for first position, virtually never featured on a full line of candidates, and often relegated to Ballot Siberia. *Id.* at ¶¶ 7-8.

Third, the burdens are further heightened in light of the impact on candidates' associational rights which must be forfeited to compete on equal footing with otherwise similarly-situated candidates, lest candidates risk punishment for not bracketing with candidates running for other offices. *Id.* at ¶ 196. Additionally, courts have found the burden to be extremely significant where ballot laws result in situations similar to those described herein, *see, e.g.*, *id.* at ¶¶ 199, 201-02, where candidates are listed in the same column as other candidates with whom they did not bracket and did not wish to associate. *See, e.g.*, *Devine v. Rhode Island*, 827 F. Supp. 852, 861-62 (D.R.I. 1993) (finding that the placement of independent and/or minor party candidates for state office on a general election ballot underneath a political party or presidential candidate with whom they do not associate or belong "raises even more serious constitutional concerns" than prohibiting independent candidates from having the ability to place a party or philosophical label next to their names in the space where major party candidates can put their party affiliation).

In *Devine*, three independent candidates for statewide office in Rhode Island ran under the designation "Reform '92" in an attempt to obtain 5% of the popular vote, as was needed to establish a recognized political party under Rhode Island law. *Id.* at 853. State election officials printed and distributed sample ballots that listed these independent candidates in a column which

contained the heading "INDEPENDENTS FOR LaROUCHE" and included at the top of column

perennial presidential candidate, Lyndon LaRouche, who was a convicted felon running his

campaign from prison. *Id.* at 853 & n.4, 855-56. Although each of these independent candidates

appeared with the designation "Reform '92" above their names in italics and parentheses, the

court found that "the inescapable visual effect was a direct association between the plaintiff

Reform '92 candidates and "INDEPENDENTS FOR LaROUCHE." *Id.* at 856.

*Devine* held that when states configure the ballot with "'voting cues'" they must exercise

great care, particularly with respect to descriptive cues concerning party affiliations and political

philosophies. *See id.* at 860. The court found instructive the case of *Rosen v. Brown*, 970 F.2d

169 (6th Cir. 1992), noting that states are not required to allow for use of designations of

candidates on the ballot, and stating with respect to states that do regulate such designations, as

follows:

> Once a State admits a particular subject to the ballot and
> commences to manipulate the content or to legislate what shall and
> shall not appear, it must take into account the provisions of the
> Federal and State Constitutions regarding freedom of speech and
> association, together with the provisions assuring equal protection
> of laws.
>
> *Devine*, 827 F. Supp. at 861 (quoting *Rosen*, 970 F.2d at 175)
> (citation omitted).

The court explained that in *Rosen*, the Sixth Circuit found that allowing only major party

candidates to have a designation burdens the rights of candidates and their supporters to

"meaningfully vote and meaningfully associate by providing a 'voting cue' to Democratic and

Republican candidates which makes it virtually impossible for Independent candidates to prevail

in the general election." *Devine*, 827 F. Supp. at 861 (citing *Rosen*, 970 F.2d at 176).

*Devine* then compared the burden therein to that in *Rosen*, stating that if the burden to candidates and voters of independents amounted to a "deprivation of constitutional dimension, then the potential *mislabeling* of candidate affiliations raises even more serious constitutional concerns." *Id.* (emphasis in original). *Devine* then struck down the practice of placing independent candidates in a column under headings that identified presidential political parties or principles that were unrelated to such candidates, holding that such a practice placed "serious burden[s]" on the First and Fourteenth Amendments that would not survive strict scrutiny nor the *Anderson* balancing test. *See id.* at 862.

Similar principles apply here. As in *Devine*, New Jersey's bracketing and ballot placement system have allowed candidates to be featured in the same column headed by candidates with whom they are not bracketed and with whom they do not wish to associate. *See* ECF 33, ¶¶ 80, 137, 139. Additionally, as in *Devine*, here the existence of a separate individual slogan next to the candidate's name does not ameliorate the constitutional burden on the right to associate/not associate. As in *Devine*, the visual display of the candidates' names together gives the appearance and impression of nonexistent candidate affiliations and/or is bound to create voter confusion regarding same. Finally, as in *Devine*, here certain groups of candidates, namely bracketed candidates including those on the county line, are treated differently and placed in columns with only affiliated candidates bearing the same slogan, while unaffiliated unbracketed candidates are subject to placement in columns with candidates with different slogans and with whom they are not associated. ECF 33, ¶¶ 80, 199. Therefore, these additional burdens should subject New Jersey's primary election bracketing and ballot placement system to heightened scrutiny.

Fourth, to the extent that this complicated and convoluted ballot design structure causes confusion, it prevents some voters from successfully exercising their choice and/or otherwise disenfranchises voters. *Id.* at ¶¶ 96, 99, 178-179. New Jersey's primary election design features inherently cause voter confusion, through ballot gaps, the full slate of county line candidates, stacking, and featuring candidates in a column by themselves or in a column with candidates running for other offices with whom they are not associated. *Id.* at 96, 99, 178-79. For example, in the 2020 Democratic Primary Election in Mercer County, Conforti was placed vertically in the same column as her opponent Schmid and also horizontal to her other opponent, Applefield. *Id.* at ¶¶ 114-15. As set forth above, this led to over-votes by approximately one-third of voters who attempted to cast a vote in that election, and thus were disenfranchised for voting for too many candidates. *Id.* at ¶ 117. Therefore, this voter confusion and the restrictions on candidates and voters being able to associate and cast their votes for the candidates of their choice were burdened in a significant and meaningful way so as to warrant strict scrutiny.

Fifth, elected county clerks, who themselves benefit from ballot positioning and other ballot design features like the county line, *id.* at ¶ 177, have exercised discretion in determining the order of candidates and visual display of ballots, which at minimum, creates an appearance of impropriety.[27] Ballot order systems which revolve around discretion of elections officials have been considered the most objectionable, and have been struck down by reviewing courts. *See* Miller, 13 N.Y.U. J. LEGIS. & PUB. POL'Y at 391; *see also Sangmeister*, 565 F.2d at 467 (striking down ballot order practice that gave discretion to clerks for ballot placement); *Weisberg*, 417 F.2d at 391-94 (discretion exercised by election official to break ties in ballot order system was

---

[27] Indeed, it is quite possible that the record after discovery will reveal the depth to which county clerks engage in this system at the behest of, or at least pursuant to the strong influence of, party leadership.

unconstitutional and in practice tipped scales in favor of some candidates, who were endorsed by party organizations, over others); *Mann*, 333 F. Supp. at 1267 (holding it is unconstitutional for election officials to use discretion to break ties for ballot position and enjoining election officials from breaking ties by any means other than by lot or other nondiscriminatory means where each candidate has an equal opportunity to be placed first on the ballot).

Moreover, county clerks have implemented varying and inconsistent standards in designing the ballot and in determining the pivot point in connection with the preferential draw, with such inconsistencies manifesting across counties, within the same county and across election cycles, within the same county and across party lines, etc. ECF 33, ¶¶ 67-68, 72, 85, 88-89, 177; *cf. Bush v Gore*, 531 U.S. 98, 106 (2000) (holding that recount procedures violated constitutional rights on equal protection grounds after finding that "the standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county from one recount team to another."). Nor are the rules of the game announced in advance such that candidates can know how their ballot position will be impacted by which candidates they choose to associate with through the bracketing process. ECF 33, ¶ 177; *cf. Bush*, 531 U.S. at 106 ("The recount mechanism implemented in response to the decisions of the Florida Supreme Court do not satisfy the minimum requirement for non-arbitrary treatment of voters necessary to secure the fundamental right . . . . The problem inheres in the absence of specific standards to ensure its equal application. The formulation of uniform rules to determine intent based on these recurring circumstances is practicable and, we conclude, necessary.").

Sixth, as articulated in the Amended Complaint and above, New Jersey is the only state in the nation that designs its primary election ballots and ballot order system primarily around groupings of candidates in columns, rather than listing the office sought immediately followed

by the names of all candidates who are running for that office. *See* ECF No. 33, ¶ 3-5 (citing Julia Sass Rubin study and United States Election Assistance Commission report). Indeed, New Jersey is unique in its practice of casting candidates off to Ballot Siberia and/or otherwise featuring candidates multiple columns away from their opponents who are running for the same office, with one or more blank spaces in between them. *Id.* at ¶¶ 3-4.

The Supreme Court has required the state to demonstrate a compelling interest when state election laws burden First Amendment associational rights, and have been particularly skeptical of such alleged state interests when nothing can "explain what makes [the particular state's] system so peculiar that it is virtually the only State that has determined that such a [system] is necessary." *See Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 226 & n.17 (1989) (finding no justification for California's primary endorsement ban where only two other states – New Jersey and Florida – implemented similar restrictions). As set forth below, the state cannot show that these laws and practices in New Jersey, as implemented by the county clerks, are sufficiently weighty to outweigh the burdens they impose, and certainly fall well short of the standard of being necessary to advance a compelling interest.

Seventh, contrary to Defendants' assertions, the arbitrary criteria by which candidates' ballot position and placement are determined are not neutral and nondiscriminatory. They provide significant ballot advantages to bracketed candidates over unbracketed candidates, ECF 33, ¶¶ 77-80, and to certain associations over others, *id.* at ¶¶ 198, 204-05. Moreover, they interject county clerks' discretion into the mix to determine the pivot point, which in turn plays a critical role as to which candidates get favored over others. *Id.* at ¶ 186. In these ways, New Jersey's primary election bracketing and ballot placement system is neither neutral nor nondiscriminatory.

Many courts deciding ballot order cases have found state laws and practices which are not neutral and/or discriminatory to be unconstitutional. *See, e.g.*, *McLain*, 637 F.2d at 1167 (ballot order listing winner of last election first and thereby benefitting incumbents was unconstitutional as it amounted to favoritism which served to convenience only voters supporting incumbents and major party candidates); *Sangmeister*, 565 F.2d at 467 (ballot order system based on preference and discretion of county clerk was unconstitutional amounting to intentional discrimination stemming from systematic and widespread exclusionary practices); *Weisberg*, 417 F.2d at 391-94 (election officials' practice of breaking ties for ballot position based on preference of election official amounted to intentional or purposeful discrimination because it was essentially choosing favorites, regardless of underlying reasons for why they preferred certain candidates); *Nelson*, 477 F. Supp. 3d at 503-04 (unconstitutional to treat one major party's candidates differently than another's based on party performance in a prior election as it represents a discriminatory allocation among similarly situated parties and is thus not facially neutral or nondiscriminatory, and was not nonpartisan, but rather was state-sanctioned favoritism); *Graves*, 946 F. Supp. at 1581 (political patronage is not a legitimate state interest to classify or discriminate in configuring ballot position of candidates); *Mann*, 333 F. Supp. at 1267 (holding Fourteenth Amendment requires equal treatment of "newcomers and incumbents alike" and elections officials could not circumvent court decision which prohibited favoring party regulars by implementing "the transparent device of favoring incumbents or those with 'seniority'"); *Netsch*, 344 F. Supp. at 1281 (priority based on incumbency and seniority was unconstitutional).[28]

---

[28]   In fact, some courts have even gone as far as to strike down ballot order laws based on alphabetical order of candidates' last names because they provide a ballot advantage based on an arbitrary criteria. *See, e.g.*, *Akins*, 904 A.2d at 707 (applying strict scrutiny under state

Here, a combination of state law preferences for bracketed candidates and county clerk discretion as to pivot points and ballot placement discriminates in favor of bracketed candidates and further punishes unbracketed candidates. ECF 33, ¶¶ 184-86. It puts the state's thumb on the scales in favor of certain candidates over others, and represents state-sanctioned favoritism. It is hard to imagine how New Jersey law could be considered neutral and non-discriminatory when it is dependent on what actions each candidate takes with respect to other candidates running for other offices, and what office the county clerk subsequently decides to use as the pivot point. *Id.* It is equally hard to imagine how it could be considered neutral and non-discriminatory when unbracketed candidates are not only excluded from the initial ballot draw, but are also further disadvantaged through Ballot Siberia, ballot gaps, stacking, etc. *Id.* at ¶ 178.

Defendants/Intervenor unavailingly argue that a candidate could choose to associate with someone else to get a better ballot position. *See e.g.*, AG Brief, ECF 53-1, p. 29; *see also* Ocean County Br., ECF 55-1, p. 6-7 (claiming that Plaintiffs' ballot position injuries stemmed from their failure to associate, through their own conscious decisions, with either Cory Booker or Lawrence Hamm who were running for United States Senator). This is the equivalent of saying that giving Democrats first ballot position in every race is neutral and nondiscriminatory because a candidate could have chosen to switch party affiliations and run in the other party's primary. Certainly, courts would find it abhorrent for a candidate to have to associate with non-like-minded individuals in order to ever have a chance at obtaining the first ballot position. *Cf.*

---

constitution) (ballot order system based in part on alphabetical order deprives candidates at end of the alphabet of equal protection and was not reasonable and nondiscriminatory); *Gould*, 536 P.2d at 1346-47 (applying strict scrutiny and striking down ballot order system based in part on alphabetical order under state and federal constitution and characterizing the law as discriminatory legislation); *Kautenburger*, 333 P.2d at 295 (striking down ballot order system based on alphabetical order as no reason exists for statute other than to disadvantage some candidates).

*Graves*, 946 F. Supp. at 1580 (state has no legitimate interest in "select[ing] one particular party's candidates for priority position on every General Election ballot"). This sentiment would not change regardless of whether the candidate was free to change their party affiliation and associate with another party. The same is true here. Candidates are forced to associate with other candidates running for other offices with whom they may not want to associate in order to ever have a chance at first ballot position. Equal treatment of similarly situated candidates running for the same office should not be dependent upon additional affirmative actions of any kind, let alone an action which compromises candidates' associational rights, and specifically, the right to not associate.

Finally, to the extent that one or more of the above items do not, by themselves, require strict scrutiny, all of the burdens in this case and all of the reasons set forth above regarding the need for heightened scrutiny, must be viewed collectively. When viewed collectively, the combination of all of these burdens and other qualities that make these laws particularly suspect contribute to the character and magnitude of the burdens imposed so as to warrant strict scrutiny based on the severity of the burden. If standard ballot order cases based on the primacy effect alone can be characterized as having the state put its thumb on the scale, then surely all of the additional burdens and features in New Jersey would be the equivalent of placing the state's entire hand on the scale, with all of its weight.

   b.   Strict Scrutiny is Warranted for Reasons Independent of the *Anderson/Burdick* Balancing Test.

Through the arbitrary awarding of state-conferred ballot advantages, New Jersey's laws and practices surrounding primary election ballots perpetuate an environment where incumbents and party elites are all but guaranteed to win, dissent is stifled, new ideas and candidates are repressed, and the ability to drive change through the democratic process is severely inhibited.

*See* ECF 33, ¶¶ 6-8 (discussing advantages of party-endorsed candidates); *id.* at ¶ 175 (bracketing and ballot placement system advantages party-endorsed candidates which further entrenches power of incumbents and political elites). When the benefits of the ballot advantages bestowed by virtue of state law from being placed on the county line becomes virtually synonymous with winning the election, then responsiveness of candidates and officeholders to unelected and/or unaccountable party elites takes precedence over meeting the needs of voters and citizens.[29]

Long ago, the Supreme Court recognized the fundamental nature of voting rights because it is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *see also United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938) (identifying without deciding categories of laws which implicated the Fourteenth Amendment that might "be subjected to more exacting judicial scrutiny" including state laws which "restrict[] those political processes which can ordinarily be expected to bring about repeal of undesirable legislation."); *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (because voting rights are "preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.").

---

[29]    *See* Brett M. Pugach, *The County Line: The Law and Politics of Ballot Positioning in New Jersey*, 72 RUTGERS U. L. REV. 629, 632-34 (2020) (providing historical background of how New Jersey, under the leadership of then-Governor Woodrow Wilson, was at the forefront of a nationwide reform to abandon party-nominating conventions and institute a direct primary election where voters could choose their party nominees for the general election free from the corrupting influence of a small handful of party insiders). The direct primary election was designed to take the finger off of the scale of the process for determining which candidates would be submitted to the voters in a general election, and those principles remain embedded in the law today. However, New Jersey's primary election ballots have enabled party insiders to contravene such principles. *See id.* at 653-65 (explaining how a small handful of unaccountable and not-directly-elected party insiders have used New Jersey's bracketing and ballot placement system to influence voter behavior, manipulate candidates and officeholders, undermine the goals and purpose of direct primary elections, and destroy the democratic process); *see also supra* n. 11 (describing contemporaneous examples).

In the ballot order context, scholars have recognized that "[w]hen election practices that impact the right to vote also act to entrench incumbents or other political elites, courts should be particularly suspicious." *See* Miller, 13 N.Y.U. J. LEGIS. & PUB. POL'Y at 401 (citing Samuel Issacharoff & Richard Pildes, *Politics as Markets: Partisan Lockups of the Democratic Process*, 50 STAN. L. REV. 643 (1998)). New Jersey's bracketing and ballot placement laws provide state-conferred advantages on the ballot to bracketed candidates which, for all practical purposes, virtually always includes party-endorsed candidates who are inevitably featured on the county line, which entrenches the power of incumbents and party insiders. ECF 33, ¶¶ 6-7. In fact, the 2020 Primary Analysis noted with respect to past elections that "no state legislative incumbent on the [county] line had lost a primary election in New Jersey between 2009 and 2018." *See* 2020 Primary Analysis, p. 2. It also found that only two congressional incumbents lost their primary elections in the last fifty years, and in both instances it was to another incumbent following redistricting and the incumbent that won was the incumbent who was featured on the county line in the critical county in the new congressional district. *See id.*[30]

Separately, New Jersey's bracketing and ballot placement laws also represent content-based and/or viewpoint-based restrictions which are subject to strict scrutiny. *See Reed v. Town*

---

[30]    The entrenchment of elites goes even further beyond the incumbent and party insider candidates that receive the benefit of their prime ballot position and display on the county line (and the hardships faced by unbracketed candidates). It is in fact political elites that exercise enormous control over the endorsement process which inevitably is used to grant access to the county line. *See* Pugach, 72 RUTGERS U. L. REV. at 658-65. Because winning the endorsement and being featured on the county line provides such an enormous ballot advantage, and in turn, not being featured on the county line makes it nearly impossible to win, candidates are incentivized to vie for the county party chair's favor and not challenge the existing power structure, further reinforcing a system designed to favor incumbents and party insiders. *See id.* at 658-60. Of course, the county party chairs are not elected directly by voters, and thus are not accountable to voters; instead, they are selected by members of the parties' county committee, who in turn are elected at primary elections and incentivized to do anything possible to receive the party endorsement so that they themselves can be featured on the county line. *See id.* at 660-61.

*of Gilbert*, 576 U.S. 155, 166 (2015) ("[S]trict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based . . . ."). They represent content-based restrictions to the extent that the visual display of bracketed candidates on the ballot focuses on associations with candidates running for other offices, at the expense of other important information. *See Cook v. Gralike*, 531 U.S. 510, 525 (2001) (state cannot use the ballot to bring one piece of information to the attention of voters and thereby highlight that information or issue as paramount); *id.* at 532 (Rehnquist, C.J. concurring) ("[T]he State has chosen one and only one issue to comment on the position of the candidates," but "[Government] may not select which issues are worth discussing or debating."). They further represent content-based restrictions to the extent that the ballot confers advantages to candidate associations with pivot point candidates, but not for candidate associations with non-pivot point candidates. It also allows bracketed candidates to express who they are not associated with by not featuring other candidates in their column, whereas unbracketed candidates are subject to having other candidates with whom they do not wish to associate featured in the same column.

These laws represent viewpoint-based restrictions to the extent that they reward candidates who associate with particular pivot point candidates by including them in the initial ballot draw and punishes candidates who do not associate with any such candidates in the ways described elsewhere in this brief. *See id.* at 531-32 (Rehnquist, C.J. concurring) (state constitutional amendment which included derogatory label on ballot for candidates who did not take action in support of term limits for federal offices was "not only not content neutral, but it actually discriminates on the basis of viewpoint because only those candidates who fail to conform to the State's position receive derogatory labels"); *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995) ("When the government targets not subject matter,

88

but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination."). These considerations provide separate grounds to warrant strict scrutiny.

### 3. Defendants'/Intervenor's Alleged State Interests are Not Legitimate and are Otherwise Not Sufficiently Weighty to Justify the Burdens on Plaintiffs' Rights.

To the extent that the Court finds strict scrutiny to be appropriate, the state law must be narrowly tailored to support a compelling state interest. *Burdick*, 504 U.S. at 434. Regardless of whether the Court deems strict scrutiny to be appropriate, the state's law must, at the very minimum, be justified by "relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191 (quoting *Norman*, 502 U.S. at 288-89). Here, there is no legitimate state interest, and thus the law could not even pass the rational basis test, let alone the *Anderson/Burdick* balancing test and/or strict scrutiny as appropriate thereunder. Furthermore, even to the extent that the state can identify some precise state interest, its importance pales in comparison to the burdens, and therefore must be struck down under the balancing test. It is simply insufficient for Defendants to articulate a state interest that is important in a general sense, without demonstrating how that state interest justified the specific feature of the law such that it is necessary to burden the Plaintiffs' rights. *See Nelson*, 477 F. Supp. 3d at 510 ("[W]hile the state's interest are important and served generally by the statute, the Court finds them to be universally weak as justifications for the actual burden the Statute imposes.").

Defendants each articulate a number of alleged state interests, regurgitating often wholly inapplicable state interests that may have been found to be important in other cases in different contexts. While phrased differently by each Defendant, the state interests more or less fall into two basic categories: (1) preserving ballot integrity and avoiding voter confusion; and (2)

89

allowing candidates to express their associations on the ballot *with the additional benefit of aligning their names in the same column*. These alleged state interests are insufficient to justify the burdens imposed by New Jersey's primary election bracketing and ballot placement laws.

a.   Preserving Ballot Integrity and Avoiding Voter Confusion

Preserving ballot integrity and avoiding voter confusion may generally be important state interests in the abstract, but do not justify the specific feature of New Jersey's bracketing and ballot placement laws and practices. If anything, the laws at issue here *damage* the integrity of our primary elections, and *promote* voter confusion, rather than avoiding it.

In the context of a ballot, which is supposed to be a neutral forum upon which voters can select a candidate of their choice, ballot integrity presupposes basic concepts of fairness and equal treatment. By contrast, here it is simply unclear, and Defendants do not adequately articulate, how providing certain candidates with a ballot advantage preserves the integrity of the election. It is also unclear how excluding certain candidates running for a particular office in a primary election from participating in a ballot draw with all other candidate for that very same office preserves the integrity of the election.[31] None of the other 49 states in this country, nor the

---

[31]     To the extent that the state claims any governmental interests to justify excluding unbracketed candidates from the preferential draw and from having any chance to obtain the first ballot position, it should be noted that the ballot order rules related to bracketed candidates were never imposed directly by the Legislature; instead they developed from practices of the county clerks exercising discretion over the ballot, and then were essentially blessed as permissible by New Jersey state courts through judicial intervention. *See Hawkes v. Gates*, 129 N.J.L. 5, 11 (N.J. 1942) (refusing to overturn discretion of county clerk to draw bracketed candidates first because *N.J.S.A.* 19:23-24 and *N.J.S.A.* 19:49-2 were silent as to the treatment of ballot position of bracketed versus unbracketed candidates); *Moskowitz v. Grogan*, 101 N.J. Super. 111, 114-16 (App. Div.), *certif. denied*, 51 N.J. 575 (1968) (holding that the requirement of a preferential draw for joint petition county candidates and those candidates bracketed with them as compared to other slates and unbracketed candidates could be inferred from the fact that *N.J.S.A.* 19:49-2 was amended after the *Hawkes* decision for other reasons and still did not speak to whether bracketed and unbracketed candidates were entitled to the same drawing). Even Defendants recognize this. *See* Ocean County Br., ECF No. 55-1, p. 19 ("The Hawkes line of cases

District of Columbia contain the unique features on their primary election ballots that New Jersey uses to disadvantage unbracketed candidates and/or otherwise injure the electoral prospects of less-favored candidates in the ways described herein (e.g. blank spaces and gaps, Ballot Siberia, stacking, etc.). *See* ECF 33, ¶¶ 3-4.

Indeed, it would be difficult to design a more confusing ballot than New Jersey's primary election ballots. The features of the ballot described in Plaintiffs' papers make it difficult to find candidates, determine what they are running for, understanding who they are running against, etc. *Id.* at ¶ 7. There is nothing orderly or fair about a ballot that has candidates haphazardly and chaotically spewn about. Making matters even worse, neither voters nor candidates know the rules of the game in advance, or why candidates were placed where they are. *Id.* at ¶ 177. Indeed, arguments that the state has an interest in avoiding voter confusion are usually centered around the idea that the law/practice is consistently and universally applied, so voters know where they can expect to find the various candidates. *See, e.g.*, *Sangmeister*, 565 F.2d at 467 (acknowledging but rejecting this justification). By contrast, here the county clerks have employed varying and inconsistent standards across counties and election cycles, making it difficult to predict candidate placement on the ballot, and even after seeing the ballot it is often difficult to understand why candidates ended up where they did. ECF 33, ¶¶ 67-68, 72, 85, 88-89, 177.

New Jersey's bracketing and ballot placement laws are not designed to avoid voter confusion. Rather, they provide structural advantage to some, selective disadvantage to others, and chaos at large. It is clear that the law has chosen to serve the convenience of those voters

reinforced *the **court's** position* that <u>N.J.S.A.</u> 19:49-2's silence meant that the legislature afforded *the county clerks discretionary authority* to conduct ballot drawing as it pertains to bracketed and unbracketed candidates.") (emphasis added).

who support certain candidates at the expense of others. In *McLain v. Meier*, 637 F.2d 1159 (8th Cir. 1980), the court struck down a general election ballot order law which favored incumbents, finding that the state justification of "making the ballot as convenient and intelligible as possible for the great majority of voters . . . . virtually admits that the state has chosen to serve the convenience of those voters who support incumbent and major party candidates at the expense of other voters," and held that such state interest does not even survive rational basis review. *Id.* at 1167. Other courts have also rejected the state interest of avoiding voter confusion and similar state interests when there is a disconnect between this alleged goal and the practical realities of the law as manifested on the ballot. *See Sangmeister*, 565 F.2d at 467 (rejecting interest in avoiding confusion and having consistent practice for voters to know in advance because it was "difficult to understand how this practice satisfies those requirements any more efficiently than would a neutral system of ballot placement"); *Nelson*, 477 F. Supp. 3d at 510 ("The state's interests would be just as well served by determining candidates' order by lot or other nondiscriminatory criteria . . . ."); *Jacobson v. Lee*, 411 F. Supp. 3d 1249 1277-81 (N.D. Fla. 2019), *vacated on other grounds*, *Jacobson v. Fla. Sec'y*, 957 F.3d 1193 (11th Cir. 2020), *vacated and opinion substituted*, 974 F.3d 1236 (11th Cir. 2020) (finding generally important state interests of voter confusion and uniformity to be weak state interests in that case in light of numerous non-confusing alternatives that would not burden plaintiffs' rights); *Holtzman*, 62 Misc. 2d 1020 at 1024 (rejecting avoidance of voter confusion as state interest in connection with incumbent-first statute, as nothing on the ballot actually indicated that the first listed candidate was the incumbent and even if sophisticated voters knew that, they might mistake the first-listed candidate as an incumbent in a race where there was no incumbent); *see also Akins*, 904 A.2d at 708 (rejecting asserted interest in promoting a logical and easily understood ballot where state

failed to demonstrate that arranging candidates in order of the party receiving the most votes in a prior election and/or by alphabetical order was necessary to create a manageable ballot); *Gould*, 536 P.2d at 1344-45 (rejecting asserted state interest of facilitating "efficient, unconfused voting" because even if most voters care most about voting for or against an incumbent, there were other means to identify incumbents "which avoid considerable discrimination against voters for nonincumbents" through preferential ballot position).

      b.  <u>Providing the Additional Associational Benefit of Visually Aligning Names</u>

Defendants/Intervenor also assert an interest in having associations between candidates expressed directly on the ballot *through the additional benefit of visually aligning such candidates together*. Defendants/Intervenor couch this in different language, from preserving the right to associate and "making those associative characteristics of candidates known to voters," *see* AG Brief, ECF 53-1, at p. 25, to "allowing candidates to communicate associational qualities such as similarity of political and ideological beliefs to voters that may aid them in making decisions," *see id.* at p. 26, to "permit[ting] candidates of similar political views to associate through the expressive activity of bracketing on the ballot," *see* Ocean County Br., ECF 55-1, p. 22.[32] Some Defendants have even couched the state interest as "ensuring an accessible ballot that avoids voter confusion and permits voters to easily identify candidates and the political parties they are affiliated with," *see, e.g.*, Mercer County Br., ECF 58-1, p. 34. This statement is absurd and nonsensical in the context of a primary election because all candidates on a primary election ballot belong to the same political party. Regardless of how the asserted stated interest is

---

[32]    Many of these articulations appear to stem from the notion that the state has an interest not only in grouping candidates together based on common principles, and "hav[ing] this fact brought to the attention of the voter," but also obtaining the benefit of "the additional effectiveness produced by alignment of their names on the machine ballot." *See* Monmouth County Br., ECF 59-2, p. 21 (quoting *Quaremba v. Allan*, 67 N.J. 1, 13 (1975)).

couched by the various Defendants, it is not a legitimate interest at all, let alone a governmental one, much less one that outweighs the burdens here.

Preliminarily, it must be noted that this case does not challenge provisions of New Jersey law which allow candidates to be featured on the ballot with a slogan next to their name, nor does it challenge the ability of party-endorsed candidates, or any candidates for that matter, to be featured on the ballot with a common slogan as other candidates running for other offices, so long as, per *N.J.S.A.* 19:23-17, that slogan does not exceed six words and does not include the name of a person or associated entity without that person or associated entity's permission. Thus, there is already an ability for candidates who share common beliefs and want to be associated with one another to express that on the ballot. This form of direct expression on the ballot already goes above and beyond that allowed on the ballot itself in other states in primary elections. *See* ECF 33, ¶ 3 (citing Julia Sass Rubin study) (ballot images demonstrate that in almost all states, primary election candidates are not listed with a slogan/designation next to their names). Nor does the relief Plaintiffs seek in any way change candidates' opportunities for coordination and association outside the context of the ballot. Subject only to campaign finance law limits, all candidates – whether or not supported by party leadership – can give and receive support from nongovernmental donors, volunteers, or organizations engaged in independent expenditures. But when the government takes on the mantle of an advocate for or against a primary candidate, it transgresses fundamental principles of ballot neutrality.

Notably, Defendants/Intervenor have already conceded that a slogan is sufficient for voters to identify who is associated and who is not associated. They claim that unbracketed candidates are not injured when they are placed on columns with candidates with whom they did not bracket, and with whom they did not want to associate, because their names appear with

94

different slogans. *See* AG Brief, ECF 53-1, p. 21 ("Voters could see what positions Plaintiffs were running for, and who Plaintiffs chose to associate or not associate with by virtue of the shared slogan."). They similarly claim that there was no injury to Conforti in Mercer County, even though she was featured in the same column as her opponent for the very same office, because they each had different slogans. *See id.* at p. 22 n.5. This argument alone totally and completely undermines any shred of justification for needing to visually align candidates at all, let alone doing so in a way that provides them a ballot advantage. There cannot be a double standard whereby a slogan is sufficient to recognize non-association of unbracketed candidates, but insufficient to identify association of bracketed candidates. In fact, what this emphasizes is that New Jersey's bracketing and ballot placement system is focused more on providing a ballot advantage to certain candidates over others, than it is about protecting associational rights.

In that vein, these laws and practices revolve around pivot point offices selected by county clerks. ECF 33, ¶ 69. Therefore, the state's interest is not just in preserving associational rights of candidates *generally*, and in doing so above and beyond use of the slogan through the additional effectiveness of visually aligning their names. Rather, more *specifically*, the more accurately-stated alleged state interest is in preserving associational rights of candidates who bracket with two freeholder/commissioner candidates, in some elections, in some counties, in some years, or with a Senate and/or Gubernatorial candidate, in other elections, in other counties, in different years. If that sounds like a ridiculous and absurd state interest to have to defend, perhaps it is because New Jersey's bracketing and ballot placement system is ridiculous and absurd. Indeed, not all ballot associations are treated equally in New Jersey primary elections. Only those bracketing requests with pivot point candidates – decision as to the office used is not made until after petitions and bracketing requests are submitted – are entitled to preferential

ballot treatment. *Id.* at ¶¶ 72, 77-78. By contrast, bracketing requests with non-pivot point candidates are not entitled to preferential ballot position, and risk relegation to Ballot Siberia, ballot gaps, etc. *Id.* at ¶¶ 79-80.

Furthermore, the additional effects of visually aligning names of candidates often sends confusing signals to voters about associations. For example, what message is sent to voters when a candidate for one office is listed in the same column as a candidate for a different office, with whom they did not bracket and did not wish to associate? *See, e.g.*, *id.* at ¶¶ 134, 137, 139. What message is being communicated to voters when Conforti and her opponent are listed in the same column on the county line in Mercer, when voters could only vote for one candidate? *See id.* at ¶¶ 114-15. What message is being communicated to voters when Conforti, who was featured on the county line for her county committee race in Monmouth, is featured in the same column as her opponent in her congressional race? *See id.* at ¶¶ 144, 202. Is a voter to believe that she wanted to associate with her opponent, that she did not want to associate with herself, or that she held common beliefs as her opponent with respect to her county committee candidacy, but did not hold common beliefs with herself with respect to her congressional candidacy? What message is being communicated when congressional candidate Chris Smith brackets with Senate candidate Hirsh Singh in Ocean County, but then brackets with Singh's opponent, Rikin "Rik" Mehta in Monmouth County? *Compare* Exh. A, ECF 33-1, p. 49 (Singh and Smith bracketed in Ocean County), *with id.* at p. 43 (Mehta and Smith bracketed in Monmouth County). Are we to believe that Smith shared common beliefs with Singh in Ocean, but then lost those common beliefs and shared new common beliefs with Mehta in Monmouth? Or vice-versa? These small handful of a myriad of like examples reinforce that the preferential ballot treatment and visual alignment of candidate names for certain bracketed candidates, as compared to the haphazard

96

chaos applied to unbracketed candidates has more to do with providing an advantage to certain favored candidates than it does with respecting nonsensical associational rights, which are not even applied on an equal basis.

Moreover, as to the *strength* of the state interest, the ballot itself is not meant to be a forum for candidate expression. *See Burdick*, 504 U.S. at 438 (purpose of primary election ballot was to select a candidate and the ballot's constitutional function was not meant to provide "a more generalized expressive function"). There is no First Amendment right to use a ballot for expressive purposes. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 453 n.7 (2008) ("The First Amendment does not give political parties a right to have their nominees designated as such on the ballot."); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 362-63 (1997) (upholding fusion ban as political parties did not have a right to use the ballot to convey a particularized message as "[b]allots serve primarily to elect candidates, not as forums for political expression."); *Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329, 336 (6th Cir. 2016) (upholding law that prevented judicial candidates from appearing on the general election ballot with their party affiliations because "a political party has no First Amendment right to use the general-election ballot for expressive activities" and "has no right to use the ballot itself to educate voters"); *cf. Cook v. Gralike*, 531 U.S. 510, 525 (2001) (state cannot use ballot to bring one piece of information to attention of voters and thereby highlight that information or issue as paramount).

If New Jersey's bracketing and ballot placement laws were found to be unconstitutional, it would have no impact on the ability of the county party committee to endorse candidates in a primary election. *Cf. Eu v, S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214 (1989) (striking down California's primary endorsement ban); *Batko v. Sayreville Democratic Org.*, 373 N.J.

Super. 93 (App. Div. 2004) (striking down New Jersey's primary endorsement ban). County committees would remain free not only to endorse candidates, but to advertise endorsements publicly, fundraise for such candidates, have endorsed candidates campaign together, and utilize other means to educate the public about their endorsements. *Cf. Husted*, 814 F.3d at 335 (law prohibiting judicial candidates from appearing on general election ballot with their party affiliation presents only a minimal burden "because political parties and judicial candidates remain free to provide, and voters remain free to receive, a plethora of information regarding whether a given candidate affiliates with or is endorsed by a particular political party" and "a political party has no First Amendment right to designate its nominee on the general-election ballot and because a party has many other opportunities to champion its nominee and educate voters."). Taking into consideration that candidates in New Jersey primaries already have the ability to associate directly on the ballot itself through use of a common slogan*, see N.J.S.A.* 19:23-17, there is no justification for using the ballot to further communicate an association in such a way as to provide significant structural advantages and disadvantages, and it is certainly not *necessary* to burden Plaintiffs' rights accordingly. *See Anderson*, 460 U.S. at 789 (after weighing burdens and state interests, courts must also take into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights").

### 4. The New Jersey State Cases Cited by Defendants Should be Disregarded by the Court or Otherwise Assigned Little to No Value.

Defendants spend considerable time discussing cases about bracketing and ballot placement in New Jersey state court. These cases are inapplicable, decided under different standards, wrongly decided, and/or not persuasive. More importantly, state court decisions, to the extent they interpret the U.S. Constitution, are not binding on a federal court. *Surrick v. Killion*,

449 F.3d 520, 535 (3d Cir. 2006) ("[D]ecisions of the [State] Supreme Court do not bind this Court with respect to federal law . . . .").

The majority of these state cases were decided decades ago, and did not address the constitutionality of New Jersey's bracketing and ballot placement system, but instead addressed how the state law should be interpreted, and what extent of discretion a county clerk was permitted under the statutes at issue. *See generally Richardson v. Caputo*, 46 N.J. 3 (1965); *In re Hoffman*, 134 N.J.L. 155 (1946); *Hawkes v. Gates*, 129 N.J.L. 5 (1942); *Moskowitz v. Grogan*, 101 N.J. Super. 111 (App. Div. 1968); *Farrington v. Falcey*, 96 N.J. Super. 409 (App. Div. 1967); *Harrison v. Jones*, 44 N.J. Super. 456 (App. Div. 1957); *Bado v. Gilfert*, 13 N.J. Super. 363 (App. Div. 1951). Furthermore, these cases were decided when New Jersey's primary endorsement ban was still in effect, which prohibited political parties from endorsing candidates in a primary election. *Cf. Batko*, 373 N.J. Super. 93 (striking down primary endorsement ban in 2004). The singular case that did discuss constitutionality was nevertheless decided well before the current *Anderson/Burdick* balancing test was announced by the Supreme Court of the United States. *See Quaremba v. Allan*, 67 N.J. 1 (1975).

*Quaremba* relied heavily on the above state court cases dealing with statutory interpretation. As to constitutionality, the court appeared to focus on two standards, neither of which remain applicable and/or dispositive in a challenge under the First and Fourteenth Amendment under today's standards. The court first looked for intentional and purposeful discrimination on the part of the county clerk, and then looked to determine if the county clerk's discretion was "rooted in reason." *See id.* at 16. These analyses are focused more on the specific actions of the discretion exercised by the county clerk, than on the constitutionality of the law more generally. They also suggest loose applications of standards similar to strict scrutiny or

99

rational basis, with nothing in between. Today's standard for equal protection challenges goes beyond a simple determination of intentional discrimination. Instead, it calls for careful considerations of the burdens and of the state interests, and requires that any state interest be sufficiently weighty to justify the imposition of the burdens. *See Crawford*, 553 U.S. at 191 (quoting *Norman v. Reed*, 502 U.S. 279, 288-89 (1992)). Thus, the analysis is not limited to a determination of whether a county clerk's action was merely rooted in reason, which is essentially a rational basis determination. Moreover, *Quaremba* did not involve a complex constitutional challenge under the theories developed in this case, and thus, the specific issues arising from the claims in this matter have never been decided.

The more recent state court cases that address bracketing, also dealt in part with interpretation of state law, and particularly *N.J.S.A.* 19:23-26.1. *See, e.g.*, *Schundler v. Donovan*, 377 N.J. Super. 339 (App. Div. 2005), *aff'd*, 183 N.J. 383 (2005). In *Schundler*, the court was faced with the issue of interpreting the intersection of *N.J.S.A.* 19:23-26.1, which called for gubernatorial candidates to all be featured on the first line of the ballot, and *N.J.S.A.* 19:49-2, which calls for bracketing requests to run through joint petition county candidates, taking into consideration court decisions like *Moskowitz v. Grogan*, which held that state candidates who were not affiliated with joint petition county candidates could not draw for position as against those who were affiliated with county candidates. Making matters more complicated, the court was faced with a situation where the physical limitations of the ballot made it impossible to fit all seven of the gubernatorial candidates on the first column or row. *See* 377 N.J. Super. at 344.

*N.J.S.A.* 19:23-26.1 prescribes three requirements with respect to primary elections involving candidates for United States Senator and Governor: (1) the names of all candidates for United States Senator or Governor had to be printed on the first column of the ballot; (2) in an

election where both of these offices were on the ballot, the names of the candidates for United States Senator should be printed in the first column and the names of the gubernatorial candidates should be printed in the second column; and (3) no candidates for any other office should be featured on the ballot in the same column as candidates for United States Senator or Governor. While a prior Law Division opinion found that the whole statute was unconstitutional, *see Lautenberg v. Kelly*, 280 N.J. Super. 76 (Law Div. 1994), the law was never repealed by the Legislature, and thus the Appellate Division in *Schundler* undertook its own constitutional review. *See Schundler*, 377 N.J. Super. at 346-47. The court proceeded to find that the first two components of *N.J.S.A.* 19:23-26.1 were constitutional, and evidenced a legislative intent to treat senatorial and gubernatorial candidates with integrity and fairness, and that "equality of treatment among candidates for the same office is a linchpin of that idea." *Id.* at 348. Thus, the court held that county clerks must try to effectuate these principles "to the greatest extent possible." *Id.*

The court then held that the third component of *N.J.S.A.* 19:23-26.1 was unconstitutional because it was at odds with associational rights articulated by the Supreme Court in *Eu*. *See id.* The court then held that the county clerks had to make "a fair effort to follow the dictate that all candidates for the highest office, *i.e.*, U.S. Senator or Governor, be treated equally to the extent physical constraints allow, as long as, at the same time, a good faith effort is made to effect the expressive rights of all candidates," and further noted that "[w]ell considered choices" by county clerks based on "decent effort[s]" to balance these ends would be sustainable. *See id.* The court further stated that due to the physical limitations of the ballot based on seven gubernatorial candidates in the election at issue, a ballot draw and bracketing will provide some candidates with "a more substantial advantage in ballot position than any decent notion of even treatment

allows," while "other, non bracketed, candidates will be shunted off to obscure columns of the ballot." *See id.* at 348-49. The court then quickly noted that in more typical elections with less candidates for the top office on the ballot, bracketing should not interfere with the ability to treat all candidates for the top office equally. *See id.* at 349. Thus, the court held that for the gubernatorial election, a single drawing had to occur between those candidates for governor, "without so extraneous a consideration as bracketing or non-bracketing as the beginning point." *Id.*

In striking down the third component of *N.J.S.A.* 19:23-26.1, the court severely overstated the breadth of the *Eu* decision, relying on *Eu* to claim that "[t]he First Amendment protects the free speech and associational rights of every candidate in a primary election *to declare a ballot affiliation* with any other candidate, or to designate his or her choice not to affiliate." *See id.* at 348 (emphasis added). It then referred to *Eu* as requiring bracketing "as a matter of constitutional imperative." *Id.* However, this unjustified major expansion of the principles in *Eu* are not supported by the decision itself and are at odds with common sense.

*Schundler* rests on the faulty premise that the principles in *Eu* apply to the ballot itself. *See id.* (claiming *Eu* recognized a First Amendment right to "declare a ballot affiliation with any other candidate"). However, nowhere in the *Eu* decision is bracketing ever discussed, nor is there any indication anywhere in that opinion that the associational principles set forth in that case apply to the *ballot* itself. Nor did *Schundler* explain any basis for leaping to such conclusion that the breadth of the principles in *Eu* extend to the *ballot*. Instead, *Eu* dealt with associational rights regarding the ability of a political party to endorse a candidate in connection with a primary election, and the right of a party to govern its internal affairs.

102

The validity of the court's conclusions about bracketing in *Schundler* is also severely undermined by experience within and outside of New Jersey. If *Eu* required bracketing "as a matter of constitutional imperative," then it follows that bracketing would have to be required in every state. However, no other states organize their primary election ballots the way New Jersey does in this regard. ECF 33, ¶ 3. Indeed, almost every state uses office block ballots (bubble ballots) in their primary elections, which do not even allow for bracketing. *See id.* at ¶ 4. Plaintiffs submit that perhaps it is not the other 49 states and the District of Columbia that are violating the Constitution by not allowing for bracketing in primary elections, but instead the single state of New Jersey which requires bracketing requests to be honored in such way as to treat candidates for the same office unequally and unfairly, and thereby undermine the integrity of the election. Moreover, not even all the county clerks in New Jersey allow for bracketing in partisan primaries, and Salem and Sussex counties in particular have not bracketed candidates. *Id.* at ¶¶ 67-68.

These considerations make clear that the entire premise of bracketing being required as a constitutional right is simply misguided. The continuation of this premise significantly burdens Plaintiffs' rights, and the failure to treat them equally based on such a faulty premise perpetuates an injustice and continues to injure rights of candidates and the voters who support them, in violation of constitutional precepts.

**C.  New Jersey's Bracketing and Ballot Placement System Runs Afoul of the Elections Clause of the United States Constitution.**

Plaintiffs' Elections Clause claims, like their other claims, are supported by adequately pleaded facts sufficient to defeat a motion to dismiss.

Article I, Section 4, Clause 1 of the United States Constitution (hereinafter the "Elections Clause") states as follows: "The Times, Places and Manner of holding Elections for Senators and

Representatives, shall be prescribed in each State by the Legislature thereof; but Congress may at any time make or alter such Regulations, except as to the Place of chusing [sic] Senators." The Elections Clause is the only delegation of power granted to the States over congressional elections, and this exclusive delegation of power does not provide for any State authority over congressional elections outside of regulating the time, place, and manner of such elections. *See Cook v. Gralike*, 531 U.S. 510, 522-23 (2001). While this grant of authority to the states is broad, it is limited to procedural regulations. *Id.* at 523.

In *Cook*, the Supreme Court considered an amendment to the Missouri state constitution adopted by voters which required a notation to be printed on both primary and general election ballots next to congressional and senatorial candidates who failed to take certain actions in support of placing terms limits on members of the United States Senate and House of Representatives, and/or who refused to take a pledge with respect to term limits in the event they get elected (hereinafter "Term Limit Amendment"). *See id.* at 513-15 (citations omitted). The notations would state the following, respectively: "DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS," and/or "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS." *See id.* at 514 (citations omitted). The Petitioner claimed that the Term Limit Amendment merely regulated the manner of holding elections by providing information related to the congressional candidates, and therefore fell within the power delegated to the States by the Elections Clause. *See id.* at 523. However, the Court disagreed, finding that the Term Limit Amendment was not a procedural regulation. *See id.*

The Court reiterated its prior precedent that the scope of the powers delegated to the States under the Elections Clause was limited to procedural regulations and was not meant to be "'a source of power to dictate electoral outcomes, to favor or disfavor a class of candidates, or to

evade important constitutional constraints.'" *Id.* (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 833-34 (1995)). The Court found that the Term Limit Amendment was not a procedural regulation, as it clearly was not a time or place regulation, nor did it regulate the manner of holding elections. *Id.* The Court found that the term "manner" included matters such as "'notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns.'" *See id.* at 523-24 (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)). Thus, the Court found that the Term Limit Amendment did not fall within the types of procedural regulations "'which experience show are necessary in order to enforce the fundamental right involved,' ensuring that elections are 'fair and honest,' and that 'some sort of order, rather than chaos, is to accompany the democratic process.'" *Id.* at 524 (citations omitted).

Instead, the Court found that the Term Limit Amendment was "plainly designed to favor candidates who are willing to support the particular form of a term limit amendment set forth in its text and to disfavor those who either oppose term limits entirely or would prefer a different proposal." *Id.* This finding was based on the fact that the Term Limit Amendment "attaches a concrete consequence to noncompliance" which manifests itself on the primary and general election ballots. *See id.* The Court recognized that the labels operate in the sense of appearing harmful or negative, and as a sanction or penalty for candidates who fail to comply with the Term Limit Amendment's conditions, further acknowledging the "substantial political risk" imposed by the ballot labels on such candidates. *See id.* at 525. In fact, the Court further found that "the adverse labels handicap candidates 'at the most crucial stage in the election process – the instant before the vote is cast.'" *Id.* (quoting *Anderson v. Martin*, 375 U.S. 399, 402 (1964)). Furthermore, the Court found that it directed voters' attention to a single issue or consideration,

implying that such issue/consideration was important and paramount, which would influence voters to cast their vote against those candidates who were disfavored with the negative label. *See id.* Although the Court was unable to determine exactly how much a candidate was disadvantaged by the Term Limit Amendment, it nevertheless held that "the labels surely place their targets at a political disadvantage to unmarked candidates for congressional office," and thus was not a procedural regulation, but one that attempted to "'dictate electoral outcomes.'" *See id.* at 525-26 (quoting *Thornton*, 514 U.S. at 833-34). Therefore, the Court held that the Term Limit Amendment was not authorized by the Elections Clause.

A finding that New Jersey's bracketing and ballot placement system violates the Elections Clause is not tied to the *Anderson/Burdick* balancing test. Here, there does not appear to be any legitimate argument that New Jersey's primary election ballots regulate the time or place of holding an election. As to regulating the manner of holding elections, as in *Cook*, New Jersey's bracketing and ballot placement laws do exactly what the Elections Clause prohibits: it dictates election outcomes and favors and disfavors classes of candidates. The list of items that the Court in *Cook* and prior courts deciding Elections Clause cases viewed as procedural all have something in common: they are meant to apply neutrally, and not to bestow an advantage to some candidates over others. In comparison, New Jersey's primary election ballots provide an advantage to bracketed and party-endorsed candidates, and disadvantage to unbracketed candidates in the ways described herein, *see generally supra* at 21. *See also* ECF 33, ¶¶ 78-80. New Jersey's system is the antithesis of the reasons set out in *Cook* to maintain procedural regulations: fairness, honesty, order, and the prevention of chaos.

New Jersey's laws were plainly made to favor candidates who bracket with pivot point candidates as determined by county clerks, and to disadvantage anyone else, including those

bracketed with non-pivot point candidates and those who are unbracketed and do not wish to associate with such pivot point candidates. As in *Cook*, the advantages and disadvantages flow from a concrete benefit provided to bracketed candidates, as well as a concrete consequence attached to candidates who choose not to bracket with a pivot point candidate, and are thus precluded from ever obtaining the first ballot position. *Id.* at ¶¶ 78-80. This certainly operates as a sanction or penalty for not associating with such candidates, and candidates who do not bracket accordingly submit themselves to substantial political risk for not doing so. *Id.* at ¶ 196. Moreover, because these consequences attach on the ballot itself, it handicaps unbracketed candidates at the most critical stage of the election process, right before voters cast their votes.

By having advantages and disadvantages flow from which candidates are associated with pivot point candidates, New Jersey's bracketing and ballot placement system highlights this one single consideration as important and paramount, and influences voters by drawing their attention to and influencing them to vote for the bracketed candidates, and particularly so for candidates on the county line, and away from unbracketed candidates relegated to Ballot Siberia. *Id.* at ¶¶ 96, 99. For example, depending on the office used as the pivot point, the ballot places emphasis on whether a town council candidate was aligned with a particular candidate for United States Senator, which would be the sole reason for displaying one town council candidate in prime ballot position and in a visually presentable column running with other candidates versus being relegated to Ballot Siberia.

Importantly, the Attorney General's Office, who intervened on behalf of the State to defend the constitutionality of these laws, readily admits that such laws and practices do not "alter[] or add[] to the times, places and manner of holding elections for U.S. Senate or House of Representatives." *See* ECF No. 53-1, at p. 30. On that basis alone, it is clear that New Jersey's

bracketing and ballot placement system violates the Elections Clause. *See Cook*, 531 U.S. at 523 n.18 ("Petitioner once shared our belief, when, in deposition testimony before the District Court, she admitted that Article VIII does not regulate the time, place, or manner of elections.").

## **CONCLUSION**

When a state implements, regulates, and subsidizes primary elections, it may not use the ballot to favor some candidates while disfavoring others. New Jersey's primary election ballot design laws force candidates to engage in a rigged system which allows some candidates to get a head start while others get tripped at the starting line. Regardless of the winner of such an election, the undisputed loser will always be the voters whose participation has been diminished or muted, thereby threatening public confidence in our elections through arbitrary and discriminatory election administration.

For the foregoing reasons, all Defendants' and Intervenor's motions to dismiss should be denied.

Respectfully submitted,

BROMBERG LAW LLC                                WEISSMAN & MINTZ

By: _____                     By: _____
Brett M. Pugach, Esq.                                  Flavio Komuves, Esq.

By: _____
Yael Bromberg, Esq.

Dated: May 24, 2021