## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## VICINAGE OF TRENTON

| | | |
|---|---|---|
| CHRISTINE CONFORTI, ARATI KREIBICH, MICO LUCIDE, JOSEPH MARCHICA, KEVIN MCMILLAN, ZINOVIA SPEZAKIS, and NEW JERSEY WORKING FAMILIES ALLIANCE, INC., | ) ) ) ) | HON. ZAHID N. QURAISHI, U.S.D.J. Civil Action No. 20-8267 (ZNQ-TJB) |
| Plaintiffs, | ) | |
| v. | ) | Civil Action |
| CHRISTINE GIORDANO HANLON, in her Official capacity as Monmouth County Clerk, SCOTT M. COLABELLA, in his official capacity as Ocean County Clerk, PAULA SOLLAMI COVELLO, in her official capacity as Mercer County Clerk, JOHN S. HOGAN, in his Official capacity as Bergen County Clerk, EDWARD P. MCGETTIGAN, in his official capacity as Atlantic County Clerk, and E. JUNIOR MALDONADO, in his official capacity as Hudson County Clerk, | ) ) ) ) ) ) ) | (Electronically Filed) |
| Defendants. | ) | |

---

### BRIEF IN SUPPORT OF MOTION TO WITHDRAW AS INTERVENOR ON BEHALF MATTHEW PLATKIN, ATTORNEY GENERAL OF NEW JERSEY

---

MATTHEW J. PLATKIN
Attorney General of New Jersey

Jeremy M. Feigenbaum
 *Solicitor General*
Angela Cai
 *Deputy Solicitor General*
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, New Jersey 08625
(862) 350-5800
jeremy.feigenbaum@njoag.gov

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ...................................................................................................1

ARGUMENT ........................................................................................................2

CONCLUSION .....................................................................................................5

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                      **Page(s)**

*Am. Trucking Ass'n, Inc. v. New York State Thruway Auth.*,
  795 F.3d 351 (2d Cir. 2015)..................................................................................3, 4

*Pennhurst State Sch. & Hosp. v. Halderman*,
  465 U.S. 89 (1984)..................................................................................................4

**Statutes**

28 U.S.C. § 2403 ............................................................................................... 1, 2, 3

**Court Rules**

Fed. R. Civ. P. 5.1 ............................................................................................. 1, 2, 3

**Other Authorities**

The Judiciary Act of 1937, 51 Harv. L. Rev. 148 (1937)..........................................3

## PRELIMINARY STATEMENT

On March 17, 2024, the Attorney General advised this Court in a related matter, *Kim v. Hanlon*, No. 24-cv-1098, Dkt. 149 (D.N.J.), of his decision not to intervene to defend the constitutionality of the challenged New Jersey statutes regarding primary ballot design and bracketing of candidates.  As discussed in that letter, the Attorney General has determined that the Office cannot defend these statutes because he has concluded they are unconstitutional.  As such, it would no longer be appropriate for him to participate as "a party" to defend the "constitutionality of [these] statute[s]" in this matter.  28 U.S.C. § 2403(b); *see also* Fed. R. Civ. P. 5.1(c).  Other defendants remain parties to this case, thus preserving this Court's plenary authority to render the ultimate decision regarding the constitutional question presented.

## BACKGROUND

As the Attorney General explained in *Kim*, after reviewing the record, he has concluded that his Office's prior intervention to defend the constitutionality of New Jersey's bracketing statutes is no longer warranted.  The Attorney General attaches that same analysis as the background to this motion, because the identical analysis likewise applies to this related matter.  *See* Ex. A.

## **ARGUMENT**

The Attorney General's withdrawal from this case is proper. When the instant case was at the pleadings stage, the Attorney General moved to intervene pursuant to Federal Rule 5.1(c) and 28 U.S.C. § 2403(b) to defend the challenged statutes. *See* Dkts. 52, 52-1 (Mar. 9, 2021). Since then, several events have transpired. This Court has issued a decision granting in part and denying in part motions to dismiss, focusing both the parties and the Attorney General on the evidence in this case. *See* Dkt. 111 (May 31, 2022). The parties have proceeded to the discovery phase. *See* Dkts. 176, 182 Scheduling Orders. Finally, a related case, *Kim v. Hanlon*, No. 24-cv-1098 (D.N.J.), was filed, presenting an evidentiary record that bears on the same issues as presented in this case. As laid out in Ex. A, in light of those developments, including the evidence in *Kim*, the Attorney General has concluded that the statutes are not constitutional and thus that the continued defense of them is not appropriate. Nothing prevents the Attorney General from withdrawing a prior intervention, especially when the very rationale for his participation no longer exists.

The decision to withdraw the prior intervention, rather than to remain a party, is particularly appropriate given the nature and structure of the federal intervention laws themselves. As originally enacted, 28 U.S.C. § 2403(b) was designed to ensure that the Attorney General had an opportunity to *defend* the validity of a statute before a court declared that statute unconstitutional—not an opportunity to intervene to ask

that one be invalidated. *See, e.g.*, The Judiciary Act of 1937, 51 Harv. L. Rev. 148, 148-149 (1937) (discussing predecessor statute providing federal attorney general intervention as of right). That dichotomy remains true today. *See* Fed. R. Civ. P. 5.1(c) (granting Attorney General a 60-day right to intervene before the federal court can "hold[] the statute unconstitutional," but allowing the federal court to reject the same constitutional challenge before the Attorney General weighs in). But now that the Attorney General has declined to defend the constitutionality of the statute, there is no reason to retain "all the rights of a party," 28 U.S.C. § 2403(b), such as to take evidence or present argument in defense of that statute. In line with that framework, although prior New Jersey Attorneys General have in extraordinary circumstances declined to defend state statutes from federal constitutional challenge and provided the reasons for their decision, this Office is aware of no case in which the Attorney General affirmatively intervened in federal court to seek to invalidate a state law.

Importantly, granting the withdrawal motion will in no way interfere with this Court's plenary authority to render the ultimate decision regarding the constitutional questions presented. Seven county clerks, who are charged with the enforcement of these state statutes (unlike the Attorney General or the Secretary of State), remain in the case. Seven county party committees also remain as intervenors to defend the statutes and practices at issue. The Attorney General's participation as a party is not required under these circumstances. *See, e.g.*, *Am. Trucking Ass'n, Inc. v. New York*

*State Thruway Auth.*, 795 F.3d 351, 359 (2d Cir. 2015) (noting "[n]o precedent supports th[e] view" the State is a necessary party to a challenge against the validity of its laws).[1]  Instead, because the Attorney General concluded based on the evidence that the challenged statutes are unconstitutional, withdrawal is appropriate.

## **<u>CONCLUSION</u>**

For these reasons, this Court should grant the motion to withdraw.

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:    s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum

Date: March 20, 2024

---

[1] The Atlantic and Hudson County Clerks have filed a crossclaim against "any/ all other defendants" under the New Jersey Joint Tortfeasor's Contribution Act and the New Jersey Tort Claims Act.  *See* Dkts. 129 at 23-24; 134 at 43.  It is unclear whether the crossclaim was filed against any intervenor.  But in any event, this action is one for prospective and declaratory relief only, *see* Dkt. 33 at 55-57, and the State enjoys sovereign immunity over any claim for monetary relief, including state-law claims for monetary relief filed in federal court. *See, e.g.*, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

# EXHIBIT A



### *State of New Jersey*

OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
PO BOX 080
TRENTON, NJ 08625-0080

March 17, 2024

**VIA ECF**

Honorable Zahid N. Quraishi, U.S.D.J.
United States District Court
Clarkson S. Fisher Building
402 East State Street
Trenton, New Jersey 08608

      Re:    ***Kim et al. v. Hanlon et al.*, No. 24-cv-1098 (ZNQ)(TJB)**

Judge Quraishi:

Federal Rule of Civil Procedure 5.1(c) expressly provides the Attorney General 60 days to decide whether to intervene in a federal action challenging the constitutionality of a state statute. The Attorney General writes to inform this Court of his decision not to intervene in this matter— and to confirm he is waiving the remainder of that 60-day period—and to provide the reasons for that decision. In light of the evidentiary record, the Attorney General has concluded that the challenged statutes are unconstitutional and therefore will not be defending them.

I

New Jersey's system of ballot design for primary elections is unique across the Nation. The system, referred to as the "county line," is the result of intersecting statutes, judicial decisions, and discretionary practices that have developed over time.

Three statutes lay out the basic parameters for primary ballot design in New Jersey. First, N.J. Stat. Ann. § 19:49-2 provides both for the use of a grid ballot for primary election ballots voted via voting machine and establishes that candidates may bracket together on a single line. Second, N.J. Stat. Ann. § 19:23-26.1 provides special rules for primary ballot positions of United States Senate and Governor candidates. Finally, N.J. Stat. Ann. § 19:23-24 sets the general rules for random ballot draws to determine the ballot positions of primary candidates.

Conditions have subsequently altered the real-world impact of those statutes. For most of the twentieth century, including when the bracketing law was first enacted, L. 1941, ch.163, § 1, New Jersey prohibited political parties from endorsing primary candidates. *See* L. 1930, c. 187, at



905, *codified as* N.J. Stat. Ann. § 19:34-52 ("It shall be unlawful for any State, county or municipal committee of any political party prior to any primary election to endorse the candidacy of any candidate for a party nomination or position."). But in 1989, the Supreme Court held such primary endorsement bans unconstitutional, *see Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989), paving the way for official party endorsements to appear and for the party's desired candidates to be bracketed as the "county line" on New Jersey's primary ballots. *See Batko v. Sayreville Democratic Org.*, 860 A.2d 967, 972 (N.J. App. Div. 2004).

Nor was that the only intervening development: statewide candidates for U.S. Senate and Governor were at one time excluded from bracketing, *see* N.J. Stat. Ann. § 19:23-26.1, but later became a core part of the county line system. Indeed, while the Legislature had prohibited Senatorial and Gubernatorial candidates from bracketing with other candidates, New Jersey state courts subsequently invalidated that provision—thus allowing Senatorial and Gubernatorial candidates to be bracketed with down-ballot candidates, including on any endorsed "county line." *Schundler v. Donovan*, 872 A.2d 1092, 1099 (N.J. App. Div.), *aff'd*, 874 A.2d 506 (N.J. 2005).

Further, because these state statutes afford wide discretion in designing the grid ballot, real-world practices illustrate the impact of the "county line." State statutes afford significant discretion over how to lay out the ballot in the face of physical limitations inherent in a grid format and significant discretion over the sequence of offices selected for a ballot draw—known as the pivot position. As a result, it is often impossible for unbracketed, non-pivot office candidates to secure an earlier position on the ballot compared to their bracketed competitors.[1] These features of grid balloting and bracketing also have allowed unbracketed candidates to be placed at the end of a ballot with multiple blank spaces separating them from their competitors, which creates the phenomenon known as "ballot Siberia." And these features have allowed for candidates who have *not* bracketed together—or are running against each other—to be grouped on the same line.[2]

## II

Although 28 U.S.C. § 2403(b) and Fed R. Civ. P. 5.1(c) afford the Attorney General the unqualified opportunity to defend these statutes, the Attorney General has concluded based on review of this record that the evidence does not provide a basis for intervening to defend their constitutionality. That factual and expert record, which did not exist when the Attorney General's Office filed briefs defending these statutes in *Conforti v. Hanlon*, No. 20-8267 (D.N.J.), and *Mazo v. Durkin*, No. 20-8336 (D.N.J.), lacks contrary evidence. Indeed, in the multiple years since these state statutes were challenged in this Court, the Attorney General has not identified reliable empirical evidence countering this record evidence, including after reviewing the filings of the other parties in this very case. As such, the Attorney General will not be intervening to defend these statutes.

---

[1] *See* Dkt. 1-2, Pasek Rpt. 21-24 (collecting evidence that outcomes of these draws are inconsistent with random selection, and that the draws do not consistently use the same pivot office, leading to disparate practices).

[2] *See* Pasek Rpt. 21-24, 70-71; Dkt. 1-3, Rubin Rpt. 27.



As this Court has explained, these constitutional issues turn on the evidence regarding both the burdens imposed by this ballot layout and the government interests these state statutes do or do not advance. *See Conforti*, 2022 WL 1744774, at \*17 (D.N.J. 2022) (emphasizing importance of evidence in evaluating ballot position effects); *see also Democratic-Republican Org. of N.J. v. Guadagno*, 900 F. Supp. 2d 447, 458 (D.N.J. 2012) (same). Under the *Anderson-Burdick* test, it is the obligation of "the reviewing court to (1) determine the 'character and magnitude' of the burden that the challenged law imposes on constitutional rights, and (2) apply the level of scrutiny corresponding to that burden." *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 136 (3d Cir. 2022) (discussing *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992)). The Attorney General has carefully reviewed the available evidence regarding both the burdens and government interests, including the evidence in the record submitted in this case. That evidence dictates his decision on how to proceed.

As to the character and magnitude of the burden on voters' and candidates' constitutional rights, the record in this case establishes an electoral advantage for candidates who bracket and a corresponding disadvantage for candidates who do not, imposing a burden on associational rights. That factual and expert record evidence includes historical data of primary results within the State;[3] an observational study that excludes confounding variables like endorsements;[4] and a randomized experiment of New Jersey primary voters.[5] These results are also consistent with the cognitive mechanisms experts have identified that would be expected to lead to these results.[6] Furthermore, as explained above, the grid ballot combined with a bracketing system enables the phenomenon known as "ballot Siberia"—where unbracketed candidates are placed at the end of a ballot, far from their competitors.

On the other side of the ledger, the record lacks evidence showing that these laws advance the relevant government interests; instead, the record confirms that they do not. Both observational and randomized experimental evidence alike show that voters are more likely to make errors when encountering grid ballots with bracketing than standard office-block ballots.[7] And the empirical and expert record calls into doubt that bracketing advances candidates' associational interests or voters' interests in identifying those associations. Because candidates are incentivized to bracket with candidates endorsed by the relevant county political party—given the structural advantages conferred by the county line—voters cannot be certain that the bracketing decisions reflect the true associational preferences of candidates. Moreover, the record evidence reflects multiple instances in which candidates who did *not* choose to associate together have been placed on the same line—

---

[3] *See* Rubin Rpt. 3-4, 11-12, 15-18; Dkt. 1-4, Wang Rpt. 2, 9-11.

[4] *See* Rubin Rpt. at 19-22; Wang Rpt. 12-13.

[5] *See* Pasek Rpt. 41-52.

[6] *See* Pasek Rpt. 28-37; Wang Rpt. 5-8, 14-15.

[7] *See* Pasek Rpt. 34-38, 71-72.



a phenomenon that can communicate inaccurate associations to voters, and is made possible only by use of a grid ballot that authorizes the bracketing of candidates.[8]

The widely-used office-block ballot, by contrast, avoids these concerns for candidates and voters alike, while still communicating candidates' legitimate associational interests. Office-block ballots permit candidates and factions to associate and to communicate those associations to voters via shared slogans, which may be printed on the ballot alongside candidate names. *See Mazo v. N.J. Sec'y of State*, 54 F.4th at 131-32 (upholding state statutes relating to slogans).[9] But whether or not candidates choose to associate with other candidates will have no bearing on their placement on the office-block ballot. Indeed, such ballots are uniformly used outside New Jersey; that New Jersey is the *only* State to use a grid ballot with a bracketing system for primary elections undermines the view that such a system "is necessary" to advance government interests. *Eu*, 489 U.S. at 226; *cf. Holt v. Hobbs*, 574 U.S. 352, 368-69 (2015). Moreover, that multiple New Jersey counties have declined to use a grid ballot with bracketing for machine voting or have used other kinds of ballots for other forms of voting likewise supports that the governmental interests can still be accomplished without the challenged statutes.[10]

### III.

Although the Attorney General traditionally defends all state statutes from constitutional challenge in any case in which there is any plausible basis to defend the law, *see* N.J. Stat. Ann. § 52:17A-4(g) (empowering Attorney General to "attend generally to all legal matters in which the State['s] rights or interests are involved"), nothing in New Jersey law prevents the Attorney General from "interpret[ing] a statute as unconstitutional" in exceptional cases. *Mech. Contractors Ass'n of N.J., Inc. v. State*, 605 A.2d 743, 749 (N.J. App. Div. 1992); *see also, e.g.*, *N.J. Highway Auth. v. Sills*, 263 A.2d 498, 501 (N.J. Ch. Div. 1970) ("That [the Attorney General] takes the position the statutes in question are unconstitutional is also within the scope of his powers and duties."). To take one example, the Attorney General will not defend a law—even if a plausible defense exists—if it infringes the executive branch's authority in violation of state separation of powers. *See Gen. Assembly of State of N.J. v. Byrne*, 448 A.2d 438, 440 (N.J. 1982).

This is an exceptional case, justifying the Attorney General's exceptionally rare decision not to defend the constitutionality of the challenged statutes. First, a central reason for the Attorney General's defense of state statutes is to implement the will of the democratic process that enacted them, but as explained above, subsequent court decisions and practices on the ground have

---

[8] *E.g.,* Rubin Rpt. 24-26, 29 (examples of primary ballots listing candidates on same line even though they did not bracket together or share a slogan).

[9] New Jersey's slogan statutes are fully compatible with an office-block ballot. N.J. Stat. Ann. §§ 19:23-17; 19:23-25.1. Indeed, the original slogan statute was enacted a decade before the original bracketing statute. *See* L. 1930 c. 187 at 798.

[10] *See* Rubin Rpt. 21-22 (machine voting); Dkt. 45, Melfi Cert. Ex. B (provisional ballots); Dkt. 95-1, Exs. A-H (office-block ballots for nonpartisan municipal elections).



overtaken the Legislature's original intent in enacting the challenged state statutes. Second, the traditional need for the Attorney General to defend the results of the democratic process does not apply neatly to a case where the plaintiffs produced substantial record evidence to challenge the statutes as undermining the democratic process. Third, New Jersey stands alone across the Nation in the use of bracketing for primary-election machine ballots, which further undermines the claim that these laws are necessary to advance the government interests on which the Attorney General would have relied. Fourth, no official that the Attorney General represents in court implements these laws, so there is no risk that any state agencies would simultaneously be enforcing but declining to defend a particular statute.[11] Finally, this Court has made clear in its prior decisions that the constitutional question at issue turns on the evidence. The Attorney General has concluded that the evidence presented does not support a defense of the constitutionality of these statutes.

For these reasons, the Attorney General declines to intervene to defend the statutes at issue in this case.[12] Consistent with that decision, the Attorney General will be moving to withdraw as intervenor in *Conforti v. Hanlon*, No. 20-8267 (D.N.J.). In *Mazo v. Durkin*, No. 20-8336 (D.N.J.), where the Secretary of State was improperly named as a defendant, the Attorney General will be seeking her dismissal from the case, because the discovery exchanged to date confirms that she does not administer or enforce any of the statutes at issue. *See, e.g.*, *Ex parte Young*, 209 U.S. 123, 157 (1908) (holding named "officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party"). But the Attorney General will not otherwise provide a defense of the challenged statutes on the merits in that case.

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

/s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum, Solicitor General
Angela Cai, Deputy Solicitor General


Cc: All counsel via ECF

---

[11] An executive official's duty to enforce, *see* N.J. Stat. Ann. § 52:17A-4(h), is distinct from its duty to defend. *See* Kate Shaw, *Constitutional Nondefense In The States*, 114 Colum. L. Rev. 213, 218 (2014). The Secretary of State does not enforce any of the statutes at issue here.

[12] Because the Attorney General will not be participating as a party, and because it does not bear on the intervention decision under 28 U.S.C. § 2403(b) and Fed R. Civ. P. 5.1(c), the Attorney General does not address *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), or any of the equitable factors that courts consider as part of a preliminary injunction application.

